IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

REDBOX AUTOMATED RETAIL, LLC,

                                    Plaintiff,

vs.

WARNER HOME VIDEO, a division of
WARNER BROS. HOME ENTERTAINMENT,
INC.,

                                    Defendant.

C.A. No. 09-613 (RBK)

## DEFENDANT WARNER HOME VIDEO'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)

Of Counsel:

Katherine B. Forrest
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
kforrest@cravath.com

Dated: October 1, 2009

Frederick L. Cottrell, III (#2555)
Anne Shea Gaza (#4093)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700
cottrell@rlf.com
gaza@rlf.com
*Counsel for Defendant*
*Warner Home Video*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................. iii

PRELIMINARY STATEMENT .............................................................................................. 1

NATURE AND STAGE OF PROCEEDINGS ........................................................................ 5

SUMMARY OF ARGUMENT .............................................................................................. 6

STATEMENT OF FACTS ...................................................................................................... 7

ARGUMENT ........................................................................................................................ 12

I.   REDBOX CANNOT STATE A SECTION 1 CLAIM BECAUSE IT HAS NOT
     ALLEGED ANY AGREEMENT OR COMMON SCHEME ........................................ 15

     A.   Warner's Unilateral Actions Do Not Support An Antitrust Claim
          Under *Colgate* and Its Progeny ....................................................................... 15

     B.   Redbox Has Not Plausibly Alleged Concerted Action Under
          *Twombly* and *Iqbal* ......................................................................................... 18

II.  REDBOX CANNOT STATE A SECTION 1 CLAIM BECAUSE IT HAS NOT
     ALLEGED PLAUSIBLE ANTICOMPETITIVE EFFECTS ......................................... 19

     A.   Redbox Has Not Alleged Anticompetitive Effects Within a
          Plausible Relevant Market .................................................................................. 19

          1.   Redbox's Definitions of the Relevant Market In This Case
               Are Untenable Under Prevailing Caselaw ................................................. 20

          2.   Redbox's Market Definition and Market Power Allegations
               Are Not Plausible Under *Twombly* and *Iqbal* ....................................... 24

          3.   Redbox Has Not Alleged—And Cannot Allege—Actual
               Anticompetitive Effects ............................................................................. 25

               a.   Redbox Has Not Plausibly Alleged a Reduction In Output ............ 26

               b.   Redbox's Allegations of "Inflated Prices" and "Consumer
                    Overcharge" Do Not Constitute Plausible Anticompetitive
                    Effects ............................................................................................. 28

               c.   Redbox's Allegations of "Reduced Consumer Choice" Do
                    Not Support Plausible Allegations of Anticompetitive
                    Effects ............................................................................................. 30

　　　　d.　Redbox Has Failed To Counter the Well-Settled Principle
　　　　　　That Vertical Nonprice Restraints Generally Enhance
　　　　　　Competition...................................................................................31

　　　　e.　Redbox Has Not Alleged Facts That Plausibly Suggest
　　　　　　Harm to Interbrand Competition Sufficient To Satisfy
　　　　　　*Twombly* and *Iqbal*..................................................................34

III.　REDBOX DOES NOT HAVE STANDING....................................................35

　　A.　Redbox Cannot Establish Antitrust Injury.........................................35

IV.　"COPYRIGHT MISUSE" IS NOT AN AFFIRMATIVE CLAIM.....................37

V.　REDBOX HAS FAILED TO STATE A CLAIM FOR TORTIOUS
　　INTERFERENCE..........................................................................................38

CONCLUSION................................................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Allen-Myland, Inc. v. IBM Co.,
33 F.3d 194 (3d Cir. 1994)............................................................................................22

Alvord-Polk, Inc. v. F. Schumacher & Co.,
37 F.3d 996 (3d Cir. 1994)............................................................................................15

Angelico v. Lehigh Valley Hosp., Inc.,
184 F.3d 268 (3d Cir. 1999)..........................................................................................36

Anheuser-Busch, Inc. v. G.T. Britts Distrib. Inc.,
44 F. Supp. 2d 172 (N.D.N.Y. 1999).......................................................................31, 36

Argos v. Orthotec LLC,
304 F. Supp. 2d 591 (D. Del. 2004)...............................................................................35

Ashcroft v. Iqbal,
129 S. Ct. 1937 (2009)...........................................................................................*passim*

Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters,
459 U.S. 519 (1983)..................................................................................................25, 35

Atlantic Richfield Co. v. USA Petroleum Co.,
495 U.S. 328 (1990)......................................................................................................36

Bell Atl. Corp. v. Twombly,
550 U.S. 544 (2007).................................................................................13, 14, 15, 34

Boyd v. Tempay,
No. 07-377, 2008 WL 5156307 (D. Del. Dec. 4, 2008) ..........................................17, 18

Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,
429 U.S. 477 (1977)......................................................................................................25

Buck v. Hampton Twp. Sch. Dist.,
452 F.3d 256 (3d Cir. 2006)............................................................................................7

Bus. Elecs. Corp. v. Sharp Elecs. Corp.,
485 U.S. 717 (1988)......................................................................................................31

Cable Holdings of Georgia, Inc. v. Home Video Inc.,
825 F.2d 1559 (11th Cir. 1987) ....................................................................................21

# TABLE OF AUTHORITIES

Page(s)

Carell v. Shubert Org., Inc.,
104 F. Supp. 2d 236 (S.D.N.Y. 2000)..................................................................................24

Cascade Cabinet Co. v. W. Cabinet & Millwork Inc.,
710 F.2d 1366 (9th Cir. 1983) ..............................................................................27, 28, 29

City of Pittsburgh v. West Penn Power Co.,
147 F.3d 256 (3d Cir. 1998).........................................................................................35

Continental T.V., Inc. v. GTE Sylvania Inc.,
433 U.S. 36 (1977)......................................................................................................31

Corning Inc. v. SRU Biosystems, LLC,
292 F. Supp. 2d 583 (D. Del. 2003)..............................................................................38

Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.,
854 F.2d 802 (6th Cir. 1988) ...............................................................................28, 33, 34

Diceon Elecs., Inc. v. Calvary Partners, L.P.,
772 F. Supp. 85 (D. Del. 1991)........................................................................................7

Discon Inc. v. NYNEX Corp.,
86 F. Supp. 2d 154 (W.D.N.Y. 2000).............................................................................30

E&L Consulting, Ltd. v. Doman Indus. Ltd.,
472 F.3d 23 (2d Cir. 2006), cert denied, 128 S. Ct. 97 (2007) .......................................30

Elder-Beerman Stores Corp. v. Federated Dept. Stores, Inc.,
459 F.2d 138 (6th Cir. 1972) .......................................................................................27

Fisher v. City of Berkeley, California,
475 U.S. 260 (1986)....................................................................................................29

Floors-N-More, Inc. v. Freight Liquidators,
142 F. Supp. 2d 496 (S.D.N.Y. 2001).............................................................................28

Fowler v. UPMC Shadyside,
No. 07-4285, 2009 WL 2501662 (3d Cir. Aug. 18, 2009) .........................4, 13, 14, 15

Geneva Pharm. Tech. Corp. v. Barr Labs Inc.,
386 F.3d 485 (2d Cir. 2004)..........................................................................................22

# TABLE OF AUTHORITIES

Gianna Enters. v. Miss World (Jersey) Ltd.,
    551 F. Supp. 1348 (S.D.N.Y. 1982).............................................................24, 26

Global Disc. Travel Servs., LLC v. Trans World Airlines, Inc.,
    960 F. Supp. 701 (S.D.N.Y. 1997) ..................................................................23

Graham v. Triangle Publ'ng, Inc.,
    233 F. Supp. 825 (E.D. Pa. 1964) ...................................................................18

Habitat Ltd. v. Art of the Muse, Inc.,
    No. 07-CV-2883, 2009 WL 803380 (E.D.N.Y. Mar. 25, 2009).....................27

IDT Corp. v. Building Owners & Managers Ass'n Int'l,
    No. 03-4113, 2005 WL 3447615 (D.N.J. Dec. 15, 2005).................13, 14, 19

Illinois Tool Works Inc. v. Indep. Ink, Inc.,
    547 U.S. 28 (2006)............................................................................................23

In re NAHC, Inc. Sec. Litig.,
    306 F.3d 1314 (3d Cir. 2002)............................................................................7

Int'l Logistics Group, Ltd. v. Chrysler Corp.,
    884 F.2d 904 (6th Cir. 1989) ..........................................................................17

Joyce Beverages v. Royal Crown Cola Co.,
    555 F. Supp. 271 (S.D.N.Y. 1983) ..................................................................27

K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.,
    61 F.3d 123 (2d Cir. 1995)...............................................................................19

Kestembaum v. Falstaff Brewing Corp.,
    575 F.2d 564 (5th Cir. 1978) ...........................................................................30

Klein v. Am. Luggage Works, Inc.,
    323 F.2d 787 (3d Cir. 1963).............................................................................17

Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,
    551 U.S. 877 (2007).......................................................................15, 32, 33

McGlinchy v. Shell Chem. Co.,
    845 F.2d 802 (9th Cir. 1988) ...........................................................................25

# TABLE OF AUTHORITIES

Monsanto Co. v. Spray-Rite Serv. Corp.,
  465 U.S. 752 (1984) .................................................................................................17

Nat'l Auto Brokers Corp. v. Gen. Motors Corp.,
  572 F.2d 953 (2d Cir. 1978) ....................................................................................27

NYNEX Corp. v. Discon, Inc.,
  525 U.S. 128 (1998) .................................................................................................18

O.S.C. Corp. v. Apple Computer, Inc.,
  792 F.2d 1464 (9th Cir. 1986) .................................................................................29

Omega Envtl., Inc. v. Gilbarco, Inc.,
  127 F.3d 1157 (9th Cir. 1997) .................................................................................27

Orson, Inc. v. Miramax Film Corp.,
  79 F.3d 1358 (3d Cir. 1996) ..............................................................................passim

PepsiCo v. Coca Cola Co.,
  No. 98 Civ. 3282, 1998 WL 547088 (S.D.N.Y. Aug. 27, 1998) ...........................22

Queen City Pizza, Inc. v. Domino's Pizza, Inc.,
  124 F.3d 430 (3d Cir. 1997) ..............................................................................passim

Rambus Inc. v. FTC,
  522 F.3d 456 (D.C. Cir. 2008), cert denied, 129 S. Ct. 1318 (2009) ....................30

Regency Oldsmobile, Inc. v. Gen. Motors Corp.,
  723 F. Supp. 250 (D.N.J. 1989) ..............................................................................18

Rick-Mik Enters., Inc. v. Equilon Enters., LLC,
  532 F.3d 963 (9th Cir. 2008) ...................................................................................23

Rome Ambulatory Surgical Ctr., LLC v. Rome Mem'l Hosp., Inc.,
  349 F. Supp. 2d 389 (N.D.N.Y. 2004) .....................................................................30

Rosenberg v. XM Ventures,
  129 F. Supp. 2d 681 (D. Del. 2001) ...........................................................................7

Ryko Mfg. Co. v. Eden Servs.,
  823 F.2d 1215 (8th Cir. 1987) .................................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

Satellite Television & Associated Res., Inc. v. Cont'l Cablevision of Virginia,
714 F.2d 351 (4th Cir. 1983) .....21

