# Exhibit A

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-K

**(Mark One)**

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES AND EXCHANGE ACT OF 1934**
For the fiscal year ended December 31, 2008

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES AND EXCHANGE ACT OF 1934**

Commission File Number: 000-22555

# COINSTAR, INC.
(Exact name of registrant as specified in its charter)

| **Delaware** | **94-3156448** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |
| **1800 114th Avenue SE, Bellevue, Washington** | **98004** |
| (Address of principal executive offices) | (Zip Code) |

**(425) 943-8000**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| **Common Stock, $0.001 par value** | **The NASDAQ Stock Market LLC** |
|---|---|
| (Title of Each Class) | (Name of Each Exchange on Which Registered) |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.: Yes ☐ No ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.: Yes ☐ No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definition of "large accelerated filer", "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐     Accelerated filer ☑
Non-accelerated filer ☐ (Do not check if a smaller reporting company)     Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act.) Yes ☐ No ☑

The aggregate market value of the common stock held by non-affiliates of the registrant, based upon the closing price of our common stock on June 30, 2008 as reported on the NASDAQ Global Select Market, was approximately $381.7 million. Shares of Common Stock held by each executive officer and director and by each person who beneficially held more than 5% of the outstanding Common Stock have been excluded as these persons may be deemed to be affiliates. This determination of affiliate status is not necessarily a conclusive determination for other purposes.

As of February 16, 2009, there were approximately 28,248,890 shares of the registrant's Common Stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the Registrant's definitive Proxy Statement for the 2009 annual meeting of stockholders are incorporated by reference in Part III of this Form 10-K.

***The termination, non-renewal or renegotiation on materially adverse terms of our contracts with one or more of our significant retailers could seriously harm our business, financial condition and results of operations.***

The success of our business depends in large part on our ability to maintain contractual relationships with our retailers in profitable locations. Our typical contract term ranges from one to three years and automatically renews until we or the retailer gives notice of termination. DVD contracts typically range from three to six years. Certain contract provisions with our retailers vary, including product and service offerings, the service fees we are committed to pay each retailer, frequency of service, and the ability to cancel the contract upon notice after a certain period of time. We strive to provide direct and indirect benefits to our retailers that are superior to or competitive with other providers or systems (including coin-counting systems which retailers could operate themselves or through a third party) or alternative uses of the floor space that our machines occupy. If we are unable to provide our retailers with adequate benefits, we may be unable to maintain or renew our contractual relationships on acceptable terms causing our business, financial condition and results of operations to suffer.

We do a substantial amount of our business with certain retailers. For example, we have significant relationships with Wal-Mart Stores, Inc. and McDonald's USA, LLC ("McDonald's USA"), which accounted for approximately 19% and 10% of our consolidated revenue, respectively, for the year ended December 31, 2008. Our relationship with Wal-Mart is governed by contracts that Wal-Mart generally may terminate with limited notice. In addition, McDonald's USA has the right to terminate its contract with us with respect to all of our kiosks in a particular geographic market, with or without cause, on 90 days' notice, in which event we have the option to repurchase our kiosks on specified terms. Cancellation, adverse renegotiation of or other changes to these relationships could seriously harm our business and reputation.

***Events outside of our control, including the current economic crisis, has and could continue to negatively affect customers' use of our products and services.***

Our customers' use of many of our products and services is dependent on discretionary spending, which is affected by, among other things, economic and political conditions, consumer confidence, interest and tax rates, and financial and housing markets. With increased economic pressures recently affecting more and more of our potential customers, we have been negatively impacted by more conservative purchasing tendencies over the last half year and expect that fewer non-essential products and services will be purchased during the coming periods if the economic downturn continues. For example, we have seen a significant decrease in revenues from our entertainment business during 2008 as people have spent less and had less to spend. Further, many of our customers have less discretionary income to transfer to relatives and other persons, often in foreign countries such as Mexico. In addition, because our business relies in part on customers initially visiting retailers to purchase products and services that are not necessarily our products and services, the fact that people are generally visiting retailers less frequently and being more careful with their money when they do, is also negatively impacting our business.

Further, our ability to obtain funding, if and as needed, through equity issuances or loans, or otherwise meet our current obligations to third parties could be adversely affected by the economic crisis. In addition, the ability of third parties to honor their obligations to us could be negatively impacted, as retailers, suppliers and other parties deal with the economic crisis as well. Finally, there may be consequences that will ultimately result from the current economic crisis are not yet known, and any one or more of these unknown consequences (as well as those currently being experienced) could potentially have a material adverse effect on our financial condition, operating results and liquidity as well as our business generally.