Seagood Trading Corp. v. Jerrico, Inc.,
924 F.2d 1555 (11th Cir. 1991) .....26, 27

Siegel Transfer, Inc. v. Carrier Exp., Inc.,
54 F.3d 1125 (3d Cir. 1995) .....16

Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.,
171 F.3d 912 (3d Cir. 1999) .....36, 37

Tampa Elec. Co. v. Nashville Coal Co.,
365 U.S. 320 (1961) .....19

Tennessean Truckstop, Inc. v. NTS, Inc.,
875 F.2d 86 (6th Cir. 1989) .....37

Theatre Party Assocs., Inc. v. Shubert Org., Inc.,
695 F. Supp. 150 (S.D.N.Y. 1988) .....23

Tops Mkts., Inc. v. Quality Mkts., Inc.,
142 F.3d 90 (2d Cir. 1998) .....20

Toscano v. PGA Tour, Inc.,
70 F. Supp. 2d 1109 (E.D. Cal. 1999) .....17

TV Commc'ns Network, Inc. v. Turner Network Television, Inc.,
964 F.2d 1022 (10th Cir. 1992) .....23

United States Land Resources, LP v. JDI Realty LLC,
No. 08-5162, 2009 WL 2488316 (D.N.J. Aug. 12, 2009) .....7

United States v. Colgate & Co.,
250 U.S. 300 (1919) .....16, 17

United States v. E.I. du Pont de Nemours & Co.,
351 U.S. 377 (1956) .....22

United States v. Visa U.S.A. Inc.,
163 F. Supp. 2d 322 (S.D.N.Y. 2001) .....25

# TABLE OF AUTHORITIES

Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc., 3
    42 F.3d 191 (3d Cir. 2003) .................................................................................38

Westman Commc'n Co. v. Hobart Int'l, Inc.,
    796 F.2d 1216 (10th Cir. 1986) ....................................................................32, 33

Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.,
    810 F.2d 243 (D.C. Cir. 1987) .........................................................................29

## Statutes & Rules

15 U.S.C. § 1 ...................................................................................... *passim*

Fed. R. Civ. P. 8 ......................................................................................14, 18

Fed. R. Civ. P. 12 .....................................................................................1, 6

Fed. R. Evid. 201 .........................................................................................7

## Other Authorities

5 Phillip E. Areeda & Herbert Hovenkamp, <u>Antitrust Law</u>, ¶ 533 .......................22

21 Phillip E. Areeda & Herbert Hovenkamp, <u>Antitrust Law</u>, ¶ 2131 .....................26

Defendant Warner Home Video ("Warner") respectfully submits this memorandum of law in support of its motion to dismiss the complaint filed by Plaintiff Redbox Automated Retail, LLC ("Redbox" or "Plaintiff") under Fed. R. Civ. P. 12(b)(6) for failure to state a claim for which relief can be granted.

## PRELIMINARY STATEMENT

Like other motion picture distributors, Warner licenses and sells DVDs according to specified terms through various distribution channels. Those distribution channels include wholesale distributorships and direct sale relationships with retailers and rental companies.

On August 13, 2009, Warner unilaterally announced to wholesalers a change in its terms of distribution for Warner DVDs. Warner announced that, beginning at the end of October 2009, it would license DVDs directly to kiosk rental companies and mail-order subscription vendors instead of selling indirectly to those companies through wholesalers. Warner made clear that it would unilaterally refuse to deal with wholesalers who did not honor its terms of sale and its direct dealing with kiosk rental companies. Warner also offered Redbox and other kiosk rental companies licensing terms subject to a 28-day window following initial DVD release.

Redbox, a kiosk rental company, responded to Warner's announcement of its new wholesale policy and its offer to Redbox of direct license terms by bringing this lawsuit, even though Redbox currently has direct distribution agreements with a number of major studios (such as Sony, Paramount and Lionsgate), and even though Redbox concedes that it obtains new-release DVD product through channels other than wholesalers.

By transforming a business negotiation relating to the terms with which it may deal with Warner into an antitrust suit, Redbox hopes to gain leverage at the bargaining table. Assisting one party over another in business negotiations is not the purpose of the antitrust laws. Nor are they meant to protect any particular merchant's margins or input costs. Indeed, the

antitrust laws are intended to protect competition and are indifferent to the fate of any particular merchant. It is therefore no surprise that Redbox's allegations against Warner fall far short of what is required to state an actionable claim.

Redbox's complaint against Warner is one of three lawsuits that it has now filed against movie studios (as the Court is aware, Redbox has also sued Universal Studios Home Entertainment and Twentieth Century Fox Home Entertainment for actions it claims they took with respect to distribution of their products). Redbox structures its complaint here similar to its action against Universal, asserting claims for antitrust violations, tortious interference with contract and copyright misuse. However, this case is different from the Universal case in a number of critical respects.

First, the factual allegations in Redbox's complaint against Warner are different from the factual allegations against Universal. Here, Redbox does not allege—because it cannot—that Warner has limited Redbox's ability to purchase Warner DVDs from *retailers* (such as Walmart and Best Buy) in addition to wholesalers, as it did in the Universal complaint. (See Universal Compl. ¶¶ 49-51.)[1] And unlike in the Universal case, Redbox does not allege that it has already suffered injury as a result of Warner's actions—only that it fears it will suffer injury in the future, once Warner's wholesale policy takes effect. (Compare id. ¶¶ 62, 90 with Compl. ¶¶ 44, 72.)[2]

Second, circumstances have changed since Redbox filed suit against Universal in October of 2008. Redbox's complaint against Warner effectively acknowledges that, since

---

[1] Citations to "Universal Compl." refer to the First Amended Complaint filed by Redbox against Universal Studios Home Entertainment on Jan. 22, 2009, C.A. No. 08-766, D.I. No. 30.

[2] Citations to "Compl." refer to the Complaint filed by Redbox against Warner in the instant action on August 18, 2009, C.A. No. 09-613, D.I. No. 1.

Redbox sued Universal, Redbox's business has grown and its kiosks have multiplied. (See Compl. ¶ 18.)[3] Thus, it is indisputable that since the alleged Universal "boycott" against Redbox has been in effect, Redbox has continued to compete and, in fact, has gained an even stronger presence. (See Compl. ¶ 18; Universal Compl. ¶¶ 42, 49-50.) Redbox's continued growth during the period Universal's wholesale policy has been in place belies its allegations of (at best future) competitive injury based on Warner's wholesale policy here. Indeed, Redbox now has direct distribution deals with at least three major studios that were not in place when it brought the Universal case. (See infra, at p. 8.) And Redbox does not allege that, in accordance with its predictions in the Universal complaint, any "decrease[d] supply", "reduce[d] consumer choice" or "increase[d] price" has actually occurred since the alleged Universal policy has been in effect. (See Universal Compl. ¶¶ 66, 67, 78.)

Third, there have been significant case law developments since the Universal complaint was filed. On May 18, 2009, the Supreme Court issued its opinion in Ashcroft v. Iqbal, which built upon the Twombly requirement that "only a complaint that states a plausible claim for relief survives a motion to dismiss". Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009). The Court instructed that a claim has facial plausibility only "when the plaintiff pleads *factual content* that allows the court to draw the *reasonable inference* that the defendant is liable for the misconduct alleged" and that a court must "draw on its judicial experience and common sense" in making this assessment. Id. at 1949-50 (internal quotations omitted) (emphasis added). The Court also affirmed that "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief," particularly when the actions alleged are "more likely explained by lawful,

---

[3] Redbox's original complaint against Universal was filed on October 10, 2008, D.I. No. 1.

unchoreographed free-market behavior" or "obvious alternative explanation[s]". Id. at 1949-51 (internal quotations omitted). On August 18, 2009, the Third Circuit confirmed that Iqbal "provides the final nail-in-the-coffin for the 'no set of facts' standard that applied to federal complaints before Twombly", and that pleading standards have now "shifted from simple notice pleading to a more heightened form of pleading". Fowler v. UPMC Shadyside, No. 07-4285, 2009 WL 2501662, at *4-5 (3d Cir. Aug. 18, 2009).

Thus, the antitrust claims Redbox asserts now against Warner are different from those asserted in the Universal complaint, in both substance and context. Most fundamentally, Redbox has failed to allege—and cannot allege—the concerted action necessary to state a Sherman Act Section 1 claim. (See infra Part I.) There is no allegation that Warner, VPD and Ingram agreed to participate in a common scheme to harm competition in the sale or rental of DVDs, and there is no allegation that Warner conspired with any retailer not to sell DVDs to Redbox. (Id.) The allegations in the Warner complaint assert nothing more than perfectly lawful unilateral action by Warner, and therefore do not state a claim under longstanding Supreme Court precedent or the heightened pleading standards of Twombly and Iqbal. (Id.)

Equally fatal for Redbox is its lack of plausible allegations that there is or will be any anticompetitive effect resulting from Warner's actions. Redbox has not alleged that it is foreclosed from competing in any "DVD market" (which, as discussed infra, is far too narrow to be a cognizable market), whether that market is defined as "single DVDs", "DVD genres", all new-release DVDs, or otherwise. (See infra Part II.A.1-2.) Redbox does not allege that it cannot obtain any actual DVD from other sources, nor that consumers are somehow foreclosed from obtaining any DVD from Redbox or from any of Redbox's numerous other competitors in the home entertainment industry (which would be pure speculation at any rate). (See infra Part

II.A.3.) And Redbox fails to suggest that interbrand competition (i.e., competition between *all* studios' films), which the Supreme Court has repeatedly instructed is the primary concern of the antitrust laws, will be harmed as a result of Warner's wholesale policy, as opposed to the more likely result that it will be stimulated. (See infra Part II.A.3.) Redbox does not make these allegations because it cannot—the fact is that competition relating to the sale and rental of DVDs is thriving, and has continued unabated since the lawsuit against Universal was filed over a year ago. (See infra at pp. 7-8.)

Notably, Redbox's claims are wholly based on speculative future events, because Warner's wholesale policy will not even take effect until October 27, when "The Orphan" is released. (See Compl. ¶ 35.) It bears asking why Redbox bothered to bring a non-existent antitrust claim relating to future events now. The answer is simple: Redbox wants negotiating leverage against Warner *now*. This is precisely the type of routine business dispute, motivated solely by a merchant's attempt to protect its profits rather than to protect competition, that the antitrust laws are *not* meant to address.

For these and the other reasons outlined below, Redbox clearly has failed to state a plausible Section 1 claim against Warner. Moreover, the tortious interference and copyright misuse claims that Redbox asserts against Warner here are virtually identical to those rejected as baseless by this Court in the Universal case. They are untenable here for the same reasons they were untenable there.

Redbox's complaint is therefore defective and should be dismissed.

## NATURE AND STAGE OF PROCEEDINGS

Redbox filed its complaint against Warner on August 18, 2009, asserting claims based on Section 1 of the Sherman Act (15 U.S.C. § 1), tortious interference with contract and

"copyright misuse". Warner now moves to dismiss the complaint in its entirety pursuant to Fed. R. Civ. P. 12(b)(6).

## SUMMARY OF ARGUMENT

1. Redbox cannot state a Section 1 claim under the Sherman Act because it has not alleged any agreement or common scheme. Warner's unilateral actions do not support a plausible Section 1 claim under the Supreme Court's longstanding Colgate doctrine and subsequent cases applying that rule. (See infra, Part I.)