***There are many risks related to our DVD services business that may negatively impact our business.***

The home video industry is highly competitive with many factors affecting our ability to profitably manage our DVD services business. Some of the risks that could negatively impact our participation in this industry include:

- Competition from other providers, including those using other distribution channels, having more experience, greater or more appealing inventory, better financing, and better relationships with those in the movie industry, than we have, including:

  - traditional video retailers, like Blockbuster, and other local and regional video stores, and other DVD kiosk businesses,

- mail-delivery and online retailers like Netflix or Amazon,

- other retailers like Wal-Mart and other chain stores selling DVDs,

- pay-per-view/cable/satellite and similar movie content providers like Comcast or HBO,

- other forms of movie content providers like Internet sites including iTunes, Hulu or Google, and

- noncommercial sources like libraries;

as well as general competition from other forms of entertainment such as movie theaters, television, sporting events and video gaming.

- Changes in the sequential timing of when movie content is made available to the various movie content distribution channels. Businesses that rent movies in physical formats such as DVDs currently enjoy a competitive advantage over other movie distribution rental channels because of the early timing of the distribution window for physical formats by movie studios. After the initial theatrical release of a movie, the movie studios' current practice is generally to make their movies available on physical formats for a 30 to 45-day release window before release to other movie distribution rental channels. However, movie studios could change, including shortening or discontinuing altogether, movie distribution windows, including simultaneous video-on-demand/computer downloads and DVD releases. For example, there have been recent announcements that certain movie studios will make new release titles available on video-on-demand or for online purchase on the same date as the DVD release. Studios also could attempt to lengthen the time that certain video retailers must wait before renting movies following their release on physical format (e.g., waiting at least 45 days following DVD release before making certain movies available for rental as recently proposed by Universal Studios).

- Changes in consumer content delivery preferences, including DVDs with higher picture/sound quality (e.g., Blu-ray), disposable or download-to-burn DVDs, more use of personal video recorders (e.g., TiVo), pay-per-view/cable/satellite and similar technologies, computer downloads, portable devices, and other mediums, and less demand for a high volume of new movie content due to such things as larger home DVD and downloaded movie libraries.

- Increased availability of movie content inventory through personal video recorders, pay-per-view/cable/satellite and similar technologies, computer downloads, portable devices, and other mediums.

- Decreased quantity and quality of movie content availability for DVD distribution due to:

  - general-industry-related factors, including financial disruptions, labor conflicts (e.g., actor/writer strikes) or movie content failing to appeal to consumers' tastes, and

  - distribution-related factors, including restrictions relating to the number of DVD selections made available to DVD kiosks and the manner in which DVD kiosks may distribute movies, i.e., only through rental (as recently proposed by Universal Studios).

- Decreased costs related to purchasing or receipt of movie content, including less expensive DVDs, including more aggressive competitor pricing strategies and piracy, and cheaper use of pay-per-view/cable/satellite and similar technologies.

In addition, although our subsidiary Redbox is majority owned and we have the right to appoint and have appointed three of the five representatives to Redbox's board of managers, prior to the expected February 26, 2009 closing of the GAM transaction described above, under the Redbox formulation documents, GAM has the right in some circumstances to require the sale of Redbox, including Coinstar's sale of its equity. Accordingly, should the closing not occur and should GAM take specific actions, Coinstar could be

required to sell all of its interests in Redbox. Adverse developments relating to any of these risks, as well as others relating to our participation in the home video industry, could significantly affect our business, financial condition and operating results.

# Exhibit B

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

# FORM 8-K

### CURRENT REPORT
Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934

Date of Report (Date of earliest event reported) July 17, 2009

# COINSTAR, INC.

(Exact name of registrant as specified in its charter)

| **Delaware** | **000-22555** | **94-3156448** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

1800 — 114th Avenue SE
BELLEVUE, WA 98004

(Address of Principal Executive Offices and Zip Code)

Registrant's telephone number, including area code: **(425) 943-8000**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 8.01 Other Events.**

On July 17, 2009, Redbox Automated Retail, LLC ("Redbox"), a wholly-owned subsidiary of Coinstar, Inc. ("Coinstar"), entered into a copy depth license agreement (the "Agreement") with SPHE Scan Based Trading Corporation ("Sony"), a subsidiary of Sony Pictures Home Entertainment Inc. Redbox estimates that it will pay Sony approximately $460 million during the term of the Agreement, which is expected to last from July 1, 2009 until September 30, 2014. However, at Sony's discretion, the Agreement may expire earlier on September 30, 2011. Coinstar has guaranteed up to $25 million of Redbox's liability under the Agreement.