2. Redbox also cannot state a Section 1 claim because it has not alleged any actual anticompetitive effects flowing from Warner's actions. Redbox has not alleged or defined a plausible relevant market; the market definitions it advances are untenable under prevailing caselaw. Because Redbox's alleged markets and allegations of market power are not plausible, it is not entitled to a presumption of actual anticompetitive effects. (See infra, Part II.A.1-2.)

3. Redbox has not alleged, and cannot allege, any facts supporting actual *market-wide* anticompetitive effects resulting from Warner's conduct. Redbox's allegations relating to reductions in output, inflated prices, consumer overcharge and reduced choice are necessarily speculative, misunderstand prevailing law, are conclusory and are inconsistent with actual anticompetitive effects. Moreover, Redbox has alleged nothing to counter the well-settled principle that vertical nonprice restraints enhance competition, and has alleged no facts suggesting that there could be any harm to interbrand competition resulting from Warner's conduct. (See infra Part II.A.3.)

4. Redbox cannot plausibly establish that it has in fact suffered or will soon suffer antitrust injury, i.e., injury of the type that the antitrust laws were designed to prevent flowing from a defendant's unlawful conduct. Because Redbox has not alleged concerted action,

a plausible market or actions that harm competition as a whole, it cannot establish that it has

suffered any actionable injury flowing from Warner's conduct. (See infra Part III.)

     5.     Redbox cannot state a claim for "copyright misuse" because it is a

defense, not an affirmative claim. (See infra Part IV.)

     6.     Redbox cannot state a claim for tortious interference because it has not

alleged a breach of its actual agreements with VPD and Ingram. (See infra Part V.)

## STATEMENT OF FACTS[4]

"The home video industry is highly competitive." (See Coinstar Inc. Form 10-K

for fiscal year ended December 31, 2008[5] at 6 (Ex. A)[6].) As Redbox's public filings

acknowledge, consumers obtain filmed entertainment for home viewing through a number of

distribution channels. (See id. at 6-7 (listing various competitive distribution channels, including

traditional video retailers, mail-delivery and online retailers, other retailers and chain stores

(Wal-Mart), pay-per-view, cable, satellite, HBO, Internet sites and libraries).) Redbox rents and

---

[4] The facts alleged in the complaint—many of which are plainly inaccurate—are assumed to be true only for the purposes of this motion to dismiss.

[5] Redbox is a wholly-owned subsidiary of Coinstar, Inc. ("Coinstar"). See Coinstar Form 8-K dated July 17, 2009, Item 8.01 (Ex. B); see also Redbox Rule 7.1 Statement (D.I.5). "In evaluating a motion to dismiss, [a court may] consider . . . items subject to judicial notice [and] matters of public record." Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006) (internal citation omitted). Courts have found that "Securities and Exchange Commission ("SEC") filings fall within [the] category of public records" that can be "considered" on a motion to dismiss. Rosenberg v. XM Ventures, 129 F. Supp. 2d 681, 685, 687 n.6 (D. Del. 2001) (citing Diceon Elecs., Inc. v. Calvary Partners, L.P., 772 F. Supp. 85, 86 (D. Del. 1991)); see also In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1331 (3d Cir. 2002). Admissions made in Coinstar SEC filings regarding competition and distribution of products in the home video industry are "not subject to reasonable dispute" because they are "capable of accurate and ready determination to sources whose accuracy cannot reasonably be questioned". See Fed. R. Evid. 201(b); cf. United States Land Resources, LP v. JDI Realty LLC, No. 08-5162, 2009 WL 2488316, at *5 (D.N.J. Aug. 12, 2009). Accordingly, the Court may consider and/or take judicial notice of the Coinstar SEC filings identified herein.

[6] Citations to "Ex. __" refer to exhibits attached to the Declaration of Katherine B. Forrest, submitted herewith.

sells DVDs to consumers through automated, self-service kiosks located at various retail outlets. (Compl. ¶ 2.) Redbox's kiosks "typically hold up to 700 DVDs comprising 70-200 individual titles" and are "updated weekly with a supply of new-release DVDs". (Id. ¶ 16.)

Since Redbox's inception in 2002, it has experienced significant growth and commercial success, expanding from 125 kiosks in 2004 to over 12,000 by the end of 2008. (See Compl. ¶¶ 15, 18.) Indeed, "Redbox now has nearly four times the number of DVD rental locations in the United States that Blockbuster has". (See id. ¶ 18.) "[I]n the first half of 2009, Redbox rented an average of 27 million DVDs per month." (Id.) Redbox's lawsuit against Universal was originally filed in the third quarter of 2008. The allegations in Redbox's complaint against Warner effectively concede that, during the period that the actions allegedly undertaken by Universal that are the subject of the Universal lawsuit have been in effect, Redbox has continued to experience tremendous growth. (Id.)

With great fanfare, Redbox recently entered into direct distribution agreements with a number of major studios, including Sony, Lionsgate and Paramount. (See Coinstar Form 8-K dated July 17, 2009, Item 8.01 (Sony) (Ex. B); Coinstar Form 8-K dated Aug. 10, 2009, Item 8.01 (Lionsgate) (Ex. C); Coinstar Form 8-K dated Aug. 25, 2009, Item 8.01 (Paramount) (Ex. D).) None of these agreements had been signed at the time Redbox sued Universal. Redbox has estimated that these direct studio deals will account for over 45% of the total new-release DVDs licensed and purchased by Redbox in 2009. (See Ex. B (Sony accounts for 19.9%); Ex. C (Lionsgate accounts for 7.4%); Ex. D (Paramount accounts for 18.5%).) Redbox also "does significant business" with two wholesale film distributors: VPD and Ingram. (Universal Opinion at 3.)[7] Notably, Redbox does not allege that direct agreements with studios or

---

[7] Citations to "Universal Opinion" refer to the opinion by this Court dated Aug. 17, 2009 in Redbox v. Universal, C.A. No. 08-766, D.I. 46.

arrangements with these two wholesalers constitute Redbox's *only* sources of DVD supply, and Redbox does not allege that it does not or cannot also purchase Warner DVDs from retailers.

In fact, Redbox's complaint states only that it has historically purchased "nearly all" of its inventory of "new-release Warner DVDs" from VPD and Ingram. (Compl. ¶ 31.) Redbox does not allege that, absent an ability to acquire product from VPD or Ingram, it will be *unable* to obtain Warner's DVDs. Redbox alleges that it has a "supply contract" with Ingram that "gives Redbox the right to purchase Warner DVDs from Ingram" and "similarly obligates Ingram to sell to Redbox" Warner DVDs "upon Redbox's request". (Id. ¶ 32.) Redbox claims that it has a "similar business relationship with VPD, although the agreement is not reflected in a single document". (Id. ¶ 34.)

The Redbox-Ingram agreement is attached to Redbox's complaint. (See Compl. Ex. A (Ingram Agreement dated August 27, 2008) at 3.) Contrary to Redbox's characterization of the agreement, it actually states that Redbox is responsible for "negotiat[ing] DVD software pricing directly with the studios" and that Ingram "will order DVD software from the studios at the pricing negotiated by Redbox" (Redbox asserts that the term "studios" includes Warner and its affiliates). (See id. at 3; see also Compl. ¶ 32.) The agreement does not state, and Redbox does not allege, that Ingram's contractual obligations to Redbox include the *guaranteed* provision of Warner DVDs upon Redbox's demand. Nor does Redbox allege that VPD agreed to guarantee the provision of Warner DVDs to Redbox upon its demand.

Redbox asserts that, on August 13, 2009, Warner informed its wholesalers, Ingram and VPD, that Warner would "no longer permit them to sell its DVDs to kiosk rental companies", because Warner would instead sell to kiosks directly (as Paramount, Sony and Lionsgate already have arranged to do). (Id. ¶¶ 4, 30.) On August 13, 2009, Warner provided

Redbox with its initial terms of sale. (Id. ¶ 30.) In this communication with Redbox, Warner stated that it would implement what Redbox dubs a 28-day "blackout period" with respect to the provision of its DVDs to kiosk rental companies. (Id.) Redbox alleges that Warner's President Mark Horak informed Redbox that, "for Warner DVDs with release dates beginning in October 2009, Warner would only provide product subject to" this 28-day "blackout period". (Id.) Redbox claims that Horak also stated that "Warner would forbid VPD, Ingram and other traditional distributors[—i.e., wholesalers—]from distributing new-release Warner DVDs to Redbox". (Id.)

Redbox asserts that "new-release DVDs constitute a separate market" from DVDs that have "been on the market for longer periods", and that the value of new-release DVDs is "perishable" because "their value drops rapidly and materially" from the date they are released. (Id. ¶¶ 22-23.) Redbox further claims that "a particular new-release DVD is generally not an acceptable substitute for another new-release DVD" and that different "categories or genres" of movies constitute another "distinct submarket within the overall new-release DVD market" because there is "low cross-elasticity of demand among consumers for new-release DVDs of different genres". (Id. ¶¶ 25, 59.)

Thus, while Redbox's complaint is far from clear on this point, Redbox appears to urge that the "relevant market" to be analyzed in this case consists of two possible "submarkets" within a greater "new-release DVD" market: either (i) single, copyrighted new-release DVD titles, or, in the alterative, (ii) single "genres" of new-release DVDs (e.g., action films or comedies). (Id. ¶¶ 48, 58, 59.) Redbox does *not* allege that the relevant market consists of *all* Warner DVDs (cf. Universal Opinion at 9), or even all new-release Warner DVDs.

Redbox claims that Warner's announcement to wholesalers of its unilateral decision to negotiate directly with Redbox regarding terms of sale of its DVDs, and the announcement to Redbox of its decision to enforce a 28-day window after individual Warner DVDs are released, amounts to a "boycott of Redbox orchestrated by Warner". (Compl. ¶ 48.) According to Redbox, this "boycott" is a "naked restraint of trade that will decrease the supply of new-release Warner DVDs in many, or all genres". (Id.) Redbox does not allege—because it cannot—that Warner's announced wholesale policy will actually affect its ability to obtain DVDs (of any kind) from other studios; or that Redbox's inability (if it were ever to occur) to obtain a Warner action film during the 28-day window would or could affect its ability to obtain a Sony action film in the same period.

Redbox alleges that, as a result of Warner's new policy, "Redbox lacks viable *wholesale* channels from which to purchase new-release Warner DVDs", explaining that Warner's "ability to stop Ingram and VPD from selling to Redbox is due to Warner's dominant market position and monopolist power within the industry with respect to its unique, new-release DVDs". (Id. ¶ 36 (emphasis added).) Redbox does not allege—because it cannot—that it will be unable to obtain adequate amounts of Warner DVD product from other channels, or other studios' DVD product by virtue of its own direct agreements with studios or from other sources.

Redbox nonetheless jumps to the following conclusion: that Warner's wholesale policy will "artificially constrain output by preventing consumers from renting new-release *Warner* DVDs from Redbox and other kiosk rental outlets". (Id. ¶ 39 (emphasis added).) Redbox claims that this will "reduce consumer choice in the various submarkets in the new-release DVD marketplace" and will "artificially increase prices that consumers will have to pay to rent or buy new-release DVDs in those submarkets, thereby negatively affecting consumer

welfare". (Id. ¶ 48.) Redbox claims this will result in "loss of customers" to Redbox and "decreased demand for Redbox's rentals and sales". (Id. ¶ 74.) Redbox does not suggest that since the time when Universal's wholesale policy actions allegedly occurred—which actions are the subject of a separate lawsuit—any consumer has *in fact* experienced reduced choice relating to any studio's DVDs or has *in fact* paid "artificially increased" prices.