Under the Agreement, Redbox agrees to license minimum quantities of theatrical and direct-to-video DVDs for rental in its more than 17,000 DVD-rental kiosks in the United States. The DVDs licensed and purchased from Sony are expected to represent approximately 19.9% percent of the total DVDs licensed and purchased by Redbox for 2009. Under the Agreement, Redbox should receive delivery of the DVDs by the "street date," the initial date on which the pictures are distributed on a rental basis to the general public for home entertainment viewing.

Certain statements in the foregoing paragraphs are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Words such as "estimate" and "expect," and variations of such words, and similar expressions identify forward-looking statements, but their absence does not mean that the statement is not forward-looking. The forward-looking statements in this release include statements regarding Redbox's relationship with Sony relating to among other things, a DVD licensing arrangement. Forward-looking statements are not guarantees of future performance and actual results may vary materially from the results expressed or implied in such statements. Differences may result from actions taken by Redbox or Sony, including those beyond our or Redbox's control. Such risks and uncertainties include, but are not limited to, the early termination or renegotiation on materially adverse terms of the Agreement and failure to abide by the terms and requirements of the Agreement. The foregoing list of risks and uncertainties is illustrative, but by no means exhaustive. For more information on factors that may affect future performance, including our relationship with Sony, please review "Risk Factors" described in our most recent Annual Report on Form 10-K and any subsequent Quarterly Reports on Form 10-Q filed with the Securities and Exchange Commission. These forward-looking statements reflect Coinstar, Inc.'s expectations as of the date hereof. Coinstar, Inc. undertakes no obligation to update the information provided herein.

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

                        COINSTAR, INC.

Date: July 20, 2009          By: /s/ Donald R. Rench
                            Donald R. Rench
                            General Counsel and Corporate Secretary

Created by Morningstar Document Research    documentresearch.morningstar.comSource: COINSTAR INC, 8-K, July 21, 2009

# Exhibit C

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

# FORM 8-K

### CURRENT REPORT
Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934

**Date of Report (Date of earliest event reported) August 10, 2009**

# COINSTAR, INC.
(Exact name of registrant as specified in its charter)

| **Delaware** | **000-22555** | **94-3156448** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

1800 — 114th Avenue SE
Bellevue, WA 98004

(Address of Principal Executive Offices and Zip Code)

Registrant's telephone number, including area code: **(425) 943-8000**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 8.01 Other Events.**

On August 10, 2009, Redbox Automated Retail, LLC ("Redbox"), a wholly-owned subsidiary of Coinstar, Inc. ("Coinstar"), entered into a Home Video Lease Output Agreement (the "Letter Agreement") with Lions Gate Films, Inc. ("Lionsgate"). Redbox estimates that it will pay Lionsgate approximately $158 million during the term of the Letter Agreement, which is expected to last from September 1, 2009 until August 31, 2014. However, at Lionsgate's discretion, the Letter Agreement may expire earlier on August 31, 2011.

Under the Letter Agreement, Redbox agrees to license minimum quantities of theatrical and direct-to-video DVDs for rental at each of the more than 15,000 locations that have a Redbox DVD-rental kiosk owned and/or operated by Redbox in the United States. The DVDs licensed from Lionsgate are expected to represent approximately 7.4% percent of the total DVDs licensed and purchased by Redbox for 2009. Under the Letter Agreement, Redbox should receive delivery of the DVDs by the "street date," the initial date on which Lionsgate first makes available a motion picture on a rental basis to the general public for the purpose of non-commercial home entertainment viewing.