Notably, Redbox acknowledges that Warner's revised policy relates only to the first 28 days of a film's release on DVD. (See id. ¶ 30.) Thus, even on the facts of Redbox's complaint, consumers will never be *prevented* from obtaining Warner films generally, or any Warner DVD from Redbox after 28 days. Moreover, Redbox's complaint effectively concedes that it can counter the 28-day window by procuring Warner DVDs from other sources during that time, including retailers.

Nevertheless, based on the purported and carefully selected "facts", Redbox asserts claims against Warner based on the Sherman Act, tortious interference and "copyright misuse". All of these claims should be dismissed.

## ARGUMENT

Redbox has failed to assert an actionable antitrust claim under longstanding precedent and bedrock principles of antitrust law. *First*, Redbox has not alleged, and cannot allege, concerted action—the *sine qua non* of a Section 1 claim under the Sherman Act—and its claims are therefore barred by clear Supreme Court precedent. *Second*, even if Redbox had alleged concerted action, it fails to allege either a plausible market definition or relevant and plausible anticompetitive effects within that market—i.e., injury to competition resulting from Warner's wholesale distribution policy; therefore it cannot state a claim under clear Supreme Court and Third Circuit law. *Third*, due to Redbox's failure to allege a conspiracy, or any injury to competition, Redbox has failed to describe any purported injury *it* has suffered flowing from

the type of injury to the *overall competitive process* that the antitrust laws were designed to prevent—it therefore cannot establish antitrust standing to bring its claim.

Measured against these basic and fundamental antitrust principles, Redbox's complaint fails to state a claim under the "plausibility" standards set forth in Twombly and Iqbal. See Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007); Iqbal, 129 S. Ct. 1937 (2009). As set forth below, Twombly and Iqbal were game-changers for would-be antitrust litigants. See Fowler, 2009 WL 2501662, at *4-5. The Supreme Court has now made it absolutely clear that before a plaintiff is entitled to force a defendant to undertake the extraordinary costs involved in defending an antitrust case, the allegations must be carefully considered, and a court must ask whether, applying a "common sense" analysis, the allegations in the complaint could "raise a right to relief above the speculative level". Iqbal, 129 S. Ct. at 1950; Twombly, 550 U.S. at 555. Here, in order for Redbox to proceed, its allegations must survive this scrutiny. They do not and cannot.

The "plausibility" pleading framework must be applied to the elements Redbox must plead to state a claim under Section 1 of the Sherman Act. See Iqbal, 129 S. Ct. at 1947. To establish a Section 1 violation, Redbox must allege: "(1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that the plaintiff was injured as a proximate result of the concerted action." Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 442 (3d Cir. 1997); IDT Corp. v. Building Owners & Managers Ass'n Int'l, No. 03-4113, 2005 WL 3447615, at *8 (D.N.J. Dec. 15, 2005). A complaint's failure to allege facts that could

plausibly establish an entitlement to relief based on these elements is properly dismissed. See id.; see also Queen City Pizza, 124 F.3d at 442 (affirming dismissal of complaint).[8]

As noted above, whether or not this complaint asserts facts satisfying these elements must, now, be answered against the "plausibility" standard set forth in Twombly, as developed by the Supreme Court's recent decision in Iqbal. In the Supreme Court's 2009 Iqbal decision, the Court instructed that "[d]etermining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense"; "labels and conclusions" and "naked assertions" will not suffice to move a plaintiff's claims "across the line from conceivable to plausible". Iqbal, 129 S. Ct. at 1950, 1949-51. And, consistent with Twombly, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability", it fails to "nudge[]" the claims "across the line from conceivable to plausible". Id. at 1950-51 (quoting Twombly, 550 U.S. at 570).

The Third Circuit recently recognized that Iqbal confirmed the tightening of pleading standards under Rule 8, did away with the "no set of facts" standard, and affirmed that "conclusory or 'bare-bones' allegations will no longer survive a motion to dismiss". Fowler, 2009 WL 2501662, at *4-5. The Third Circuit instructed that, after Iqbal, a District Court must disregard all legal conclusions in a complaint and then "determine whether the facts alleged in

---

[8] As in the Universal case, Redbox's complaint purports to assert antitrust claims using various terms ("quick look", "unlawful boycott", "illegal restraint of trade" and "unreasonable restraint of trade"), but all of these "claims" are based on Section 1 of the Sherman Act. (Compl. Counts II-V.) As this Court has recognized, the "quick look doctrine" and the "rule of reason" are "modes of analysis" and are not "separate grounds for antitrust claims", and it is similarly "inappropriate" to distinguish the other two counts. (Universal Opinion at 7.) Thus, because these four counts all allege a single violation of Section 1 of the Sherman Act, they should not be distinguished from one another in analyzing this motion to dismiss. (See id.) At most, the complaint attempts to assert a sole, vertical rule-of-reason, Section 1 claim—but fails to properly plead the elements of such a claim. (See infra Part I-II.)

the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" Id. at *5

(internal citation omitted).

> "In other words, a complaint must do more than allege the plaintiff's entitlement
> to relief. A complaint has to 'show' such an entitlement with its facts. As the
> Supreme Court instructed in Iqbal, 'where the well-pleaded facts do not permit
> the court to infer more than the mere possibility of misconduct, the complaint has
> alleged—but it has not 'show[n]'—that the pleader is entitled to relief'."

Fowler, 2009 WL 2501662, at *5 (internal citations omitted).

As we explain below, Redbox's complaint fails as a matter of law under

longstanding precedent to establish the necessary elements of a Section 1 claim. Further, when

the Twombly and Iqbal pleading standards are applied to the substantive, factual allegations of

Redbox's complaint, it is plain that Redbox has not alleged a plausible claim for relief.

I.      REDBOX CANNOT STATE A SECTION 1 CLAIM BECAUSE IT HAS NOT
        ALLEGED ANY AGREEMENT OR COMMON SCHEME

      A.      Warner's Unilateral Actions Do Not Support An Antitrust Claim Under *Colgate*
        and Its Progeny.

The "very essence" of a Section 1 claim is "the existence of an agreement".

Alvord-Polk, Inc. v. F. Schumacher & Co., 37 F.3d 996, 999 (3d Cir. 1994). "The requirement is

an important one, for it emphasizes the distinction between [S]ection 1 liability, which is

imposed for concerted action in restraint of trade, and liability imposed under [S]ection 2 of the

Sherman Act for monopolization." Id. The "crucial question" in the analysis of Redbox's

Section 1 claim is therefore "whether the challenged anticompetitive conduct stems from

independent decision or from an agreement, tacit or express". Twombly, 550 U.S. at 553

(internal citation omitted); Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877,

901 (2007) ("plaintiffs alleging a § 1 . . . conspiracy must present evidence tending to exclude

the possibility a manufacturer and its distributors acted in an independent manner").

Although Warner has existing distribution arrangements with VPD and Ingram, those are not the "agreement[s] in restraint of trade" that Redbox points to as unlawful here. Instead, Redbox points to Warner's unilateral statement to wholesalers in August 2009 that they should no longer sell Warner DVDs to kiosks because Warner would now deal directly with kiosk companies. (Compl. ¶¶ 4, 30, 36.) This communication was, in fact, not an "agreement" at all. It was incontestably a unilateral action by Warner. Thus, Redbox's claims depend completely on Warner's unilateral announcement of its new wholesale policy and the prediction that wholesalers will "acquiesce" in following the policy's terms.[9] This claim is unsupportable under longstanding precedent.

Long ago the Supreme Court made it clear that unilateral conduct is wholly permissible and cannot constitute a Section 1 violation as a matter of law. United States v. Colgate & Co., 250 U.S. 300 (1919). Under the venerable Colgate doctrine:

> "In the absence of any purpose to create or maintain a monopoly, the [Sherman] [A]ct does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal; and, of course, he may announce in advance the circumstances under which he will refuse to sell. . . . A retail dealer has the unquestioned right to stop dealing with a wholesaler for reasons sufficient to himself, and may do so because he thinks such dealer is acting unfairly in trying to undermine his trade."

Colgate, 250 U.S. at 307. Thus, "[u]nilateral action, no matter what its motivation, cannot violate [S]ection 1". Siegel Transfer, Inc. v. Carrier Exp., Inc., 54 F.3d 1125, 1131 (3d Cir. 1995) (internal citation and quotation omitted). It follows that a "manufacturer can announce its

---

[9] Redbox's complaint also attempts to blend two separate communications Warner made: the first was Warner's announcement to wholesalers that it would now deal directly with kiosk companies, and the second was Warner's offer to Redbox for direct terms that include a 28-day window. (Id. ¶¶ 4, 30.) It is this window—perhaps just the duration of the window—that has raised Redbox's ire, but that is not a violation of the Sherman Act. Redbox's complaint relies solely on the announcement to wholesalers and predicted wholesaler acquiescence as the purportedly unlawful act. (See id. ¶¶ 48-49, 55, 61, 64-66.)

resale prices in advance and refuse to deal with those who fail to comply" and "*a distributor is free to acquiesce in the manufacturer's demand in order to avoid termination*" without creating an agreement for Section 1 purposes. Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 761 (1984) (emphasis added).[10]

       Redbox's complaint lacks any allegations that Warner and its wholesalers made a "conscious commitment to a common scheme" or established a "unity of purpose or a common design and understanding" to achieve an anticompetitive effect. See Boyd v. Tempay, No. 07-377, 2008 WL 5156307, at *3 (D. Del. Dec. 4, 2008). Redbox asserts only that Warner "informed" its wholesalers of its new wholesale policy and "ordered" that they comply with the terms if they wished to continue to deal with Warner, and that the wholesalers might soon "acquiesce" to these terms to ensure a continued supply of Warner DVDs. (Compl. ¶¶ 4, 36, 38.) This factual allegation is *entirely consistent* with unilateral action under the law. See, e.g., Monsanto, 465 U.S. at 761 (dealer simply "acquiesc[ing]" in manufacturer's demanded policy does not constitute actionable conspiracy).

      Indeed, it is no coincidence that Warner acted the way that it did. Warner followed a long line of cases and precedent in determining how to instruct its distributors regarding its revised distribution policy in August of 2009, and acted exactly as the law instructed it was permitted to do.[11] Consequently, Redbox has not asserted—and cannot assert—the basic element of concerted action necessary to state its Section 1 claim.

---

[10] See also, e.g., Int'l Logistics Group, Ltd. v. Chrysler Corp., 884 F.2d 904, 907 (6th Cir. 1989) ("A conspiracy may not evolve under circumstances where a dealer or distributor involuntarily complies to avoid termination of his product source."); Toscano v. PGA Tour, Inc., 70 F. Supp. 2d 1109, 1115 (E.D. Cal. 1999) (even "the existence of a contract between a party who announces his terms and a party who acquiesces in them does not, without more, give rise to an inference of concerted action under § 1"); see also infra, note 11.