Certain statements in the foregoing paragraphs are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Words such as "estimate" and "expect," and variations of such words, and similar expressions identify forward-looking statements, but their absence does not mean that the statement is not forward-looking. The forward-looking statements in this release include statements regarding Redbox's relationship with Lionsgate relating to among other things, a DVD licensing arrangement. Forward-looking statements are not guarantees of future performance and actual results may vary materially from the results expressed or implied in such statements. Differences may result from actions taken by Redbox or Lionsgate, including those beyond our or Redbox's control. Such risks and uncertainties include, but are not limited to, the early termination or renegotiation on materially adverse terms of the Letter Agreement and failure to abide by the terms and requirements of the Letter Agreement. The foregoing list of risks and uncertainties is illustrative, but by no means exhaustive. For more information on factors that may affect future performance, including our relationship with Lionsgate, please review "Risk Factors" described in our most recent Annual Report on Form 10-K and any subsequent Quarterly Reports on Form 10-Q filed with the Securities and Exchange Commission. These forward-looking statements reflect Coinstar, Inc.'s expectations as of the date hereof. Coinstar, Inc. undertakes no obligation to update the information provided herein.

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

        COINSTAR, INC.

Date: August 10, 2009

By: /s/ Donald R. Rench
    Donald R. Rench
    General Counsel and Corporate Secretary

3

Created by Morningstar Document Research    documentresearch.morningstar.comSource: COINSTAR INC, 8-K, August 11, 2009

# Exhibit D

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

# FORM 8-K

**CURRENT REPORT**
Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934

**Date of Report (Date of earliest event reported) August 25, 2009**

# COINSTAR, INC.

(Exact name of registrant as specified in its charter)

| **Delaware** | **000-22555** | **94-3156448** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

1800 – 114th Avenue SE
BELLEVUE, WA 98004

(Address of Principal Executive Offices and Zip Code)

Registrant's telephone number, including area code: **(425) 943-8000**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 8.01 Other Events.**

On August 25, 2009, Redbox Automated Retail, LLC ("Redbox"), a wholly-owned subsidiary of Coinstar, Inc. ("Coinstar"), entered into a revenue sharing license agreement (the "Agreement") with Paramount Home Entertainment Inc. ("Paramount") that runs from August 25, 2009, through December 31, 2009 (the "Initial Term"). Prior to December 15, 2009, Paramount has the unilateral right to extend the term of the Agreement to December 31, 2014 (the "Extended Term"). However, if Paramount does agree to the Extended Term, at Paramount's discretion, the Agreement may be terminated earlier on December 31, 2011. Redbox estimates that it would pay Paramount approximately $575 million during the Initial Term and the Extended Term. Coinstar has guaranteed up to $25 million of Redbox's liability under the Agreement.

Under the Agreement, Redbox agrees to license minimum quantities of theatrical and direct-to-video DVDs for rental at each of the more than 15,000 locations that have a Redbox DVD-rental kiosk owned and/or operated by Redbox in the United States. The DVDs licensed and purchased from Paramount are expected to represent approximately 18.5% percent of the total DVDs licensed and purchased by Redbox for 2009. Under the Agreement, Redbox should receive delivery of the DVDs by the "street date," the first date on which the titles are available to the general public for home entertainment purposes, whether on a rental or sell-through basis.

Certain statements in the foregoing paragraphs are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Words such as "estimate" and "expect," and variations of such words, and similar expressions identify forward-looking statements, but their absence does not mean that the statement is not forward-looking. The forward-looking statements in this release include statements regarding Redbox's relationship with Paramount relating to among other things, a DVD revenue sharing licensing arrangement. Forward-looking statements are not guarantees of future performance and actual results may vary materially from the results expressed or implied in such statements. Differences may result from actions taken by Redbox or Paramount, including those beyond our or Redbox's control. Such risks and uncertainties include, but are not limited to, the failure to extend the term, the early termination or the renegotiation on materially adverse terms, of the Agreement, and failure to abide by the terms and requirements of the Agreement. The foregoing list of risks and uncertainties is illustrative, but by no means exhaustive. For more information on factors that may affect future performance, including our relationship with Paramount, please review "Risk Factors" described in our most recent Annual Report on Form 10-K and any subsequent Quarterly Reports on Form 10-Q filed with the Securities and Exchange Commission, as well as other filings. These forward-looking statements reflect Coinstar, Inc.'s expectations as of the date hereof. Coinstar, Inc. undertakes no obligation to update the information provided herein.

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

    COINSTAR, INC.

    By: /s/ Donald R. Rench

Date: August 10, 2009
    Donald R. Rench
    General Counsel and Corporate Secretary

3

Created by Morningstar Document Research    documentresearch.morningstar.comSource: COINSTAR INC, 8-K, August 11, 2009