[11] See, e.g., Colgate, 250 U.S. at 307; Monsanto, 465 U.S. at 761; Klein v. Am. Luggage Works, Inc., 323 F.2d 787 (3d Cir. 1963) (retailers who adhere to suggested resale prices,

B.   Redbox Has Not Plausibly Alleged Concerted Action Under *Twombly* and *Iqbal*.

As demonstrated above, even when taken as true, Redbox's allegations relating to Warner's conduct here are consistent only with independent action and do not reasonably suggest any conscious commitment to a common scheme. Redbox simply ignores the clearly unilateral nature of Warner's wholesale policy and dubs it the "orchestration" of a "boycott". But plainly, characterizing Warner's statement of the terms upon which it will deal as a "boycott" is nothing more than "the mere pleading of 'statutory words'" and does not satisfy *Twombly*, *Iqbal* or the "Rule 8(a)(2) pleading requirements". [12] *Boyd*, 2008 WL 5156307, at *3-4 ("The Third Circuit Court of Appeals has held that simply pleading . . . that Defendant engaged in concerted action to achieve anticompetitive effects are insufficient allegations to survive a motion to dismiss."). Because Redbox's assertions of a two-party "boycott" are simply "labels and conclusions", they cannot suffice to move a plaintiff's claims "across the line from

knowing that compliance is expected by manufacturer in consonance with policy, do not thereby, without more, become coconspirators with the manufacturer); Regency Oldsmobile, Inc. v. Gen. Motors Corp., 723 F. Supp. 250, 266-67 (D.N.J. 1989) (rejecting argument that bank performing administrative functions for defendant was coconspirator); Graham v. Triangle Publ'ng, Inc., 233 F. Supp. 825, 830 (E.D. Pa. 1964) ("[defendant's] actions consist of no more than a simple unilateral refusal to deal which falls within the permissible limits of the Colgate case and [Klein]"); see also supra, note 10.

[12] Indeed, faced with Redbox's claim in the Universal case that Universal "orchestrated a boycott" of Redbox, this Court recognized that "[a]lthough [Redbox] deems its antitrust claim against Universal as a 'group boycott' or an otherwise artificial restraint on trade, those terms [are] inconsistent with the fundamental claims alleged", but concluded that "[p]laintiff sufficiently pleaded that Universal induced or otherwise convinced others to boycott Redbox". (Universal Opinion at 7, 9.) While the conclusion that the "boycott" label is inapplicable to Redbox's claims applies with equal force to this case, this case is distinguished from Universal because, *inter alia*, the Court did not address the substantive requirements of the "concerted action" prong of Section 1 in its earlier opinion and because Redbox does not make allegations regarding retailers in this case.

Moreover, Redbox's conclusory suggestion that Warner's imposition of restrictions on the parties to whom and terms under which its DVDs can be sold automatically amounts to a "boycott" prohibited by the antitrust laws is wrong. NYNEX Corp. v. Discon, Inc., 525 U.S. 128, 135 (1998) ("[P]recedent limits the *per se* rule in the boycott context to cases involving horizontal agreements among direct competitors."). Accordingly, as used by Redbox, the term "boycott" is a misnomer and of no legal effect.

conceivable to plausible". Iqbal, 129 S. Ct. at 1949-51. In light of that fundamental failure, Redbox's Section 1 claim must be dismissed.

## II. REDBOX CANNOT STATE A SECTION 1 CLAIM BECAUSE IT HAS NOT ALLEGED PLAUSIBLE ANTICOMPETITIVE EFFECTS

### A. Redbox Has Not Alleged Anticompetitive Effects Within a Plausible Relevant Market.

Redbox also fails to assert facts suggesting that the purported conspiracy "unreasonably restrains competition" by producing "adverse, anticompetitive effects within the relevant product and geographic markets". Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1367 (3d Cir. 1996). Redbox's failure to plausibly allege that Warner's announced wholesale policy "tend[ed] to foreclose a substantial volume of competition" in a relevant market is fatal to its claims. See Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 335 (1961); see also IDT Corp., 2005 WL 3447615 (dismissing complaint for failure to assert sufficient facts concerning anticompetitive effects).

Redbox fails to define a plausible relevant market, and therefore fails to allege that Warner has "market power" sufficient to "raise prices above those that would prevail in a competitive market". Orson, 79 F.3d at 1367. Had a plausible allegation of such market power been asserted, this Court might have considered that a "surrogate" for a demonstration of actual anticompetitive effect. See, e.g., id. Regardless, the focus of the inquiry remains on harm to market-wide competition—which Redbox has failed adequately to allege. See K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co., 61 F.3d 123, 129 (2d Cir. 1995) ("A showing of market power, while necessary to show adverse effect indirectly, is not sufficient. There must be other grounds to believe that the defendant's behavior will harm *competition market-wide*.") (emphasis added). Redbox does not allege any facts plausibly supporting an "*actual* anticompetitive effect[]*, such as a reduction of output, increase in price, or deterioration in

quality of goods and services" resulting from Warner's wholesale policy. Orson, 79 F.3d at 1367 (emphasis added). To be cognizable, such effects would have to impact competition *as a whole*. See Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 96 (2d Cir. 1998) (showing of "*actual* adverse effect on competition as a whole in the relevant market" ensures that "otherwise routine disputes between business competitors do not escalate to the status of an antitrust action") (emphasis in original).

    Here, Redbox proffers several market definitions, clearly crafted to be as narrow as possible in order to inflate Warner's market presence to the point at which anticompetitive effects could be presumed. (Compl. ¶¶ 28, 58-59.) But these "markets" are illogical, facially implausible and demonstrably rejected by Redbox's own business practices and a long line of case law. Consequently, the proposed markets can neither provide a basis from which to measure Warner's market strength (or to assess where and how anticompetitive effects are allegedly being felt), nor entitle Redbox to any presumption of anticompetitive effects based on the conclusory allegation that Warner has "market power". Redbox also fails to allege facts plausibly suggesting *actual* anticompetitive effects, making only conclusory allegations of "supply reduction", "inflated" prices and "reduced choice" that are not consistent with the actual facts alleged or with Redbox's own competitive position since its lawsuit against Universal was filed. (Compl. ¶¶ 39, 48, 60.) These conclusory labels cannot support Redbox's claims.

    1. Redbox's Definitions of the Relevant Market In This Case Are Untenable Under Prevailing Caselaw.

    As discussed above, Redbox has "the burden of defining the relevant market" so that potential effects on competition resulting from Warner's purportedly unlawful policy can be assessed. See Queen City Pizza, 124 F.3d at 436. Once it can be determined who the relevant competing entities in that market are, it can be determined whether Warner has market power

sufficient to raise and maintain prices above a competitive level despite the presence of other competitors' products. Redbox appears to assert that there are three possible markets relevant to its claims:

- *First*, Redbox argues that every individual, copyrighted, new-release movie title held by a given studio is a unique product, has no comparable substitute, and is a market unto itself. (Compl. ¶¶ 25, 28, 59.) For example, using this definition, "The Orphan" would constitute its own market (but only during the time that it is a "new-release"), would not compete with any other film titles, and consumers wishing to watch "The Orphan" as soon as it is released for home-viewing would never settle for watching any other movie instead. Redbox's market definition also assumes that any consumer wishing to watch "The Orphan" would insist on obtaining it in a DVD format, as opposed to, for example, obtaining the film via pay-per-view on television through a cable or satellite provider, or on the internet via a subscription rental service, or in some other way.[13]

- *Second*, Redbox argues in the alternative that new-release DVDs within different "genres" constitute a relevant "submarket". (Id. ¶ 58.) For example, a Warner movie in the "horror" genre such as "The Orphan" would compete with other movies in that genre, such as Sony's "Quarantine", and consumers wishing to watch a film within the "horror" genre would never settle for watching a movie in another genre, such as "suspense". Again, this definition assumes that consumers will only settle for watching their filmed entertainment of choice on DVDs and will not watch movies on cable, satellite, the internet, or in some other way.

- *Third*, Redbox suggests that "new-release DVDs" are a relevant market. (Id.) Under this market definition, any Warner new-release DVD would compete with all other studios' DVDs, but a consumer wishing to watch a new-release such as "The Orphan" would never settle for watching an older release, such as "My Bloody Valentine". This proposed definition again assumes that consumers only watch filmed entertainment on DVDs and not on cable, satellite, the internet or in some other way.

---

[13] Redbox offers *no* reason why the relevant market should be limited to films offered for home entertainment on DVD alone and should not instead consist of films offered for home entertainment viewing in any form, including, <u>e.g.</u>, films available for home viewing through pay-per-view, cable, satellite, and internet sites such as iTunes and Hulu. The relevant market to assess in this case should be at least the entire home entertainment market. <u>See</u> <u>Cable Holdings of Georgia, Inc. v. Home Video Inc.</u>, 825 F.2d 1559, 1563 (11th Cir. 1987) (finding relevant market to be "passive visual entertainment which included cable television, satellite television, video cassette recordings, and free over-the-air television"); <u>see also</u> <u>Satellite Television & Associated Res., Inc. v. Cont'l Cablevision of Virginia</u>, 714 F.2d 351, 355 (4th Cir. 1983) (affirming market definition including "cinema, broadcast television, video disks and cassettes, and other types of leisure and entertainment-related businesses for customers who live in single-family dwellings and apartment houses").

At no point does Redbox suggest that the relevant market consists solely of *Warner* new-release DVDs. (Compare Universal Order at 9 with Compl. ¶¶ 25, 28, 58-60.)

None of Redbox's three proposed markets, which Redbox describes as being based on purported inelasticity of "consumer preferences" (Compl. ¶ 59; see also id. ¶ 28), can stand when measured against the Twombly/Iqbal plausibility standard and other clear, prevailing caselaw. "The test for a relevant market is not commodities reasonably interchangeable by a *particular plaintiff*, but 'commodities reasonably interchangeable by consumers for the *same purposes*'". Queen City Pizza, 124 F.3d at 438 (quoting United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 395 (1956) (emphasis added)). "Interchangeability implies that one product is roughly equivalent to another *for the use to which it is put*; while *there may be some degree of preference for the one over the other, either would work effectively*." Queen City Pizza, 124 F.3d at 437 (emphasis added) (internal quotation and citation omitted).[14] As the Third Circuit has acknowledged, "[a] person needing transportation to work could accordingly buy a Ford or a Chevrolet automobile, or could elect to ride a horse or bicycle, assuming those options were feasible". Id. (quoting Allen-Myland, Inc. v. IBM Co., 33 F.3d 194, 206 (3d Cir. 1994)). Redbox's complaint offers no allegations as to why, regardless of consumer *preferences* for one film over another, the *use* to which one film is put is any different from the use to which another film is put. That is, Redbox does not explain how the film "Quarantine", which is used for

---

[14] Notably, Redbox's attempt to define various "submarkets" is superfluous. Geneva Pharm. Tech. Corp. v. Barr Labs Inc., 386 F.3d 485, 496 (2d Cir. 2004) ("The term 'submarket' is somewhat of a misnomer, since the 'submarket' analysis simply clarifies whether two products are in fact 'reasonable' substitutes and are therefore part of the same market"); PepsiCo v. Coca Cola Co., No. 98 Civ. 3282, 1998 WL 547088, at *5 (S.D.N.Y. Aug. 27, 1998) (the "'submarket' definition turns on the same inquiry as a market definition – whether the products in a proposed submarket are reasonably interchangeable in use or production with products in the broader market") (internal quotations omitted). The most important consideration in market analysis is substitutability in supply or demand; "thus the identification of a submarket is in principle no different than the identification of a relevant market". See 5 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, ¶ 533 (internal citation and quotation omitted).

purposes of home entertainment, could possibly be put to a different use than the film "The Orphan", which is also used for purposes of home entertainment, irrespective of a consumer's personal tastes.

Moreover, to the extent that Redbox's "single title" DVD market allegations reduce to an assertion that Warner has market power over single DVD titles due solely to its copyright, that is legally untenable under Supreme Court precedent. Illinois Tool Works Inc. v. Indep. Ink, Inc., 547 U.S. 28, 44-46 (2006) (intellectual property right in a product does not by itself confer market power for purposes of antitrust analysis); Rick-Mik Enters., Inc. v. Equilon Enters., LLC, 532 F.3d 963, 973 (9th Cir. 2008) (copyright case stating that "intellectual property rights are no longer presumed to confer market power, [thus, plaintiff's] conclusory allegation that [defendant's] intellectual property rights nonetheless do confer market power, unaccompanied by supporting facts, is insufficient") (internal citations omitted). Of course, "a company does not violate the Sherman Act by virtue of the natural monopoly it holds over its own product". TV Commc'ns Network, Inc. v. Turner Network Television, Inc., 964 F.2d 1022, 1025 (10th Cir. 1992) (granting motion to dismiss). Indeed, courts have *routinely* rejected "single product" market arguments of the type Redbox now makes. See, e.g., Theatre Party Assocs., Inc. v. Shubert Org., Inc., 695 F. Supp. 150, 154-55 (S.D.N.Y. 1988) (no plausible explanation "why other forms of entertainment, namely other Broadway shows . . . are not adequate substitute products [for 'Phantom of the Opera']"); Queen City Pizza, 124 F.3d at 436-37 (citing TV Commc'ns, 964 F.2d at 1025 (failure to plead relevant market where proposed market consisted of "only one specific television channel")); Global Disc. Travel Servs., LLC v. Trans World Airlines, Inc., 960 F. Supp. 701, 705 (S.D.N.Y. 1997) (rejecting plaintiff's contention that a consumer "is 'locked into' Pepsi because she prefers the taste, or NBC because

she prefers 'Friends,' 'Seinfeld,' and 'E.R.'"); Gianna Enters. v. Miss World (Jersey) Ltd., 551 F. Supp. 1348, 1354 (S.D.N.Y. 1982) (no rational explanation for restricting market to one particular type of beauty pageant for antitrust claim).

Thus, Redbox fails to allege a plausible basis for finding that single new-release DVDs, genres of new-release DVDs, or even all new-release DVDs, are "a market unto themselves". Carell v. Shubert Org., Inc., 104 F. Supp. 2d 236, 264-65 (S.D.N.Y. 2000). Lacking a plausible market, Redbox cannot adequately allege how the purported anticompetitive effects *in that market* could realistically occur. Orson, 79 F.3d at 1368. And of course, when the market is expanded beyond single-brand products, there is no factual basis in the complaint (or reality) to assume that Warner (or any individual studio) could have market power sufficient to force price raises for *all* DVDs in that market—whether limited to new-releases or including all DVDs.

      2.    Redbox's Market Definition and Market Power Allegations Are Not Plausible Under *Twombly* and *Iqbal*.

Although sufficiently plausible allegations of Warner's "market power" can, under certain circumstances not present here, be a surrogate for demonstrating actual detrimental effects of allegedly anticompetitive conduct, the allegations here fall far short. See, e.g., Orson, 79 F.3d at 1367-68. Antitrust caselaw, antitrust economic theory and common sense have repeatedly rejected single-brand product markets. To put Redbox's single-brand or genre product market to Iqbal's "common sense" test, one can ask: Has Redbox ever stocked an entire kiosk with only a single title of one DVD? Of course not. Has Redbox ever stocked an entire kiosk with a single genre, or with only Warner DVDs? Again, of course not. Market realities dictate more; and Twombly and Iqbal require plausibility for an alleged market to pass muster. Because Redbox fails to allege a plausible market, not only can anticompetitive effects not be

presumed, Redbox's complaint should be dismissed. See Iqbal, 129 S. Ct. at 1950; see also Queen City Pizza, 124 F.3d at 442-43.

### 3. Redbox Has Not Alleged—And Cannot Allege—Actual Anticompetitive Effects.

Lacking adequate allegations of market power, Redbox must at least allege facts supporting plausible claims of *actual* anticompetitive effects. It is *not* sufficient for Redbox to allege facts solely indicating economic harm to *Redbox*. It is axiomatic that the antitrust laws do not exist to protect individual businesses or their profits; their purpose is "the protection of competition, not competitors". Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488 (1977) (internal citation omitted). Thus, economic injury to a competitor—indeed, even the "*elimination*" of a market competitor—"without more, does not prove anticompetitive effect". McGlinchy v. Shell Chem. Co., 845 F.2d 802, 812 (9th Cir. 1988). As such, Redbox's claims that it will "lose customers" and experience "decreased demand for Redbox rentals"—which are conclusory predictions at best—are not relevant here. (See Compl. ¶ 74.) Instead, Redbox needs to assert indications of *actual* competitive harm resulting from Warner's wholesale policy, such as a reduction in output (e.g., fewer film titles),[15] an increase in price (e.g., consumers pay more for film purchases or rentals generally), or a reduction in quality of goods (e.g., films). Orson, 79 F.3d at 1367.[16] Redbox's complaint fails to make any plausible allegations in that respect.

---

[15] Reduction in output relates to the *market-wide* availability of a good—not the availability of one manufacturer's good to a particular plaintiff. See, e.g., United States v. Visa U.S.A. Inc., 163 F. Supp. 2d 322, 406 n.28 (S.D.N.Y. 2001) ("The term 'output reduction' can mean a marketwide decrease in the number of units produced. But it can also refer to a decline in the quality of the goods, or a decline in the rate of improvement or innovation that is committed to a particular market") (internal quotations omitted); see also Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters, 459 U.S. 519, 539 n.40 (1983) (noting distinction between alleging market-wide restraint of trade and behavior directed at "certain" parties).

[16] Of course, "labels and conclusions" such as general and conclusory allegations of "artificially constrain[ed] output", "artificial product shortage" and "artificial price" (see Compl. ¶¶ 39, 60) will not suffice to state a claim. Cf. Iqbal, 129 S. Ct. at 1949, 1951 (claims that

<u>Redbox Has Not Plausibly Alleged a Reduction In Output.</u>

Redbox does not allege the current existence of any *actual* anticompetitive effects of Warner's alleged wholesale policy, and instead relies on conclusory assertions that some undefined notion of "output" will be "constrain[ed]". (Compl. ¶ 39; <u>see also</u> id. ¶ 37.) Output of what? This conclusory assertion misunderstands the nature of the output at issue. Output refers to goods in a cognizable market—here, output would be produced films.[17] Redbox does *not* allege—because it cannot—that Warner will stop producing films or DVDs in the future, or that Redbox has been foreclosed from procuring Warner DVDs directly from other sources, such as retailers, instead of from wholesalers, or that it cannot procure Warner DVDs directly from Warner (subject to the 28-day window). And, of course, Redbox does not allege that *other* brands of new-release DVDs are unavailable to Redbox (<u>e.g.</u>, those brands distributed by Sony, Paramount, Lionsgate or other studios). (<u>See</u> id. ¶ 36.)

The law is clear that the existence of "alternative sources of supply" of a product (here, films from any studio) to a plaintiff can "negate[] the existence of anticompetitive effects". <u>Orson</u>, 79 F.3d at 1372.[18] On the face of its complaint, Redbox is not foreclosed from *any* alternative sources of supply, whether the market is defined by single film, film genre, or otherwise. Redbox is free to acquire and offer competing films or DVDs released by non-

---

plaintiff was subjected to certain treatment "solely on account of his religion, race and/or national origin and for no legitimate penological interest" and that John Ashcroft was the "principal architect" of this policy were conclusory and not assumed to be true).

[17] <u>Cf.</u> 21 Phillip E. Areeda & Herbert Hovenkamp, <u>Antitrust Law</u>, ¶ 2131 (in discussing intraventure output limitations, "the antitrust concern is not with intraventure output as such, but rather with possible limitations on *market* output.").

[18] <u>See also</u> <u>Seagood Trading Corp. v. Jerrico, Inc.</u>, 924 F.2d 1555, 1572-73 (11th Cir. 1991) (no anticompetitive impact where plaintiffs not foreclosed from every alternative); <u>Gianna</u>, 551 F. Supp. at 1354 (plaintiff must describe "how the net economic effect of the alleged violation is to restrain trade in the relevant market and that no reasonable alternate source is available").

Warner studios, Redbox can obtain DVDs from retailers, and Redbox is, of course, always able to obtain Warner DVDs from Warner by agreeing to terms of sale with Warner directly. Indeed, even exclusive dealing arrangements—where a manufacturer elects to distribute product to only *one* distributor—are routinely upheld when competing *alternatives* are available—and Warner's distribution policy is far less restrictive than such an arrangement.[19] Even if Redbox had to pay more for Warner DVDs under this policy (which the facts alleged in the complaint do not establish), that would not be a cognizable antitrust harm.[20] Orson, 79 F.3d at 1358.[21]

Nor is there any plausible suggestion in Redbox's complaint that output to *consumers* will be affected by Warner's wholesale policy. There is no claim that consumers as a group will be unable to obtain DVDs, or even Warner DVDs, from other sources (which would, of course, be absurd given the large number of ways that consumers can access movie product). Courts decline to find antitrust violations when there are alternative products and distribution channels available. See, e.g., Habitat Ltd. v. Art of the Muse, Inc., No. 07-CV-2883, 2009 WL

---

[19] See, e.g., Omega Envtl., Inc. v. Gilbarco, Inc., 127 F.3d 1157, 1163 (9th Cir. 1997) (existence of potential alternative sources of distribution "eliminate[s] substantially any foreclosure effect" of defendant's policy at issue); Elder-Beerman Stores Corp. v. Federated Dept. Stores, Inc., 459 F.2d 138 (6th Cir. 1972) (exclusive dealing between defendant department store and buyers for particular brands of merchandise was insufficient, absent evidence that plaintiff department store was foreclosed from market alternatives, to establish a conspiracy in restraint of trade).

[20] Cf. Seagood Trading Corp., 924 F.2d at 572-73 (rejecting plaintiff's argument in refusal to deal case that, while it could obtain refused services from other companies, it would be more expensive; "plaintiffs are then asking us to equip them with [defendant's] competitive advantage. This is not a function of the antitrust laws.").

[21] See also Nat'l Auto Brokers Corp. v. Gen. Motors Corp., 572 F.2d 953, 957, 959 (2d Cir. 1978) (rejecting claim that GM conspired to impede plaintiff's efforts to obtain cars for plaintiff's brokers because "despite some refusals, there were many GM dealers willing to deal with [plaintiff] and that [plaintiff] was able to obtain from one dealer or another almost all of the GM cars it wanted"); Cascade Cabinet Co. v. W. Cabinet & Millwork Inc., 710 F.2d 1366 (9th Cir. 1983) (no adverse effect on competition where plaintiff did not allege that it was unable to lease other commercial space or that defendant interfered with its attempts to lease other space; court found plaintiff was in fact able to enter the market); Joyce Beverages v. Royal Crown Cola Co., 555 F. Supp. 271, 278-79 (S.D.N.Y. 1983) (availability of alternative methods of distribution precludes finding that supplier is foreclosed from the market).

803380, at *10 (E.D.N.Y. Mar. 25, 2009) (dismissing antique distributor's complaint because defendants sold goods to other distributors in the area; therefore there were alternative sources for the goods); Floors-N-More, Inc. v. Freight Liquidators, 142 F. Supp. 2d 496, 501-02 (S.D.N.Y. 2001) (defendants' refusal to sell to plaintiff did not establish adverse effect on competition; no allegation that defendants were "now the only store in the geographic market where customers can purchase products made by the manufacturers"). Indeed, where a product remains "just as available" in the market "as it was before" and there is no allegation "of anticompetitive purpose or effect at the interbrand level", there will be no violation of Section 1 even if the intent of the restraint is to "destroy" the plaintiff's business. Cf. Crane & Shovel Sales Corp. v. Bucyrus-Erie Co., 854 F.2d 802, 806, 810 (6th Cir. 1988) (internal citation omitted).

b.  Redbox's Allegations of "Inflated Prices" and "Consumer Overcharge" Do Not Constitute Plausible Anticompetitive Effects.

Redbox's complaint also includes several conclusory allegations of "inflated prices", but asserts no plausible reason to expect that Warner's wholesale policy must result in a price increase of its DVDs to anyone but (possibly) Redbox. A higher price to Redbox may cost Redbox money, but it is decidedly not an antitrust violation. See, e.g., Cascade Cabinet Co., 710 F.2d at 1373 ("although Cascade complains of its business losses, economic injury to a competitor does not equal injury to competition. . . . [I]t is injury to the market, not to individual firms, that is significant") (internal quotations omitted). Redbox has the ability to offer its DVDs (even Warner's DVDs) at the price point of its choice. No legal principle dictates that Warner must assist Redbox in maintaining its chosen margins.

Redbox also alleges a purported "price increase" based on its speculative assumption that in the future consumers will not be able to rent new-release Warner DVDs at the

$1 per night price point from Redbox. (Compl. ¶ 4.) A higher consumer price for a *Warner* DVD could not constitute a *market-wide* anticompetitive effect. And if the market *is* limited to Warner's own DVDs, Redbox's allegations are nonetheless insufficient. Given Redbox's conceded ability to procure DVDs from non-wholesale sources and the possibility—even likelihood—that Redbox will *always* find ways to stock Warner DVDs, if Redbox chooses to offer Warner DVDs in its kiosks at a price higher than $1, that is Redbox's unilateral business choice based on the margin it desires. The law is quite clear that harm to an individual competitor's profits are not cognizable anticompetitive effects. See, e.g., Cascade Cabinet Co., 710 F.2d at 1373; O.S.C. Corp. v. Apple Computer, Inc., 792 F.2d 1464, 1469 (9th Cir. 1986) ("injury to an antitrust plaintiff is not enough to prove injury to competition"). Moreover, even if Redbox did *not* choose to purchase Warner DVDs from retailers and instead purchased directly from Warner subject to Warner's 28-day window, Redbox kiosks would remain a source to consumers for Warner DVDs 28 days after their initial release at the $1 a day rate.

Moreover, courts have repeatedly made clear that, in the absence of monopoly power, increased prices to consumers caused by single-firm conduct or by vertical agreements are not enough to sustain an antitrust violation. Fisher v. City of Berkeley, California, 475 U.S. 260, 266 (1986) ("it [is] of considerable importance that independent activity by a single entity be distinguished from a concerted effort by more than one entity to fix prices or otherwise restrain trade. Even where a single firm's restraints directly affect prices and have the same economic effect as concerted action might have, there can be no liability under § 1 in the absence of agreement") (internal citations and quotations omitted); see also Williamsburg Wax Museum, Inc. v. Historic Figures, Inc., 810 F.2d 243, 252 (D.C. Cir. 1987) ("[A]n excessive price alone does not establish a violation of the antitrust laws, because imposition of a high price is not, in

and of itself, an anticompetitive act."). Redbox does not assert a Section 2 monopoly claim here, nor does it allege that Warner intends to somehow monopolize the market for its own DVDs, or the entire new-release DVD "market". Indeed, such a claim—that Warner intends to monopolize the market by requiring that consumers pay *higher* prices—would be nonsensical. Because a seller's efforts to obtain higher prices "normally has no particular tendency to exclude rivals and thus to diminish competition", the unsupported allegations that "consumers might pay more" under Warner's announced wholesale policy utterly fail to provide the anticompetitive effects necessary to support Redbox's claim. See Rambus Inc. v. FTC, 522 F.3d 456, 464 (D.C. Cir. 2008), cert denied, 129 S. Ct. 1318 (2009).

      c.      Redbox's Allegations of "Reduced Consumer Choice" Do Not Support Plausible Allegations of Anticompetitive Effects.

Redbox also conclusorily alleges that, due to the "boycott" of Redbox, it will not be able to offer new-release Warner DVDs to consumers, resulting in "reduce[d] consumer choice in the marketplace". (See Compl. ¶ 60.) The mere incantation of "reduce[d] consumer choice" does not constitute a sufficient allegation of *market-wide* anticompetitive effect. See, e.g., Discon Inc. v. NYNEX Corp., 86 F. Supp. 2d 154, 163 (W.D.N.Y. 2000); see also Rome Ambulatory Surgical Ctr., LLC v. Rome Mem'l Hosp., Inc., 349 F. Supp. 2d 389, 413 (N.D.N.Y. 2004) ("conclusory" statements about "restraints on price, choice, and output as a result of the alleged conspiracy" fail to show anticompetitive effects). In fact, courts have explicitly rejected the argument suggested by Redbox here: that the vertical restriction imposed by Warner injures competition or violates antitrust laws because consumers "ha[d] fewer options" and are "required to pay artificially inflated prices". E&L Consulting, Ltd. v. Doman Indus. Ltd., 472 F.3d 23, 30 (2d Cir. 2006), cert denied, 128 S. Ct. 97 (2007); see also Kestembaum v. Falstaff Brewing Corp., 575 F.2d 564, 571 (5th Cir. 1978). Indeed, the Supreme Court has long permitted

manufacturers to restrict the locations from which retailers may sell their products, even though the restrictions plainly restrict consumer choice with respect to specific brands. See Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 54-55 (1977). And again, Redbox does not suggest that as a result of Warner's wholesale policy consumers are precluded from obtaining Warner DVDs from *any* outlets (including Redbox's own kiosks), or that other competitors of Redbox's will not be able to provide consumers with competing products. Cf. Anheuser-Busch, Inc. v. G.T. Britts Distrib. Inc., 44 F. Supp. 2d 172, 175 (N.D.N.Y. 1999) (rejecting "reduced market choice" argument that as a result of manufacturer removing plaintiff as beer representative, retailers can no longer purchase different brands of beer from plaintiff).

      d.    Redbox Has Failed To Counter the Well-Settled Principle That Vertical Nonprice Restraints Generally Enhance Competition.

Assuming *arguendo* that Redbox has asserted the existence of an agreement, as pled, that agreement would amount to a vertical nonprice restraint.[22] The Supreme Court long ago made clear that vertical nonprice restraints are unlikely to have a "pernicious effect on competition" and, indeed, have "real potential to stimulate interbrand competition, the primary concern of antitrust law". Bus. Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 724 (1988); GTE Sylvania, Inc., 433 U.S. at 52 n.19.

"Interbrand competition" is competition among sellers of the same product (i.e., all studios' DVDs—thus, Warner's "The Orphan" would compete with Paramount's "Imagine That"), while intrabrand competition is competition among sellers of the same brand of a product (i.e., Warner DVDs—thus, Warner's "The Orphan" competes with Warner's "Whiteout", or, construed more narrowly, "The Orphan" would compete only with "The Orphan"). It is well-

---

[22] (Cf. Universal Opinion at 9 ("Plaintiff's Sherman Act claim, practically speaking, alleges a vertical nonprice restraint or vertical boycott").)

settled that it is competition relating to *products*, and not to single *brands*, that the antitrust laws

generally seek to protect. See Orson, 79 F.3d at 1368 ("The Supreme Court has also repeatedly

confirmed in vertical restraint cases that interbrand competition, as opposed to intrabrand

competition, is the primary goal of the antitrust laws."). This is based on the common sense

understanding that:

> "The Supreme Court has recognized that manufacturers have an economic interest
> in maintaining as much intrabrand competition as is consistent with the efficient
> distribution of their products. The only real incentive a manufacturer has to
> restrict distribution of its product is to make its product more competitive. It
> gains nothing by reducing competition in the distribution of its product."

Westman Commc'n Co. v. Hobart Int'l, Inc., 796 F.2d 1216, 1226 (10th Cir. 1986) (quotations

omitted). Thus, "in dealing with vertical nonprice restraints the focus of antitrust concern is the

impact of a particular restraint on *inter*brand competition, rather than its impact on *intra*brand

competition . . . . This is especially true in cases where substantial competition in the interbrand

market provides a check on the exploitation of intrabrand market power by providing a ready

supply of adequate substitutes to consumers." Ryko Mfg. Co. v. Eden Servs., 823 F.2d 1215,

1231 (8th Cir. 1987) (emphasis added). Even to the extent a vertical restraint results in a higher

price to consumers, it must be remembered that:

> "[I]n general, the interests of manufacturers and consumers are aligned with
> respect to retailer profit margins. The difference between the price a
> manufacturer charges retailers and the price retailers charge consumers represents
> part of the manufacturer's cost of distribution, which, like any other cost, the
> manufacturer usually desires to minimize. . . . A manufacturer has no incentive to
> overcompensate retailers with unjustified margins. The retailers, not the
> manufacturer, gain from higher retail prices. The manufacturer often loses;
> interbrand competition reduces its competitiveness and market share because
> consumers will substitute a different brand of the same product."

Leegin Creative Leather Prods., 551 U.S. at 896 (internal quotation and citation omitted).

Certainly, it is clear that *inter*brand competition in the DVD business is thriving,

and that Warner has made a calculated choice to impose specific vertical nonprice restraints with

respect to distribution of its own brand, thereby restricting only *intra*brand competition for Warner DVDs.[23] Warner's only economically rational incentive in imposing that restraint can be to make its product *more* competitive. Warner might be wrong in pursuing this strategy; its products may become *less* competitive when they are up against other studios' movies offered at other prices in other distribution channels. Cf. Leegin Creative Leather Prods., 551 U.S. at 896. If so, the market will correct that, and interbrand competition will require Warner to change its business practices. See id. It is not the place of the antitrust laws to interfere with lawful market dynamics, and courts must guard against formulaic application of rules "prohibiting procompetitive conduct the antitrust laws should encourage". Id. at 895.[24]

The Third Circuit case of Orson v. Miramax, 79 F.3d 1358 (3d Cir. 1996), is instructive. In Orson, the Third Circuit examined an agreement between a movie distributor and an art-house movie theater limiting the sale of the distributor's first-run movies to the theatre. Plaintiff owned a competing art-house movie theater in the area and brought a Section 1 claim, asserting that it was unlawfully prevented from competing because it was unable to exhibit the distributor's films immediately upon release. The Court held that the reasonableness of the exclusive dealing agreement depended on the "competitive stance of the theaters involved and the . . . effect on competition, especially the *interbrand competition* which, as the Supreme Court

---

[23] See Crane, 854 F.2d at 810 ("Every distribution choice by a manufacturer could be either a good or bad decision from a business standpoint, but the antitrust laws have never been intended to police such a choice, absent any allegation that such choice is part of a scheme to create monopoly market power by the manufacturer, or which is based on, or causes, anticompetitive effect at the interbrand level.").

[24] Cf. Westman Comme'n Co., 796 F.2d at 1227 ("The prospect of limited intrabrand competition that results from restricted distribution may encourage distributors to make the investment necessary to carry a new manufacturer's product . . . . If the antitrust laws are applied so as to interfere with a manufacturer's ability to deal freely with its distributors, procompetitive vertical restraints may be deterred. In the end, we are convinced that, when a manufacturer is left free to determine the profile of its distributorships, procompetitive incentives will lead it to make distribution decisions that ultimately benefit consumers.").

has instructed, is our primary concern in an antitrust action". Id. at 1372 (emphasis added). The Court found that "competition thrived at both the distributor and exhibitor level", and that, although the agreements "most certainly reduced intrabrand competition to some degree by disallowing the [plaintiff] from showing on a first-run basis any Miramax film that the [other theater] had selected, they undeniably promoted *interbrand* competition by requiring the [plaintiff theater] to seek out and exhibit the films of other distributors, which it consistently accomplished. Thus, . . . competition in the relevant market was enhanced; art film consumers in [Philadelphia] had more movies from which to choose." Id. (emphasis added). To the extent that Redbox has alleged an intrabrand restraint (e.g., Warner DVDs) and since it has not even attempted to allege how an *intrabrand* restraint would impact *interbrand* competition, the complaint must be dismissed.[25]

> e. Redbox Has Not Alleged Facts That Plausibly Suggest Harm to Interbrand Competition Sufficient To Satisfy *Twombly* and *Iqbal*.

To meet Twombly and Iqbal's standard, Redbox must allege facts plausibly suggesting that the purported nonprice vertical restraint Redbox claims is at issue here will be *more* likely than not to harm *overall competition* in a cognizable market. See Twombly, 550 U.S. at 565-67. Redbox must, then, find a way around the caselaw—from the Supreme Court down—that vertical nonprice restraints generally *enhance* interbrand competition, the "primary goal of the antitrust laws". See, e.g., Orson, 79 F.3d at 1368. Thus, applying Twombly, Warner's vertical wholesale announcement is more or equally consistent with "lawful, unchoreographed free-market behavior" and cannot support an antitrust claim. Iqbal, 129 S. Ct. at 1950.

---

[25] See Crane, 854 F.2d at 810 ( "[E]ven though refusals to deal limit intrabrand competition, they are likely to benefit consumers by increasing interbrand rivalry.") (internal citation omitted).

Moreover, Redbox's conclusory speculations are implausible and are in direct tension with the facts asserted and with Redbox's own claims of ongoing growth and clearly thriving competition in the DVD market during the same time period when Universal's allegedly similar wholesale policies were in effect. (See Compl. ¶ 18.) Thus, Redbox's speculation about its own future, let alone the future of competition generally, is conclusory at best. Twombly and Iqbal require more. See Iqbal, 129 S. Ct. at 1950.

III.    REDBOX DOES NOT HAVE STANDING

A.    Redbox Cannot Establish Antitrust Injury.

In light of Redbox's failure to assert plausible concerted action, a plausible market or plausible anticompetitive effects, it comes as no surprise that Redbox has not pleaded sufficient allegations that it has—or will ever suffer—the type of antitrust injury necessary for standing. Simply put, any injury Redbox may suffer is not the type of injury to competition the antitrust laws seek to prevent.

As the Third Circuit has observed, standing takes on particular significance in the context of antitrust laws, "where a balance must be struck between encouraging private actions and deterring legitimate competitive activity through overly vigorous enforcement". City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 264 (3d Cir. 1998). Antitrust standing is more than the "injury in fact" and the "case or controversy" required by Article III of the constitution. See, e.g., Associated Gen. Contractors of Cal., 459 U.S. at 535 n.31 (1983).[26] "To

---

[26] Notably, Redbox's purported injury-in-fact is totally hypothetical at this point, since Redbox admits that Warner's announced wholesale policy has not yet taken effect, and will only take effect for DVDs with release dates beginning on October 27, 2009. (Compl. ¶¶ 30, 35-36, 38.) To establish Article III injury in fact, "a plaintiff must show that . . . [an] injury is actual or imminent, not conjectural or hypothetical", and a plaintiff seeking injunctive relief must "show that the defendant's conduct will likely cause injury in the future". Argos v. Orthotec LLC, 304 F. Supp. 2d 591, 594 (D. Del. 2004) (internal citation and quotation omitted). For the reasons already set forth above, Redbox cannot establish that it has suffered, or likely will suffer, any actual injury in fact sufficient to establish Article III standing.

establish antitrust standing a plaintiff must show both: (1) harm *of the type* the antitrust laws were intended to prevent; and (2) an injury to the plaintiff which flows from that which makes defendant's acts unlawful." Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912, 924 n.6 (3d Cir. 1999) (emphasis added); Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334 (1990) (antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful"). The most relevant factor in this analysis is "whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress", (i.e., injury to plaintiff *resulting* from *injury to competition* caused by defendant's unlawful conduct). Angelico v. Lehigh Valley Hosp., Inc., 184 F.3d 268, 274 (3d Cir. 1999).

"The antitrust injury requirement obligates [a plaintiff] to demonstrate . . . that the challenged action has had an actual adverse effect *on competition as a whole in the relevant market*; to prove it has been harmed as an individual competitor will not suffice." Anheuser-Busch, Inc., 44 F. Supp. 2d at 174 (emphasis added).[27] Thus, to survive this motion to dismiss, Redbox must allege sufficient facts to support an allegation of an adverse effect on market-wide competition *and* a connection between that injury to competition and the injury that it has suffered. Id. at 174-75 ("Defendants have clearly alleged injury to their own business interests. The fundamental flaw in the [antitrust claim], however, is that it alleges no detrimental impact upon market-wide competition. . . . Rather, defendants merely allege injury to themselves, which is insufficient to confer standing to assert antitrust violations.").

---

[27] Because a plaintiff is required to demonstrate anticompetitive effects in a *relevant market* to establish antitrust standing, Redbox's failure to allege a cognizable market is equally as problematic as its failure to allege plausible anticompetitive effects.

Redbox has not asserted plausible allegations of antitrust injury. For example, Redbox does not allege that, as a result of *Warner's* wholesale policy, competitors generally (who necessarily include a large number of market participants) have been unable to compete in procuring and providing, by sale, rental or otherwise, DVDs to consumers—even new-release DVDs. In order to allege injury to the *competitive process* for purposes of antitrust standing, Redbox must reach outside of its own situation and plausibly allege that Warner's wholesale policy has prevented *other* competitors (e.g., companies engaged in the sale or rental of films) from competing as well. Redbox has not alleged that any competitors—let alone Redbox—have actually been foreclosed from competing—be it for individual Warner DVDs, new-release Warner DVDs, by "genre" or *all* DVDs. (See supra, Part IV.A.1.)

It is insufficient as a matter of law for Redbox to rely for its antitrust standing on a concern that it, Redbox, may potentially pay more for Warner DVDs. Tennessean Truckstop, Inc. v. NTS, Inc., 875 F.2d 86, 88 (6th Cir. 1989) ("[T]he fact that a particular competitor in a particular market has lost profits does not inevitably mean that competition as a whole is lessened."); see also supra Part II.A.3. Moreover, Redbox's failure to allege any actionable conspiracy or concerted action under Colgate indicates that its injury cannot flow from conduct that the antitrust laws were meant to prevent. See Steamfitters Local Union No. 420, 171 F.3d at 924 n.6.

Thus, Redbox has failed to assert facts that could plausibly establish antitrust standing, requiring dismissal of its Sherman Act claim. Iqbal, 129 S. Ct. at 1950.

IV.   "COPYRIGHT MISUSE" IS NOT AN AFFIRMATIVE CLAIM

Redbox's claim of "copyright misuse" is "unavailable to Plaintiff in this action as well as impertinent to the current dispute". (See Universal Opinion at 6.) Copyright misuse is an equitable defense, not a cause of action, and prior efforts by plaintiffs to wield it as an

affirmative claim have been rejected by this Court and in this Circuit. Id.; see also Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc., 342 F.3d 191, 203-204 (3d Cir. 2003).

## V.    REDBOX HAS FAILED TO STATE A CLAIM FOR TORTIOUS INTERFERENCE

In the Universal case, this Court dismissed Redbox's tortious interference claim. (Universal Op. at 13.) The identical tortious interference claims asserted by Redbox in this case warrant dismissal based on the same rationale.

To state a claim for tortious interference with contract, a plaintiff must allege facts sufficient to support:  (i) the existence of a business relationship; (ii) the alleged interfering party's knowledge of that relationship; (iii) intentional interference; (iv) causing or inducing a breach of the relationship; (v) which causes damages.  See Corning Inc. v. SRU Biosystems, LLC, 292 F. Supp. 2d 583, 585-86 (D. Del. 2003).

Redbox contends that Warner's policy of refusing to deal with Ingram and VPD if they continue to supply DVDs to Redbox constitutes an intentional inducement for Ingram and VPD to breach their agreements with Redbox.  According to Redbox's complaint, this "breach" has not yet occurred, but Redbox fears that VPD and Ingram will, in the future, "bow to Warner's coercion and stop filling Redbox's orders for Warner DVDs", with the first affected title being "The Orphan", due to be released on October 27, 2009.  (Compl. ¶¶ 35, 72.)

Redbox's claim suffers from the fundamental defect that "Ingram's contractual obligations to Redbox do not include the guaranteed provision of [Warner] DVDs upon Redbox's demand".  (See Compl. Ex. A; Universal Opinion at 11.)  The contract does not obligate Ingram to deliver Warner DVDs to Redbox unconditionally; thus, even if Ingram complies with Warner's policy, that would not be a breach of the agreement.  (Id. at 12.)  Redbox asserts that its relationship with VPD is substantially the same as that with Ingram; thus, the same conclusion applies to that agreement.  (Id. at 12 n.2.)

## CONCLUSION

For the foregoing reasons, Plaintiff's complaint fails to state a claim against Warner and should be dismissed with prejudice.

Of Counsel:

Katherine B. Forrest
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
kforrest@cravath.com

Dated: October 1, 2009

*Anne Shea Gaza*

Frederick L. Cottrell, III (#2555)
Anne Shea Gaza (#4093)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700
cottrell@rlf.com
gaza@rlf.com
*Counsel for Defendant*
*Warner Home Video*

## CERTIFICATE OF SERVICE

I hereby certify that on October 1, 2009, I caused to be served by **hand delivery and e-mail** the foregoing document and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

James S. Green
Seitz, Van Ogtrop & Green, P.A.
222 Delaware Avenue, Suite 1500
P. O. Box 68
Wilmington, DE 19899
jgreen@svglaw.com

I hereby certify that on October 1, 2009, I caused the foregoing document to be sent via **e-mail** to the following non-registered participants:

Charles S. Bergen
George R. Dougherty
Michael S. Gulland
Grippo & Elden LLC
111 South Wacker Drive
Chicago, IL 60606
cbergen@grippoelden.com
gdougherty@grippoelden.com
mgulland@grippelden.com

Anne Shea Gaza (#4093)
gaza@rlf.com