IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

REDBOX AUTOMATED RETAIL, LLC,

                        Plaintiff,

        v.

WARNER HOME VIDEO, a division of
WARNER BROS. HOME ENTERTAINMENT,
INC.,

                    Defendant.

C.A. No. 09-613 (RBK)

**DEFENDANT WARNER HOME VIDEO'S OPENING BRIEF IN SUPPORT OF
ITS MOTION TO DISMISS THE AMENDED COMPLAINT PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

Of Counsel:

Katherine B. Forrest
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
kforrest@cravath.com

Dated: December 21, 2009

Frederick L. Cottrell, III (#2555)
Anne Shea Gaza (#4093)
Stephen M. Ferguson (#5167)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700
cottrell@rlf.com
gaza@rlf.com
ferguson@rlfcom

*Attorneys for Defendant
Warner Home Video*

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES .................................................................................................iii

PRELIMINARY STATEMENT ...........................................................................................1

NATURE AND STAGE OF PROCEEDINGS .....................................................................7

SUMMARY OF ARGUMENT .............................................................................................8

STATEMENT OF FACTS ....................................................................................................9

ARGUMENT ......................................................................................................................15

I.   REDBOX CANNOT STATE A SECTION 1 CLAIM BECAUSE IT HAS NOT
     ALLEGED ANY AGREEMENT OR COMMON SCHEME .........................................17

     A.   Warner's Unilateral Actions Do Not Support an Antitrust Claim
          Under *Colgate* and *Twombly*. ....................................................................17

     B.   Redbox Has Not Plausibly Alleged Concerted Action Under
          *Twombly* and *Iqbal*........................................................................................19

II.  REDBOX CANNOT STATE A SECTION 1 CLAIM BECAUSE IT HAS NOT
     ALLEGED PLAUSIBLE ANTICOMPETITIVE EFFECTS...........................................20

     A.   Redbox Has Not Alleged Anticompetitive Effects Within a
          Plausible Relevant Market. ........................................................................20

          1.   Redbox's Definitions of the Relevant Market in This Case
               Are Untenable Under Prevailing Case Law................................................21

          2.   Redbox's Market Definition and Market Power Allegations
               Are Not Plausible Under *Twombly* and *Iqbal*...........................................24

          3.   Redbox Has Not Alleged—And Cannot Allege—Actual
               Anticompetitive Effects. ........................................................................26

               a.   Redbox Has Not Plausibly Alleged a Reduction in Output...........27

               b.   Redbox's Allegations of "Inflated Prices" and "Consumer
                    Overcharge" Do Not Constitute Plausible Anticompetitive
                    Effects. ............................................................................29

               c.   Redbox's Allegations of "Reduced Consumer Choice" Do
                    Not Support Plausible Allegations of Anticompetitive
                    Effects. ............................................................................30

# TABLE OF CONTENTS
### (continued)

**Page(s)**

    d.    Redbox Has Failed To Counter the Well-Settled Principle That Vertical Nonprice Restraints Generally Enhance Competition.................................................................................31

    e.    Redbox Has Not Alleged Facts That Plausibly Suggest Harm to Interbrand Competition Sufficient To Satisfy *Twombly* and *Iqbal.* ......................................................34

III.    REDBOX LACKS STANDING BECAUSE IT HAS FAILED TO ALLEGE ANTITRUST INJURY ...........................................................................35

IV.    "COPYRIGHT MISUSE" IS NOT AN AFFIRMATIVE CLAIM ...................................37

V.    REDBOX HAS FAILED TO STATE A CLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACT..........................................................37

VI.    REDBOX HAS FAILED TO STATE A CLAIM FOR TORTIOUS INTERFERENCE WITH BUSINESS OPPORTUNITY OR FOR UNFAIR COMPETITION ...........................................................................38

CONCLUSION...........................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Agilent Tech., Inc. v. Kirkland,
No. 3512-VCS, 2009 WL 119865 (Del. Ch. Jan. 20, 2009)...............................................38, 40

Allen-Myland, Inc. v. IBM Corp.,
33 F.3d 194 (3d Cir. 1994).................................................................................................23

Alvord-Polk, Inc. v. F. Schumacher & Co.,
37 F.3d 996 (3d Cir. 1994).................................................................................................17

Angelico v. Lehigh Valley Hosp., Inc.,
184 F.3d 268 (3d Cir. 1999)..............................................................................................35

Anheuser-Busch, Inc. v. G.T. Britts Distrib., Inc.,
44 F. Supp. 2d 172 (N.D.N.Y. 1999)..........................................................................31, 36

Ashcroft v. Iqbal,
129 S. Ct. 1937 (2009)............................................................................................. *passim*

Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters,
459 U.S. 519 (1983)...........................................................................................................35

Bell Atl. Corp. v. Twombly,
550 U.S. 544 (2007)................................................................................................. *passim*

Boyd v. Tempay,
No. 07-377, 2008 WL 5156307 (D. Del. Dec. 4, 2008) ..............................................18, 20

Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,
429 U.S. 477 (1977)......................................................................................................26, 36

Buck v. Hampton Twp. Sch. Dist.,
452 F.3d 256 (3d Cir. 2006)..................................................................................................9

Burtch v. Milberg Factors, Inc.,
No. 07-556, 2009 WL 840589 (D. Del. Mar. 30, 2009) .............................................18, 19, 20

Bus. Elecs. Corp. v. Sharp Elecs. Corp.,
485 U.S. 717 (1988)...........................................................................................................31

Cable Holdings of Georgia, Inc. v. Home Video, Inc.,
825 F.2d 1559 (11th Cir. 1987) .........................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

Carell v. Shubert Org., Inc.,
        104 F. Supp. 2d 236 (S.D.N.Y. 2000)............................................................24

Cascade Cabinet Co. v. W. Cabinet & Millwork Inc.,
        710 F.2d 1366 (9th Cir. 1983) ..........................................................28, 29

City of Pittsburgh v. West Penn Power Co.,
        147 F.3d 256 (3d Cir. 1998)...............................................................35

Continental T.V., Inc. v. GTE Sylvania Inc.,
        433 U.S. 36 (1977)..............................................................................31

Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.,
        854 F.2d 802 (6th Cir. 1988) ...............................................28, 33, 34

DeBonaventura v. Nationwide Mut. Ins. Co.,
        419 A.2d 942 (Del. Ch. 1980)..............................................................8

Delaware Solid Waste Auth. v. E. Shore Envtl., Inc.,
        No. Civ. A 1472-K, 2002 WL 537691 (Del. Ch. Mar. 28, 2002)...........................40

Diceon Elecs., Inc. v. Calvary Partners, L.P.,
        772 F. Supp. 859 (D. Del. 1991)..........................................................9

Discon Inc. v. NYNEX Corp.,
        86 F. Supp. 2d 154 (W.D.N.Y. 2000) ...................................................30

E&L Consulting, Ltd. v. Doman Indus. Ltd.,
        472 F.3d 23 (2d Cir. 2006), cert. denied, 552 U.S. 816 (2007) ...............31

Elder-Beerman Stores Corp. v. Federated Dept. Stores, Inc.,
        459 F.2d 138 (6th Cir. 1972) .............................................................28

Fisher v. City of Berkeley, California,
        475 U.S. 260 (1986)............................................................................30

Floors-N-More, Inc. v. Freight Liquidators,
        142 F. Supp. 2d 496 (S.D.N.Y. 2001)..................................................28

Fowler v. UPMC Shadyside,
        578 F.3d 203 (3d Cir. 2009)......................................................5, 15, 16

Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.,
        386 F.3d 485 (2d Cir. 2004)................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

Gianna Enters. v. Miss World (Jersey) Ltd.,
 551 F. Supp. 1348 (S.D.N.Y. 1982)..................................................................24, 27

Global Disc. Travel Servs., LLC v. Trans World Airlines, Inc.,
 960 F. Supp. 701 (S.D.N.Y. 1997) ...............................................................24

Habitat Ltd. v. Art of the Muse, Inc.,
 No. 07-CV-2883, 2009 WL 803380 (E.D.N.Y. Mar. 25, 2009)................................28

IDT Corp. v. Building Owners & Managers Ass'n Int'l,
 No. 03-4113, 2005 WL 3447615 (D.N.J. Dec. 15, 2005)........................................21

Illinois Tool Works Inc. v. Indep. Ink, Inc.,
 547 U.S. 28 (2006)...............................................................................24

In re Elevator Antitrust Litig.,
 502 F.3d 47 (2d Cir. 2007)......................................................................19

In re Intelligroup Sec. Litig.,
 527 F. Supp. 2d 262 (D.N.J. 2007) ..............................................................4

In re NAHC, Inc. Sec. Litig.,
 306 F.3d 1314 (3d Cir. 2002)....................................................................9

Int'l Logistics Group, Ltd. v. Chrysler Corp.,
 884 F.2d 904 (6th Cir. 1989) ...................................................................18

Jackson v. Broad. Music, Inc.,
 No. 04-CV-5948, 2006 WL 250524 (S.D.N.Y. Feb. 1, 2006)....................................4

John J. & Warren H. Graham v. Triangle Publ'g, Inc.,
 233 F. Supp. 825 (E.D. Pa. 1964) ..............................................................18

Joyce Beverages of New York, Inc. v. Royal Crown Cola Co.,
 555 F. Supp. 271 (S.D.N.Y. 1983) ..............................................................28

K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.,
 61 F.3d 123 (2d Cir. 1995).......................................................................21

Kendall v. Visa U.S.A., Inc.,
 518 F.3d 1042 (9th Cir. 2008) ..................................................................19

Kestembaum v. Falstaff Brewing Corp.,
 575 F.2d 564 (5th Cir. 1978) ...................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

Klein v. Am. Luggage Works, Inc.,
  323 F.2d 787 (3d Cir. 1963)...................................................................18

Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,
  551 U.S. 877 (2007)........................................................................33

McGlinchy v. Shell Chem. Co.,
  845 F.2d 802 (9th Cir. 1988) ..............................................................26

Monsanto Co. v. Spray-Rite Serv. Corp.,
  465 U.S. 752 (1984)........................................................................18

Nat'l Auto Brokers Corp. v. Gen. Motors Corp.,
  572 F.2d 953 (2d Cir. 1978)...............................................................28

NYNEX Corp. v. Discon, Inc.,
  525 U.S. 128 (1998)........................................................................20

O.S.C. Corp. v. Apple Computer, Inc.,
  792 F.2d 1464 (9th Cir. 1986) ............................................................29

Omega Envtl., Inc. v. Gilbarco, Inc.,
  127 F.3d 1157 (9th Cir. 1997) ............................................................28

Orson, Inc. v. Miramax Film Corp.,
  79 F.3d 1358 (3d Cir. 1996)........................................................... *passim*

PepsiCo v. Coca Cola Co.,
  No. 98 Civ. 3282, 1998 WL 547088 (S.D.N.Y. Aug. 27, 1998) .............................23

Queen City Pizza, Inc. v. Domino's Pizza, Inc.,
  124 F.3d 430 (3d Cir. 1997)........................................................... *passim*

Rambus Inc. v. FTC,
  522 F.3d 456 (D.C. Cir. 2008), cert. denied, 129 S. Ct. 1318 (2009)....................30

Redbox Automated Retail LLC v. Universal City Studios LLLP,
  C.A. No. 08-766, 2009 WL 2588748 (D.N.J. Aug. 17, 2009)........................... *passim*

Regency Oldsmobile, Inc. v. Gen. Motors Corp.,
  723 F. Supp. 250 (D.N.J. 1989) ...........................................................18

Rick-Mik Enters. Inc. v. Equilon Enters., LLC,
  532 F.3d 963 (9th Cir. 2008) ..............................................................24

# TABLE OF AUTHORITIES

**Page(s)**

Rome Ambulatory Surgical Ctr., LLC v. Rome Mem'l Hosp., Inc.,
349 F. Supp. 2d 389 (N.D.N.Y. 2004)................................................................30

Rosenberg v. XM Ventures,
129 F. Supp. 2d 681 (D. Del. 2001)..................................................................9

RxUSA Wholesale, Inc. v. Alcon Labs., Inc.,
No. 06-CV-3447, 2009 WL 3111728 (E.D.N.Y. Sept. 24, 2009)...........................19

Ryko Mfg. Co. v. Eden Servs.,
823 F.2d 1215 (8th Cir. 1987) .........................................................................32

Rypac Packaging Mach. Inc. v. Poges,
2000 WL 567895 (Del. Ch. May 1, 2000)...........................................................38

Satellite Television & Associated Res., Inc. v. Cont'l Cablevision of Virginia,
714 F.2d 351 (4th Cir. 1983) ...........................................................................22

Seagood Trading Corp. v. Jerrico, Inc.,
924 F.2d 1555 (11th Cir. 1991) ........................................................................27

Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.,
171 F.3d 912 (3d Cir. 1999)......................................................................35, 37

Tennessean Truckstop, Inc. v. NTS, Inc.,
875 F.2d 86 (6th Cir. 1989) .............................................................................36

Theatre Party Assocs., Inc. v. Shubert Org., Inc.,
695 F. Supp. 150 (S.D.N.Y. 1988) ...................................................................24

Tops Mkts., Inc. v. Quality Mkts., Inc.,
142 F.3d 90 (2d Cir. 1998)...............................................................................21

Toscano v. PGA Tour, Inc.,
70 F. Supp. 2d 1109 (E.D. Cal. 1999)................................................................18

TV Commc'ns Network, Inc. v. Turner Network Television, Inc.,
964 F.2d 1022 (10th Cir. 1992) ........................................................................24

U.S. Land Res., LP v. JDI Realty LLC,
No. 08-5162, 2009 WL 2488316 (D.N.J. Aug. 12, 2009) .....................................9

United States v. Colgate & Co.,
250 U.S. 300 (1919)................................................................................8, 17

# TABLE OF AUTHORITIES

**Page(s)**

United States v. E.I. du Pont de Nemours & Co.,
  351 U.S. 377 (1956)............................................................................................23

United States v. Merck-Medco Managed Care, L.L.C.,
  336 F. Supp. 2d 430 (E.D. Pa. 2004) .................................................................10

United States v. Visa U.S.A. Inc.,
  163 F. Supp. 2d 322 (S.D.N.Y. 2001)................................................................26

United States, ex rel. Lobel v. Express Scripts, Inc.,
  No. 09-1047, 2009 WL 3748805 (3d Cir. Nov. 10, 2009) .................................15

Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.,
  342 F.3d 191 (3d Cir. 2003)...............................................................................37

Westman Commc'n Co. v. Hobart Int'l, Inc.,
  796 F.2d 1216 (10th Cir. 1986) ...............................................................32, 33, 34

Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.,
  810 F.2d 243 (D.C. Cir. 1987) ...........................................................................30

**Statutes & Rules**

15 U.S.C. § 1 ............................................................................................................7

Fed. R. Civ. P. 12.................................................................................................1, 7

Fed. R. Evid. 201 ...................................................................................................10

**Other Authorities**

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, ¶ 2131 .......................27

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, ¶ 533 .........................23

Defendant Warner Home Video ("Warner") respectfully submits this opening brief in support of its motion to dismiss the amended complaint filed by Plaintiff Redbox Automated Retail, LLC ("Redbox" or "Plaintiff") under Fed. R. Civ. P. 12(b)(6).

## PRELIMINARY STATEMENT

Like other motion picture distributors, Warner licenses and sells DVDs according to specified terms through various distribution channels. Those distribution channels include wholesale distributorships and direct sale relationships with retailers and rental companies. Warner also licenses and sells its product pursuant to a variety of time frames or "windows". For instance, a film is typically first released in theaters, followed by release as a DVD and "pay-per-view" or "video on demand", then premium channels (e.g., HBO), then cable and satellite, etc.

On August 13, 2009, Warner unilaterally announced a change in its terms of distribution for Warner DVDs. Warner announced that, beginning at the end of October 2009, it would license DVDs directly to kiosk rental companies and mail-order subscription vendors instead of selling indirectly to those companies through other distributors. Warner made clear that it would unilaterally refuse to deal with distributors who did not honor its terms of sale and its direct dealing with kiosk rental companies. Warner also offered Redbox and other kiosk companies licensing or sales terms subject to a 28-day window following initial DVD release.

Redbox, a kiosk rental company who already has direct distribution agreements with a number of studios, including Sony, Paramount, Lionsgate, Summit and NCircle Entertainment, and who obtains new-release DVDs through multiple other distribution channels, responded to Warner's new policy and offer of direct dealing to Redbox by bringing this lawsuit on August 18, 2009. After Warner moved to dismiss that complaint, Redbox voluntarily withdrew it and filed an amended complaint on November 30, 2009. The amended complaint adds few new factual allegations and, as set forth below, unsuccessfully attempts to wordsmith

around Supreme Court case law requiring dismissal based on the facts alleged. Critically, although Warner released four DVD titles before the amended complaint was filed that are subject to the new distribution policy ("The Orphan", "My Sister's Keeper", "Four Christmases" and "Shorts"), nowhere does Redbox claim it has been unable to obtain, or that consumers have had to pay more for, any of these DVDs.

Plain and simple, this is a business dispute between Redbox and Warner; a dispute about Warner's terms of sale, and a dispute about a decades-old policy of Warner exercising its unilateral right to release its product at different times in "windows". By transforming a business negotiation into an antitrust lawsuit, Redbox hopes that this Court will give it leverage at the bargaining table. The law is clear that assisting one party over another in business negotiations is not the purpose of the antitrust laws—and is a waste of this Court's resources. The antitrust laws are also not intended to protect any particular merchant's margins or input costs. Indeed, the antitrust laws are intended to protect against harm to competition as a *whole*—which, here, is consumer access to filmed entertainment in a myriad of forms. Bluntly put, the antitrust laws are indifferent to the fate of any particular merchant. As a result, Redbox's amended complaint falls far short of stating an actionable claim.

Perhaps the most telling indicator that Redbox's antitrust claims lack any substantive merit is the fact that, at the time Redbox's original complaint was filed, Warner's distribution policy had not yet taken effect and Redbox's allegations of competitive harm were purely speculative; but now, after the October release of "The Orphan" and three other DVDs, the policy has taken effect. If Warner's policy had or ever could actually lead to the reduced competition, raised prices and reduced supply that Redbox claims, Redbox would have said so with respect to "The Orphan" and these other DVDs. It did not, because it cannot. Redbox's

amended complaint does *not* allege that it has actually been unable to procure or stock new-release copies of "The Orphan", it does *not* allege that prices for "The Orphan" have actually risen, and it does *not* allege that supply of "The Orphan" to consumers has actually been reduced; nor does it make such allegations with respect to the other DVDs affected by the policy. In other words, Redbox remains unable to point to any fact or reality-based allegation supporting the argument that competition as a whole has been or will be injured as a result of Warner's policy. This is fatal to Redbox's claims.

As this Court is aware, Redbox's complaint against Warner is one of three lawsuits that it has now filed against movie studios with which it has not reached a business agreement—Redbox has also sued Universal Studios Home Entertainment and Twentieth Century Fox Home Entertainment.  Despite Redbox's amendment of its complaint, this case remains different from the <u>Universal</u> case in a number of critical respects.

<u>First</u>, circumstances have changed since Redbox filed suit against Universal in October of 2008.  Redbox's complaint against Warner acknowledges that, since Redbox sued Universal, Redbox's business has grown and its kiosks have multiplied.  (<u>See</u> Am. Compl. ¶¶ 16, 18 & <u>infra</u> n.8 (Redbox had over 12,000 kiosks nationwide at the end of 2008; grew to over 17,000 kiosks; currently there are over 20,000 kiosks).)[1]  Thus, since the alleged Universal "boycott" against Redbox has been in effect, Redbox has continued to compete vigorously. Redbox's continued growth during the period Universal's distribution policy has been in place belies its allegations of competitive injury based on Warner's distribution policy here. Moreover, Redbox now has direct distribution deals with a number of studios that were not in

---

[1] Redbox's original complaint against Universal was filed on October 10, 2008, D.I. No. 1. Citations to "Am. Compl." refer to the Amended Complaint filed by Redbox against Warner in the instant action on November 30, 2009, C.A. No. 09-613, D.I. No. 21.

place when it brought the Universal case:   Redbox's direct deals with Sony, Paramount, Lionsgate, Summit and NCircle alone supply Redbox with 50% of the new-release DVDs it seeks to carry.   The fact that Redbox cannot also obtain Warner's new-release offerings through the wholesale channel of its choice evinces no harm to competition as a whole.   Finally, Redbox does not identify any actual "decrease[d] supply", "reduce[d] consumer choice" or "increase[d] price" that has actually occurred as it predicted since the Universal policy took effect over a year ago.   (See Univ. Am. Compl.[2] ¶¶ 66-67, 78.)   Indeed, Redbox's public statements during the time the policy has been in effect assert just the opposite.[3]

Second, there have been significant case law developments since the Universal complaint was filed.   On May 18, 2009, the Supreme Court issued its opinion in Ashcroft v. Iqbal, which built upon the Twombly requirement that "only a complaint that states a plausible claim for relief survives a motion to dismiss".   Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007).   The Court instructed that a claim has facial plausibility only "when the plaintiff pleads *factual content* that allows the court to draw the *reasonable inference* that the defendant is liable for the misconduct alleged" and that a court must "draw on its judicial experience and common sense" in making this assessment.   Id. at 1949-50 (emphasis added).   The Court also affirmed that "[w]here a complaint pleads facts that

---

[2] Citations to "Univ. Am. Compl." refer to the First Amended Complaint filed by Redbox against Universal Studios on Jan. 22, 2009, C.A. No. 08-766, D.I. No. 30.

[3] See Redbox Automated Retail, LLC's Reply Brief in Support of Its Motion to Strike dated Oct. 14, 2009, in Universal, C.A. No. 08-766, D.I. No. 61, at 2 (acknowledging Redbox's statements that despite Universal policy Redbox "continues to provide [its customers] the hit releases that they require" and that it has an "amazing ability to acquire product" despite the claimed boycott); see Jackson v. Broad. Music, Inc., No. 04-CV-5948, 2006 WL 250524, at *7 (S.D.N.Y. Feb. 1, 2006) ("the court may take judicial notice of . . . admissions in pleadings and other documents in the public record filed by a party in other judicial proceedings that contradict the party's factual assertions in a subsequent action without converting the motion into one for summary judgment"); In re Intelligroup Sec. Litig., 527 F. Supp. 2d 262, 273 (D.N.J. 2007).

are *merely consistent with* a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief," particularly when the actions alleged are "more likely explained by lawful, unchoreographed free-market behavior" or "obvious alternative explanation[s]". Id. at 1949-51 (emphasis added; quotation and punctuation omitted).   On August 18, 2009, the Third Circuit confirmed that Iqbal "provides the final nail-in-the-coffin for the 'no set of facts' standard that applied to federal complaints before Twombly", and that pleading standards have now "shifted from simple notice pleading to a more heightened form of pleading". Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009).

Third, the allegations in this case are different from the allegations in the Universal case. In Universal, this Court considered the relevant market to be one for Universal DVDs (Univ. Op.[4] at 9), and Redbox argued that Universal orchestrated a "concerted boycott at both the wholesale and retail level", that Redbox was forced to turn to the "costly and inconvenient" method of purchasing from retailers, that retailers canceled orders that Redbox had made for Universal DVDs, and that Redbox employees were "escorted out" of stores when they attempted to purchase multiple Universal DVDs (id. ¶¶ 49-51). Here, Redbox alleges that the market at issue is one for *all "new-release DVDs"* (with purported submarkets for single DVDs and DVD genres) (Am. Compl. ¶¶ 23, 60-62), alleges only that it lacks viable "wholesale channels" to purchase new-release DVDs, and speculates that Warner has also "interfered with" its ability to obtain product through retailers and other distributors because certain retailers have refused to sell "new-release" DVDs in bulk to Redbox (id. ¶¶ 32, 38, 81, 84). Unlike in the Universal case, the retailer allegations are based solely on the notion that it would not make

---

[4] Citations to "Univ. Op." refer to the opinion by this Court dated Aug. 17, 2009, in Redbox Automated Retail LLC v. Universal City Studios LLLP, C.A. No. 08-766, 2009 WL 2588748 (D.N.J. Aug. 17, 2009) (D.I. No. 46).

economic sense for a retailer to ever deny bulk sales of new-release DVDs to Redbox—which is plainly incorrect, see Parts I & VI, infra. (Id. ¶¶ 32, 79.) Moreover, in this case Redbox describes retailers simply as "other channels from which to purchase DVDs". (See Am. Compl. ¶ 78.) Finally, unlike in the Universal case, Redbox does not allege that it, or competition as a whole, has suffered injury as a result of Warner's actions (i.e., with respect to "The Orphan" or the other DVDs affected by the policy)—only that injury will be suffered in the future. (See Univ. Am. Compl. ¶ 62; Am. Compl. ¶¶ 39-41.)

Thus, the antitrust claims Redbox asserts now against Warner are different from those asserted in the Universal case, in both substance and context. Most fundamentally, Redbox has failed to allege—and cannot allege—the actual concerted action necessary to state a Sherman Act Section 1 claim. (See infra Part I.) Redbox's amended complaint attempts to do so by adding terms such as "agreement" without facts to plausibly support those buzzwords. Twombly and Iqbal require more than mere words—they require factual allegations plausibly suggesting actionable conduct. (Id.)

Equally and independently fatal for Redbox is its lack of plausible allegations that there have been or will be any anticompetitive effects resulting from Warner's actions. Redbox has not alleged that it is foreclosed from competing in any "DVD market", whether that market is defined as new-release DVDs, single DVDs, or "DVD genres". (See infra Part II.A.1-2.) Redbox does not allege that consumers are foreclosed from obtaining new-release DVDs from Redbox or from Redbox's numerous other competitors in the home entertainment industry. (See infra Part II.A.3.) And Redbox fails to suggest that interbrand competition (i.e., competition among all studios' films), which the Supreme Court has repeatedly instructed is the primary concern of the antitrust laws, will be harmed as a result of Warner's distribution policy—as

opposed to the more likely result that it will be stimulated. (See infra Part II.A.3.)  Redbox does not make these allegations because it cannot—the fact is that competition is thriving, and has continued unabated since the lawsuit against Universal was filed over a year ago and since the Warner policy took effect. (See infra at pp. 9-10.)

For these and the other reasons outlined below, Redbox clearly has failed to state a plausible Section 1 claim against Warner.  Moreover, the tortious interference and copyright misuse claims that Redbox asserts against Warner here are virtually identical to those rejected as baseless by this Court in the Universal case and should be rejected here too. (See infra Parts IV-V.)  Finally, Redbox's amended complaint adds two entirely new claims for tortious interference with prospective business opportunity and for unfair competition. (Am. Compl. Counts VII-VIII.)  Both of these claims fail because Redbox's allegations do not plausibly suggest that Warner wrongfully interfered with any prospective business relationships or that Redbox had a reasonable expectation of business opportunity. (See infra Part VI.)

Redbox's amended complaint therefore remains defective and should be dismissed.

## NATURE AND STAGE OF PROCEEDINGS

Redbox filed its initial complaint against Warner on August 18, 2009, asserting claims based on Section 1 of the Sherman Act (15 U.S.C. § 1), tortious interference with contract and "copyright misuse".  Warner moved to dismiss the complaint in its entirety pursuant to Fed. R. Civ. P. 12(b)(6) on October 1, 2009.  Redbox requested additional time to oppose the motion, and on October 13, 2009, Redbox filed a stipulation extending its time to oppose the motion to November 30.  Redbox subsequently informed Warner that it would seek to amend its complaint. On November 30, 2009, Redbox filed the amended complaint that is the subject of this motion.

## SUMMARY OF ARGUMENT

1.     Redbox cannot state a Section 1 claim under the Sherman Act because its factual allegations remain inconsistent with any actionable agreement or common scheme; and its perfunctory and unsupported assertions of "agreement" do not support a plausible Section 1 claim under the Supreme Court precedent of Colgate and Twombly. (See Part I.)

2.     Redbox's Section 1 claim fails because it has not defined a plausible relevant market under prevailing case law.  Because Redbox's defined markets and market power allegations are not plausible, it is not entitled to a presumption of actual anticompetitive effects. (See Part II.A.1-2.)

3.     Redbox has not alleged any facts supporting actual, market-wide anticompetitive effects.  Redbox's allegations relating to reductions in output, inflated prices, consumer overcharge and reduced choice are necessarily speculative, misunderstand prevailing law, conclusory and do not constitute actual anticompetitive effects.  Moreover, Redbox has alleged nothing to counter the well-settled principle that vertical nonprice restraints generally enhance competition. (See Part II.A.3.)

4.     Redbox cannot plausibly establish that it has in fact suffered or will soon suffer antitrust injury, i.e., injury of the type that the antitrust laws were designed to prevent, flowing from a defendant's unlawful conduct; thus, Redbox lacks standing. (See Part III.)

5.     Redbox cannot state a claim for "copyright misuse" because it is a defense, not an affirmative claim. (See Part IV.)

6.     Redbox cannot state a claim for tortious interference with contract or business relations because it has not alleged a breach of any actual agreements. (See Part V.)

7.     Redbox cannot state a claim for tortious interference with "prospective business opportunity" or for unfair competition because Redbox's allegations do not plausibly

suggest that Warner wrongfully interfered with any business opportunity or that Redbox had a reasonable expectation of entering into a valid business relationship. (See infra Part VI.)

## STATEMENT OF FACTS[5]

"The home video industry is highly competitive." (See Coinstar Inc. Form 10-Q for the period ended Sept. 30, 2009,[6] ("Coinstar 10-Q"), at 34 (Ex. A)[7].) As Redbox's public filings acknowledge, consumers obtain filmed entertainment for home viewing through a number of distribution channels. (See id. at 34-35 (listing multiple competitive distribution channels, including traditional video retailers, mail-delivery and online retailers, retailers and chain stores, pay-per-view, cable, satellite, HBO, Internet sites and libraries).) Redbox rents and sells DVDs to consumers through automated, self-service kiosks located at various retail outlets. (Am. Compl. ¶ 2.) Redbox's kiosks "typically hold up to 700 DVDs comprising 70-200 individual titles" and are "updated weekly with a supply of new-release DVDs". (Id. ¶ 16.)

---

[5] The facts alleged in the complaint—many of which are plainly inaccurate—are assumed to be true only for the purposes of this motion to dismiss.

[6] Redbox is a wholly-owned subsidiary of Coinstar, Inc. ("Coinstar"). See Coinstar Form 8-K dated July 17, 2009, Item 8.01 (Ex. B); see also Redbox Rule 7.1 Statement (D.I. No. 3). "In evaluating a motion to dismiss, [a court] may consider . . . items subject to judicial notice [and] matters of public record." Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006) (internal citation omitted). Courts have found that "Securities and Exchange Commission ("SEC") filings fall within [the] category of public records" that can be "considered" on a motion to dismiss. Rosenberg v. XM Ventures, 129 F. Supp. 2d 681, 685, 687 n.6 (D. Del. 2001) (citing Diceon Elecs., Inc. v. Calvary Partners, L.P., 772 F. Supp. 859, 860 (D. Del. 1991)); see also In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1331 (3d Cir. 2002). Admissions made in Coinstar SEC filings regarding competition and distribution of products in the home video industry are "not subject to reasonable dispute" because they are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned". See Fed. R. Evid. 201(b); cf. U.S. Land Res., LP v. JDI Realty LLC, No. 08-5162, 2009 WL 2488316, at *4 (D.N.J. Aug. 12, 2009). Accordingly, the Court should consider or take judicial notice of the Coinstar SEC filings identified herein.

[7] Citations to "Ex. __" refer to exhibits attached to the Declaration of Katherine B. Forrest, submitted herewith.

Since Redbox's inception in 2002, it has experienced significant growth and commercial success, expanding from 125 kiosks in 2004 to over 12,000 by the end of 2008, to over 17,000 in 2009. (See Am. Compl. ¶¶ 16, 18.)[8] Indeed, "Redbox now has nearly four times the number of DVD rental locations in the United States that Blockbuster has". (See Am. Compl. ¶ 18.) "[I]n the first half of 2009, Redbox rented an average of 27 million DVDs per month." (Id.) Much of this amazing growth occurred after Redbox's lawsuit against Universal was originally filed in the third quarter of 2008. (Id. ¶¶ 16, 18.)

Earlier this year, and with great fanfare, Redbox entered into direct distribution agreements with a number of studios, including Sony, Lionsgate and Paramount.[9] Redbox also recently signed agreements with Summit Entertainment, the studio that distributes the wildly popular "Twilight" franchise, and NCircle Entertainment, a leading distributor of children's entertainment.[10] All of these deals will account for approximately 50% of the total new-release DVDs licensed and purchased by Redbox in 2009. (See Ex. B (Sony accounts for 19.9%); Ex. C (Lionsgate accounts for 7.4%); Ex. D (Paramount accounts for 18.5%).) None of these agreements had been signed at the time Redbox sued Universal.

Redbox also "does significant business" with two wholesale film distributors: VPD and Ingram. (Univ. Op. at 3.) Redbox's complaint states that it has historically purchased

---

[8] As of September 30, 2009, Redbox's total number of kiosks had climbed to 20,600 and was expected to reach 22,000 by the end of the year. (See Coinstar 10-Q at 7, 34 (Ex. A).)

[9] See Coinstar Form 8-K dated July 17, 2009, Item 8.01 (Sony) (Ex. B); Coinstar Form 8-K dated Aug. 10, 2009, Item 8.01 (Lionsgate) (Ex. C); Coinstar Form 8-K dated Aug. 25, 2009, Item 8.01 (Paramount) (Ex. D); see also Coinstar Form 8-K dated Dec. 10, 2009 (extending Paramount deal) (Ex. E).

[10] See Redbox Press Releases dated Nov. 2, 2009, "Redbox Signs Distribution Agreement with NCircle Entertainment" and "Redbox and Summit Entertainment Sign Distribution Agreement" (Ex. F). See Fed. R. Evid. 201(b); United States v. Merck-Medco Managed Care, L.L.C., 336 F. Supp. 2d 430, 446 & n.12 (E.D. Pa. 2004) (taking judicial notice of facts in press release).

"all, or nearly all" of its inventory of DVDs from VPD and Ingram. (Am. Compl. ¶ 33.) Redbox does not allege that, absent an ability to acquire product from VPD or Ingram, it is *unable* to obtain Warner new-release DVDs—just that it "no longer ha[s] access to new-release DVDs through its normal wholesale channels". (Am. Compl. ¶ 40.) Redbox also does not allege that it has not been able to obtain adequate supply of "The Orphan", "My Sister's Keeper", "Four Christmases" or "Shorts"—the only Warner titles impacted by the new distribution policy as of the filing of Redbox's amended complaint. In other words, Redbox asserts an antitrust violation based solely on the fact that it cannot purchase Warner new-release DVDs from the distribution channel of its choice at the time of its preference.

Redbox alleges that it has a "supply contract" with Ingram that "gives Redbox the right to purchase DVDs from Ingram" and "similarly obligates Ingram to sell to Redbox" DVDs "upon Redbox's request". (Id. ¶ 34.) Redbox claims that it has a "similar business relationship with VPD". (Id. ¶ 36.) The Redbox-Ingram agreement is attached to Redbox's complaint. (See Am. Compl. Ex. A (Ingram Agreement dated August 27, 2008) at 3.) The agreement states that Redbox is responsible for "negotiat[ing] DVD software pricing directly with the studios" and that Ingram "will order DVD software from the studios at the pricing negotiated by Redbox" (Redbox asserts that the term "studios" includes Warner and its affiliates). (See id. at 3; see also Am. Compl. ¶ 34.) The agreement does not state that Ingram's or VPD's contractual obligations to Redbox include the *guaranteed* provision of Warner DVDs upon Redbox's demand.

Redbox asserts that, on August 13, 2009, Warner's President Mark Horak informed Redbox that it would "demand that VPD, Ingram and other traditional distributors stop distributing new-release DVDs to Redbox" because Warner would instead sell to Redbox and other kiosks directly (as Paramount, Sony, Lionsgate and others already have arranged to do).

(<u>Id.</u> ¶ 30.)  Warner provided Redbox with its initial terms of sale, offering what Redbox dubs a 28-day "blackout period" [<u>i.e.</u>, window] with respect to the provision of "Warner DVDs with release dates beginning in October 2009".  (<u>Id.</u>)  In its amended complaint, without any factual specificity, Redbox added claims that Warner then "contacted representatives of both VPD and Ingram, seeking confirmation that both VPD and Ingram would agree to stop selling new-release DVDs to Redbox", telling them "that, absent agreement, it would eliminate all supply to them". (<u>Id.</u> ¶¶ 4, 30-31.)  Redbox also amended its complaint to allege that when VPD and Ingram were "faced with this choice", they "bow[ed] to Warner's direct demand" and "agreed to Warner's request", which they "communicated to Warner".  (<u>Id.</u> ¶¶ 4, 31, 37.)

Redbox's amended complaint further asserts that it has "been informed by Wal-Mart, Best Buy and Target that Redbox may not purchase more than three copies of any new-release DVD".  (<u>Id.</u> ¶ 32.)  Redbox claims that "each retailer has an incentive to sell as many DVDs as possible to any purchaser who walked into a store and wanted to buy DVDs", and concludes that "[i]t makes no economic sense for any retailer to deny sales to Redbox unless it knows that other retailers have also agreed not to meet Redbox's demand".  (<u>Id.</u>)  Redbox thus speculates that Warner sought "cooperation from [ ] major wholesalers and retailers to prevent sales of new-release DVDs to Redbox".  (<u>Id.</u>)  Redbox does not allege the "who", "what", "when" or "where" of these alleged contacts.

Redbox asserts that "new-release DVDs constitute a separate market" from DVDs that "have been on the market for longer periods", and that the value of new-release DVDs is "perishable" because "their value drops rapidly and materially" from the date they are released. (<u>Id.</u> ¶¶ 22-23.)  Redbox further claims that "a particular new-release DVD is generally not an acceptable substitute for another new-release DVD" and that different "categories or genres" of

movies constitute another "distinct submarket within the overall new-release DVD market" because there is "low cross-elasticity of demand among consumers for new-release DVDs of different genres". (Id. ¶¶ 25, 61.) Thus, Redbox urges that the "relevant market" to be analyzed in this case consists of all "new-release DVDs" with two possible "submarkets": (i) single, copyrighted, new-release DVD titles, or, (ii) single "genres" of new-release DVDs (e.g., action films or comedies). (Id. ¶¶ 28, 60-62.) Redbox does *not* allege that the relevant market consists of *all* Warner DVDs (cf. Univ. Op. at 9), or even all new-release Warner DVDs.

Redbox claims that Warner's announcement of its unilateral decision to negotiate directly with Redbox regarding terms of sale of its DVDs amounts to a "boycott of Redbox orchestrated by Warner" that "will decrease the supply of new-release DVDs in many, or all genres". (Am. Compl. ¶¶ 50-51, 66-68.)   Redbox does not suggest that the decades-old windowing business model used by Warner and other studios—i.e., of applying separate windows for theatrical release, VOD and pay-per-view, airlines, DVDs, cable release, etc.— which is critical to Warner's ability to manage its copyrighted content, *itself* translates to a boycott of Redbox.  Rather, Redbox's complaint reduces to the notion that *it* wants to dictate its distribution window.  And despite Redbox's sweeping allegations, Redbox does not explain how its purported inability to obtain a Warner action film during the 28-day window would or could affect its ability to obtain, for example, a Sony action film in the same period, or how Warner's announced distribution policy could possibly affect the ability of any of Redbox's many competitors to obtain new-release DVDs from Warner or from other studios such that the "supply" of new-release DVDs in the "new-release" market or "submarkets" could be reduced.

Redbox alleges that, absent Warner's policy, it would have continued to purchase "nearly all" of its supply of Warner DVDs from VPD and Ingram, and that "Warner's ability to

stop Ingram and VPD from selling to Redbox is due to Warner's dominant market position and monopolistic power within the industry with respect to its unique, new-release DVDs". (Id. ¶ 38.)  Redbox concludes that as a result of Warner's "communications with distributors", "Redbox lacks viable alternative wholesale channels from which to purchase the new-release DVDs that it needs". (Id.)  Redbox does not allege—because it cannot—that Warner's policy has prevented it from obtaining adequate numbers of new-release DVD product from *other* channels, or that it has been prevented from obtaining other studios' DVD product.

Redbox nonetheless extrapolates from purported distribution restrictions on *Warner* DVDs the existence of purported restrictions on the entire new-release DVD "market", arguing that Warner's distribution policy will "artificially constrain output by preventing consumers from renting new-release DVDs from Redbox and other kiosk rental outlets". (Id. ¶ 39.)  Redbox claims that this will "reduce consumer choice in the various submarkets in the new-release DVD marketplace" and will "artificially increase prices that consumers will have to pay to rent or buy new-release DVDs in those submarkets, thereby negatively affecting consumer welfare". (Id. ¶ 50.)  Redbox claims this will result in "loss of customers" to Redbox and "decreased demand for Redbox's rentals and sales". (Id. ¶ 76.)

Redbox does not suggest that since the time when Universal's distribution policy actions occurred—actions that are the subject of a separate lawsuit—any consumer has *in fact* experienced reduced choice relating to *any* studio's DVDs or has *in fact* paid "artificially increased" prices, or that since the Warner policy took effect in October, any increased prices or decreased supply has occurred.  Indeed, a recent Redbox public filing expressly states that the Warner and Universal distribution policies require Redbox to "obtain DVD titles from alternative sources". (Coinstar 10-Q at 35 (Ex. A).)  Redbox has also made numerous other public

statements affirming that it will continue to supply consumers with new-release DVDs regardless of the studios' distribution policies.[11]   Finally, Redbox acknowledges that Warner's revised policy relates only to the first 28 days of a film's release on DVD.   (See Am. Compl. ¶ 30.) Thus, even on the facts of Redbox's complaint, consumers will not be *prevented* from obtaining Warner films generally, or any Warner DVD from Redbox, after 28 days.

## ARGUMENT

To establish a Section 1 violation, Redbox's amended complaint must allege: "(1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that the plaintiff was injured as a proximate result of the concerted action." Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 442 (3d Cir. 1997).   Redbox's amended complaint fails to state a claim based on these elements when measured against the "more exacting standard" of pleading established by Twombly and Iqbal.   United States, ex rel. Lobel v. Express Scripts, Inc., No. 09-1047, 2009 WL 3748805, at *1 (3d Cir. Nov. 10, 2009) (citing Twombly, 550 U.S. at 555-57, and Iqbal, 129 S. Ct. at 1950-51).

Twombly and Iqbal were game-changers for would-be antitrust litigants.   See Fowler, 578 F.3d at 209-211.   The Supreme Court has now made it absolutely clear that before a plaintiff is entitled to force a defendant to undertake the extraordinary costs involved in defending an antitrust case, the allegations must be carefully considered, and a court must ask whether, applying a "common sense" analysis, the complaint could "raise a right to relief above the speculative level".   Iqbal, 129 S. Ct. at 1950; Twombly, 550 U.S. at 555.   The "plausibility"

---

[11]   See, e.g., Redbox Automated Retail, LLC's Reply Brief in Support of Its Motion to Strike dated Oct. 14, 2009, in Universal, C.A. No. 08-766, D.I. No. 61, at 2 (acknowledging statements that, despite Universal's policy, Redbox "continues to provide [its customers] the hit releases that they require" and has an "amazing ability to acquire product" despite the claimed boycott).

pleading framework must be applied to each of the elements Redbox must plead to state a claim under Section 1 of the Sherman Act.[12] See Iqbal, 129 S. Ct. at 1947.

In the Supreme Court's 2009 Iqbal decision, the Court instructed that determining plausibility is "a context-specific task" requiring the reviewing court to draw on "judicial experience", and that "labels and conclusions" will not move claims "across the line from conceivable to plausible". Iqbal, 129 S. Ct. at 1950, 1949-51. Put another way, adding "magic words" to a pleading instead of facts (as Redbox has attempted to do in its amended complaint) does not satisfy Twombly's requirements. Moreover, even if actual new and relevant facts were alleged, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability", it fails to "nudge[]" the claims "across the line from conceivable to plausible". Id. at 1949-51 (quoting Twombly, 550 U.S. at 570). That is plainly the case here.

The day after this Court's opinion on the Universal motion to dismiss was issued, the Third Circuit issued a decision recognizing that Iqbal had affirmed the tightening of pleading standards under Rule 8, done away completely with the "no set of facts" standard, and affirmed that "conclusory or 'bare-bones' allegations will no longer survive a motion to dismiss". Fowler, 578 F.3d at 210. The Third Circuit instructed that, after Iqbal:

> "[A] complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts. As the Supreme Court instructed in Iqbal, 'where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief'."

---

[12] As in the Universal case, Redbox purports to assert antitrust claims using various terms ("quick look", "unlawful boycott", "illegal restraint of trade" and "unreasonable restraint of trade"), but these "claims" are all based on Section 1 of the Sherman Act. (Am. Compl. Counts II-V.) As this Court has recognized, the "quick look doctrine" and the "rule of reason" are "modes of analysis" and are not "separate grounds for antitrust claims", and it is similarly "inappropriate" to distinguish the other two counts. (Univ. Op. at 7.) Thus, because these four counts all allege a single, vertical, rule-of-reason Section 1 claim, they should not be distinguished from one another in analyzing this motion to dismiss. (See id.)

Id. at 211.   Applied to the facts alleged in Redbox's amended complaint against the legal

framework of its substantive claims, this standard mandates dismissal.

I.      REDBOX CANNOT STATE A SECTION 1 CLAIM BECAUSE IT HAS NOT
        ALLEGED ANY AGREEMENT OR COMMON SCHEME

       A.      Warner's Unilateral Actions Do Not Support an Antitrust Claim Under *Colgate*
        and *Twombly.*

       The "very essence" of a Section 1 claim is "the existence of an agreement", which

is a conscious commitment to a common scheme. Alvord-Polk, Inc. v. F. Schumacher & Co., 37

F.3d 996, 999 (3d Cir. 1994).   Simply reciting the word "agreement" is not enough.   Twombly,

550 U.S. at 555.   Acutely aware of this requirement, Redbox amended its complaint to add the

word "agreement" and vague assertions of conduct.   (See, e.g., Am. Compl. ¶¶ 4, 31-32, 38.)

Redbox's key allegations are that Warner "told the distributors that, absent agreement, it would

eliminate all supply to them" and that "[f]aced with the choice Warner provided to them", they

"bow[ed] to Warner's *direct demands*".   (Am. Compl. ¶¶ 4, 37 (emphasis added).)

       Long ago the Supreme Court made it clear that unilateral conduct is wholly

permissible and cannot constitute a Section 1 violation as a matter of law.   United States v.

Colgate & Co., 250 U.S. 300, 307 (1919).   Under the venerable Colgate doctrine:

> "In the absence of any purpose to create or maintain a monopoly, the [Sherman]
> [A]ct does not restrict the long recognized right of trader or manufacturer engaged
> in an entirely private business, freely to exercise his own independent discretion
> as to parties with whom he will deal; and, of course, he may announce in advance
> the circumstances under which he will refuse to sell. . . .   A retail dealer has the
> unquestioned right to stop dealing with a wholesaler for reasons sufficient to
> himself, and may do so because he thinks such dealer is acting unfairly in trying
> to undermine his trade."

Id. Thus, a "manufacturer can announce its resale prices in advance and refuse to deal with those

who fail to comply" and "a distributor is free to acquiesce in the manufacturer's demand in order

to avoid termination" without creating an agreement for purposes of Section 1.  Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 761 (1984).[13]

The allegations in Redbox's amended complaint fall squarely within the Colgate doctrine.  There are no plausible allegations that Warner and its wholesalers made a "conscious commitment to a common scheme" to achieve an anticompetitive effect.  See Boyd v. Tempay, No. 07-377, 2008 WL 5156307, at *3 (D. Del. Dec. 4, 2008) (quoting Monsanto, 465 U.S. at 764).  Redbox asserts only that Warner unilaterally formulated a new distribution policy and instructed that its distributors comply with the terms if they wished to continue to deal with Warner, and that wholesale distributors were forced to acquiesce to these terms to ensure a continued supply of Warner DVDs.  (Am. Compl. ¶¶ 4, 37-38.)  This factual allegation is consistent with unilateral action having "lawful, independent goals" under the law.[14]  Indeed, it is no coincidence that Warner acted the way that it did.  Warner followed a long line of cases and precedent in determining how to instruct its distributors regarding its revised distribution policy in August of 2009, and acted exactly as the law instructed it was permitted to do.[15]

Redbox's allegations relating to retailers such as Wal-Mart, Best Buy and Target and "other distributors" are even further away from establishing the concerted action necessary

---

[13] See also, e.g., Int'l Logistics Group, Ltd. v. Chrysler Corp., 884 F.2d 904, 907 (6th Cir. 1989) ("A conspiracy may not evolve under circumstances where a dealer or distributor involuntarily complies to avoid termination of his product source."); Toscano v. PGA Tour, Inc., 70 F. Supp. 2d 1109, 1115 (E.D. Cal. 1999); see also infra, nn.14-15.

[14] See, e.g., Burtch v. Milberg Factors, Inc., No. 07-556, 2009 WL 840589, at *14-15 (D. Del. Mar. 30, 2009) (quoting Twombly, 127 S. Ct. at 1971); Monsanto, 465 U.S. at 761.

[15] See, e.g., Colgate, 250 U.S. at 307; Monsanto, 465 U.S. at 761; Klein v. Am. Luggage Works, Inc., 323 F.2d 787 (3d Cir. 1963) (retailers who adhere to suggested resale prices, knowing that compliance is expected by manufacturer in consonance with policy, do not thereby, without more, become co-conspirators with the manufacturer); Regency Oldsmobile, Inc. v. Gen. Motors Corp., 723 F. Supp. 250, 266-67 (D.N.J. 1989) (rejecting argument that bank performing administrative functions for defendant was co-conspirator); John J. & Warren H. Graham v. Triangle Publ'g, Inc., 233 F. Supp. 825, 830 (E.D. Pa. 1964); see also supra, nn.13-14.

to state a Section 1 claim than its allegations relating to VPD and Ingram. These allegations fail even to specify the "who", "what", "when", and "where" of the "numerous" agreements Redbox claims exist. (Am. Compl. ¶¶ 4, 32.)[16]  Redbox alleges only that some retailers refused to sell Redbox products in bulk and that they must have been acting pursuant to an agreement because otherwise this refusal to sell would not make economic sense.[17]  This logic is faulty—retailers often place limitations on purchases per customer, and there are also many obvious reasons why retailers may see a reason not to sell in bulk to a kiosk company that directly competes with and cannibalizes their DVD sales.[18]  And again, even if the refusal to sell were due to Warner's distribution policy, that would be nothing more than acquiescence in a unilateral distribution scheme.  Consequently, Redbox has not asserted—and cannot assert—an agreement as is required by Section 1. See supra nn.13-15.

      B.      <u>Redbox Has Not Plausibly Alleged Concerted Action Under *Twombly* and *Iqbal*.</u>

          Redbox's effort to characterize Warner's unilateral statement of the terms upon which it will deal as a "boycott" is nothing more than "the mere pleading of 'statutory words'" in

---

[16] <u>Burtch,</u> 2009 WL 840589, at *13 ("[b]ecause the Complaint offers only vague allegations of unspecified agreements . . . I do not infer from them that a Section 1 conspiracy existed"); <u>Kendall v. Visa U.S.A., Inc.,</u> 518 F.3d 1042, 1048 (9th Cir. 2008); <u>Twombly,</u> 550 U.S. at 565 n. 10; <u>In re Elevator Antitrust Litig.,</u> 502 F.3d 47, 50-51 (2d Cir. 2007) ("averments of agreements made at some unidentified place and time" are "nothing more than a list of theoretical possibilities" and are "insufficient to establish a plausible inference of agreement").

[17] <u>Cf. RxUSA Wholesale, Inc. v. Alcon Labs., Inc.,</u> No. 06-CV-3447, 2009 WL 3111728, at *17 (E.D.N.Y. Sept. 24, 2009) (granting motion to dismiss where plaintiff "conclusorily" argued that "there was no legitimate reason for refusing to sell to plaintiff other than to quell competition" without alleging facts to support the conclusion).

[18] Moreover, Redbox's suggestion that it cannot purchase products in bulk from *any* retailer is contradicted by clear statements in Redbox's own public filings acknowledging that many large retailers continue to sell new-release DVDs in bulk to Redbox. For example, in a recent 8-K filing, Redbox noted that while "[c]ertain Walmart, Best Buy and Target stores have informed field representatives of Redbox that such stores were limiting sales of new-release DVDs to as few as three copies[, . . . many third-party retailer locations, including Walmart, Best Buy and Target locations, have continued to sell new-release DVDs to Redbox without those limitations." (Coinstar 8-K dated November 30, 2009 (Ex. G).)

its amended complaint, which does not satisfy <u>Twombly</u>, <u>Iqbal</u> or the "Rule 8[ ] pleading requirements".[19]  <u>Boyd</u>, 2008 WL 5156307, at *3-4 ("[S]imply pleading . . . that Defendant engaged in concerted action to achieve anticompetitive effects are insufficient allegations to survive a motion to dismiss.").  Moreover, Redbox's rationale for asserting that retailers will not sell to it in bulk must be due to Warner's actions—because to do otherwise makes no economic sense—is not plausible.  Any refusal to sell in bulk is equally, if not more, consistent with a retailer's standard practice and self-interest in dealing with a competitor.  <u>Burtch</u>, 2009 WL 840589, at *14; <u>Twombly</u>, 550 U.S. at 566-67.  Because Redbox's assertions of a two-party "boycott" are simply "labels and conclusions", they cannot suffice to move a plaintiff's claims "across the line from conceivable to plausible".  <u>Iqbal</u>, 129 S. Ct. at 1949-51.  In light of that fundamental failure, Redbox's Section 1 claim must be dismissed.

## II.   REDBOX CANNOT STATE A SECTION 1 CLAIM BECAUSE IT HAS NOT ALLEGED PLAUSIBLE ANTICOMPETITIVE EFFECTS

### A.   <u>Redbox Has Not Alleged Anticompetitive Effects Within a Plausible Relevant Market.</u>

Redbox has failed to assert facts suggesting that the purported conspiracy "unreasonably restrains trade" by producing "adverse, anticompetitive effects within the relevant product and geographic markets".  <u>Orson, Inc. v. Miramax Film Corp.</u>, 79 F.3d 1358, 1367 (3d

---

[19] In the <u>Universal</u> case, this Court recognized that "[a]lthough [Redbox] deems its antitrust claim against Universal a 'group boycott' or an otherwise artificial restraint on trade . . . , its description of its claims in those terms is inconsistent with the fundamental claims alleged". (Univ. Op. at 7-8.)  The conclusion that the "boycott" label is inapplicable to Redbox's claims applies with equal force to this case; however, this case is also distinguished from <u>Universal</u> because, <i>inter alia</i>, the Court did not address the substantive requirements of the "concerted action" prong of Section 1 in <u>Universal</u> and because Redbox's allegations regarding retailers are different in this case.  Moreover, Redbox's conclusory suggestion that Warner's imposition of restrictions on the parties to whom and terms under which its DVDs can be sold automatically amounts to a "boycott" prohibited by the antitrust laws is wrong.  <u>See, e.g.</u> NYNEX Corp. v. Discon, Inc., 525 U.S. 128, 135 (1998) ("[P]recedent limits the <i>per se</i> rule in the boycott context to cases involving horizontal agreements among direct competitors.").  Accordingly, as used by Redbox, the term "boycott" is a misnomer and of no legal effect.

Cir. 1996); <u>IDT Corp. v. Building Owners & Managers Ass'n Int'l</u>, No. 03-4113, 2005 WL

3447615, at *8 (D.N.J. Dec. 15, 2005) (dismissing complaint for lack of anticompetitive effects).

First, Redbox has failed to define a plausible relevant market, and consequently

fails to plausibly allege that Warner has "market power" sufficient to "raise prices above those

that would prevail in a competitive market". <u>Orson</u>, 79 F.3d at 1367.  Had a plausible allegation

of such market power been asserted, this Court might have considered that a "surrogate" for a

demonstration of actual anticompetitive effect. <u>See, e.g.</u>, <u>id.</u>  Second, even if market power had

been adequately alleged, Redbox's amended complaint fails to allege *any* harm to market-wide

competition.[20]  Redbox does not allege facts plausibly supporting an "*actual* anticompetitive

effect[]", such as [a] reduction of output, increase in price, or deterioration in quality of goods and

services" resulting from Warner's distribution policy.  <u>Orson</u>, 79 F.3d at 1367.   To be

cognizable, such effects would have to impact competition *as a whole*.[21]  For these reasons, even

if Redbox had alleged concerted action, it still fails to state an actionable claim.

    1.    <u>Redbox's Definitions of the Relevant Market in This Case Are Untenable<br>Under Prevailing Case Law.</u>

Redbox has "the burden of defining the relevant market" so that potential effects

on competition resulting from Warner's distribution policy can be assessed.  <u>See</u> <u>Queen City</u>

<u>Pizza</u>, 124 F.3d at 436.  Redbox asserts that there are three possible relevant markets here:

- First, Redbox asserts that "new-release DVDs" are a relevant market.  (Am. Compl. ¶¶ 22-23.)  Under this market definition, any Warner new-release DVD

---

[20]   <u>See</u> <u>K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.</u>, 61 F.3d 123, 129 (2d Cir. 1995) ("A showing of market power, while necessary to show adverse effect indirectly, is not sufficient.  There must be other grounds to believe that the defendant's behavior will harm *competition market-wide*.").

[21]   <u>See</u> <u>Tops Mkts., Inc. v. Quality Mkts., Inc.</u>, 142 F.3d 90, 96 (2d Cir. 1998) (showing of "*actual* adverse effect on competition as a whole in the relevant market" ensures that "otherwise routine disputes between business competitors do not escalate to the status of an antitrust action") (emphasis in original).

would compete with all other studios' DVDs, but a consumer wishing to watch a new-release such as "The Orphan" would never settle for watching an older release, such as "My Bloody Valentine". This proposed definition also assumes that any consumer wishing to watch "The Orphan" would insist on obtaining it in a DVD format, as opposed to, for example, obtaining the film via pay-per-view on television through a cable or satellite provider, or on the internet via a digital rental service, download, or in some other way.[22]

- 

- Second, Redbox continues to assert that every individual, copyrighted, new-release movie title held by a given studio is a unique product, has no comparable substitute, and is a "submarket" unto itself. (Am. Compl. ¶¶ 25, 28, 60-61.) For example, using this definition, "The Orphan" would constitute its own market (but only during the time that it is a "new-release"), would not compete with any other film titles, and consumers wishing to watch "The Orphan" as soon as it is released for home-viewing would never settle for watching any other movie instead and will insist on watching their filmed entertainment of choice on DVDs.

- 

- Third, Redbox asserts that new-release DVDs within different "genres" constitute a relevant "submarket". (Id. ¶ 61.) For example, a Warner movie in the "horror" genre such as "The Orphan" would compete with other movies in that genre, such as Sony's "Quarantine", and consumers wishing to watch a film within the "horror" genre would never settle for watching a movie in a "suspense" genre, or watch filmed entertainment on anything other than DVDs.

- 

At no point does Redbox suggest that the relevant market consists solely of *Warner* new-release DVDs. (Compare Univ. Op. at 9 with Am. Compl. ¶¶ 22-25, 28, 60-61.)

"The test for a relevant market is not commodities reasonably interchangeable by a *particular plaintiff*, but 'commodities reasonably interchangeable by consumers for the *same*

---

[22] Redbox offers *no* reason why the relevant market should be limited to films offered for home entertainment on DVD alone and should not instead consist of home entertainment offered in any form, including, e.g., films available for home viewing through pay-per-view, cable, satellite, and internet sites such as iTunes and Hulu. The relevant market to assess in this case should be at least the entire home entertainment market. See Cable Holdings of Georgia, Inc. v. Home Video, Inc., 825 F.2d 1559, 1563 (11th Cir. 1987) (relevant market was "passive visual entertainment which includes cable television, satellite television, video cassette recordings, and free over-the-air television"); Satellite Television & Associated Res., Inc. v. Cont'l Cablevision of Virginia, 714 F.2d 351, 355 (4th Cir. 1983) (affirming market including "cinema, broadcast television, video disks and cassettes, and other types of leisure and entertainment-related businesses for customers who live in single-family dwellings . . ."). Redbox's own public filings acknowledge that it faces competition from multiple video distribution channels and technologies, and also from "other forms of entertainment such as sporting events and video gaming". (See Coinstar 10-Q at 35 (Ex. A).)

purposes'". Queen City Pizza, 124 F.3d at 438 (quoting United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 395 (1956) (emphasis added)). "Interchangeability implies that one product is roughly equivalent to another *for the use to which it is put*; while *there may be some degree of preference for the one over the other, either would work effectively.*" Queen City Pizza, 124 F.3d at 437 (emphasis added) (internal quotation marks and citation omitted).[23]

Redbox's purported "new-release" market is obviously untenable under this standard. Redbox's complaint asserts no fact even suggesting that, regardless of consumer *preferences* for one film over another, the *use* to which a "new-release" film is put is any different from the use to which a non-new-release film is put.[24] That is, Redbox does not explain how the more recent film "The Orphan", which is used for purposes of home entertainment, could possibly be put to a different use than the film "My Bloody Valentine", which is also used for purposes of home entertainment, irrespective of a consumer's personal preference for a "newer" movie over a movie that is less "new". For the same reason, Redbox's "DVD genre" submarket is untenable: Redbox alleges no facts plausibly suggesting that suspense, science-fiction, or horror films are *used* for anything other than home entertainment purposes, regardless of a consumers' personal tastes. Id. Finally, with respect to the purported "single DVD title"

---

[23] Notably, Redbox's attempt to define various "submarkets" is superfluous. Geneva Pharm. Tech. Corp. v. Barr Labs. Inc., 386 F.3d 485, 496 (2d Cir. 2004) ("The term 'submarket' is somewhat of a misnomer, since the 'submarket' analysis simply clarifies whether two products are in fact 'reasonable' substitutes and are therefore part of the same market"); PepsiCo v. Coca Cola Co., No. 98 Civ. 3282, 1998 WL 547088, at *5 (S.D.N.Y. Aug. 27, 1998) (the "'submarket' definition turns on the same inquiry as a market definition"). The most important consideration in market analysis is substitutability in supply or demand; "thus the identification of a submarket is in principle no different than the identification of a relevant market". See 5 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, ¶ 533 (internal citation and quotation omitted).

[24] See Queen City Pizza, 124 F.3d at 437 ("[a] person needing transportation to work could accordingly buy a Ford or a Chevrolet automobile, or could elect to ride a horse or bicycle, assuming those options were feasible") (quoting Allen-Myland, Inc. v. IBM Corp., 33 F.3d 194, 206 (3d Cir. 1994)).

submarket, courts have *routinely* rejected "single product" market arguments of the type Redbox now makes. See, e.g., Theatre Party Assocs., Inc. v. Shubert Org., Inc., 695 F. Supp. 150, 154-55 (S.D.N.Y. 1988) (no explanation "why other forms of entertainment, namely other Broadway shows . . . are not adequate substitute products [for 'Phantom of the Opera']"); Queen City Pizza, 124 F.3d at 436-37 (citing TV Comme'ns Network, Inc. v. Turner Network Television, Inc., 964 F.2d 1022, 1025 (10th Cir. 1992) (one television channel not relevant market)).[25]

Thus, Redbox fails to allege a plausible basis for finding that new-release DVDs, genres of new-release DVDs, or single new-release DVDs are "a market unto themselves". Carell v. Shubert Org., Inc., 104 F. Supp. 2d 236, 264-65 (S.D.N.Y. 2000). Lacking a plausible market, Redbox cannot adequately allege how the purported anticompetitive effects *in that market* could realistically occur. Orson, 79 F.3d at 1368. At any rate, when the market is expanded beyond single-brand products to "genres" or to all new-releases, there is no factual basis in the amended complaint (or reality) to assume that Warner (or any individual studio) could have market power sufficient to force price raises for *all* DVDs in that market.

>   2.   Redbox's Market Definition and Market Power Allegations Are Not Plausible Under *Twombly* and *Iqbal.*

Although sufficiently plausible allegations of "market power" can, under certain circumstances not present here, be a surrogate for demonstrating actual detrimental effects of

---

[25] See also Global Disc. Travel Servs., LLC v. Trans World Airlines, Inc., 960 F. Supp. 701, 705 (S.D.N.Y. 1997) (rejecting contention that a consumer "is 'locked into' Pepsi because she prefers the taste, or NBC because she prefers 'Friends,' 'Seinfeld,' and 'E.R.'"); Gianna Enters. v. Miss World (Jersey) Ltd., 551 F. Supp. 1348, 1354 (S.D.N.Y. 1982). Moreover, to the extent that Redbox's "single title" DVD submarket allegations reduce to an assertion that Warner has market power over single DVD titles due solely to its copyright, that is legally untenable. Illinois Tool Works Inc. v. Indep. Ink, Inc., 547 U.S. 28, 44-46 (2006) (intellectual property right in a product does not by itself confer market power for purposes of antitrust analysis); Rick-Mik Enters. Inc. v. Equilon Enters., LLC, 532 F.3d 963, 973 (9th Cir. 2008). Of course, "a company does not violate the Sherman Act by virtue of the natural monopoly it holds over its own product". TV Comme'ns, 964 F.2d at 1025 (granting motion to dismiss).

allegedly anticompetitive conduct, the allegations here fall far short. <u>See, e.g.</u>, <u>Orson</u>, 79 F.3d at 1367-68. <u>First</u>, as noted above, it is simply not plausible that a consumer would put a new-release DVD to a different use than a non-new-release DVD. <u>Queen City Pizza</u>, 124 F.3d at 437. To put Redbox's "new-release" product market to <u>Iqbal</u>'s "common sense" test, one can ask: Has Redbox ever stocked a kiosk full of only new-releases? Has Blockbuster ever filled an entire store with new-releases alone? Of course not. Moreover, why does a new-release transform into a non-new-release on the 29th day following its "street date"? Why should it be 29 days in this case when it is 31 days in <u>Fox</u>, and 46 days in <u>Universal</u>? There are no plausible, common sense explanations for Redbox's arbitrary and illogical market definition. And even if, contrary to common sense and well-settled case law, a "new-release market" were found to exist, Redbox has asserted absolutely no facts indicating how *Warner* exercises power within a greater "new-release DVD market", in which numerous other studios offering a vast array of filmed entertainment compete, sufficient to "raise prices above those that would prevail in a competitive market." <u>Orson</u>, 79 F.3d at 1367; <u>see</u> Coinstar 10-Q at 34-35 (Ex. A) (listing multiple competitive distribution channels). Redbox's conclusory allegations that Warner has a "dominant market position and monopolistic power within the industry with respect to its unique, new-release DVDs" (Am. Compl. ¶ 38) do not translate to market power in the entire new-release "market", despite Redbox's efforts to extrapolate from one to another.

   <u>Second</u>, with respect to Redbox's purported "submarkets", antitrust case law and common sense have repeatedly rejected single-brand markets. Again, to put Redbox's single-brand or genre product market to <u>Iqbal</u>'s "common sense" test: Has Redbox ever stocked an entire kiosk with only a single title of one DVD? Has Redbox ever stocked an entire kiosk with a single genre? Again, of course not; market realities dictate more. Because Redbox fails to

allege a plausible market or market power, not only can anticompetitive effects not be presumed, Redbox's complaint should be dismissed.  See Iqbal, 129 S. Ct. at 1950; see also Queen City Pizza, 124 F.3d at 442-43.

> 3.   Redbox Has Not Alleged—And Cannot Allege—Actual Anticompetitive Effects.

Lacking adequate allegations of market power, Redbox must at least allege facts supporting plausible claims of *actual* anticompetitive effects.  It is *not* sufficient for Redbox to allege facts solely indicating economic harm to *Redbox*.  It is axiomatic that the antitrust laws do not exist to protect individual businesses or their profits; their purpose is "the protection of competition not competitors".  Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488 (1977) (internal citation omitted).  Thus, economic injury to a competitor—indeed, even the "*elimination*" of a market competitor—without more, "does not prove anticompetitive effect".  McGlinchy v. Shell Chem. Co., 845 F.2d 802, 812 (9th Cir. 1988).  As such, Redbox's claims that it will lose customers and experience "decreased demand for Redbox rentals"—which are conclusory predictions at best[26]—are not relevant here.  (See Am. Compl. ¶ 76.)  Instead, Redbox needs to assert indications of *actual* competitive harm resulting from Warner's distribution policy, such as a reduction in output (e.g., fewer film titles available for consumers),[27] an increase in price (e.g., consumers pay more for film purchases or rentals generally), or a reduction in quality of goods (e.g., films).  Orson, 79 F.3d at 1367.

---

[26] "Labels and conclusions" such as general and conclusory allegations of "artificially constrain[ed] output", "artificial product shortage" and "artificial price" (see Am. Compl. ¶ 39) will not suffice to state a claim.  Cf. Iqbal, 129 S. Ct. at 1949, 1951.

[27] Reduction in output relates to the *market-wide* availability of a good—not the availability of one manufacturer's good to a particular plaintiff.  See, e.g., United States v. Visa U.S.A. Inc., 163 F. Supp. 2d 322, 406 n.28 (S.D.N.Y. 2001) ("The term 'output reduction' can mean a marketwide decrease in the number of units produced.  But it can also refer to a decline in the quality of the goods, or a decline in the rate of improvement or innovation that is committed to a particular market") (internal quotation marks and citation omitted)).

a.    Redbox Has Not Plausibly Alleged a Reduction in Output.

Instead of pointing to an actual instance of anticompetitive effect, Redbox relies on conclusory assertions that some undefined notion of "output" will be "constrain[ed]." (Am. Compl. ¶¶ 37, 39.)    Output of what?    Output refers to goods in a cognizable market—here, output would be filmed entertainment.[28]  Redbox does *not* allege that consumers will be unable to obtain output—even if defined as "new releases" of filmed entertainment—through other means.    And of course, Redbox does not allege that Warner will stop producing filmed entertainment or DVDs in the future.    Indeed, even though the Warner policy took effect on October 27, 2009 with the DVD release of "The Orphan", Redbox's amended complaint makes no allegation that supply of "The Orphan"—or any other movie impacted by the policy—has been reduced.    Redbox's own public filings state that Warner's distribution policy has merely required Redbox to procure Warner DVDs "from alternative sources." (Coinstar 10-Q at 35 (Ex. A).)    And, of course, Redbox does not—and cannot—allege that *other* brands of new-release DVDs are unavailable to Redbox because of *Warner's* policy.

The existence of "alternative sources of supply" of a product (here, new-release films from any studio) to a plaintiff can "negate[] the existence of anticompetitive effects". Orson, 79 F.3d at 1372.[29]  Redbox is free to acquire and offer competing films or DVDs released by non-Warner studios.    Redbox can and does obtain Warner DVDs from other sources.    And Redbox could obtain Warner DVDs from Warner by agreeing to terms of sale with Warner

_____

[28]   Cf. 21 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, ¶ 2131 (in discussing intraventure output limitations, "the antitrust concern is not with intraventure output as such, but rather with possible limitations on *market* output.").

[29]   See also Seagood Trading Corp. v. Jerrico, Inc., 924 F.2d 1555, 1572-73 (11th Cir. 1991) (no anticompetitive impact where plaintiffs not foreclosed from every alternative); Gianna, 551 F. Supp. at 1354 (plaintiff must describe "how the net economic effect of the alleged violation is to restrain trade in the relevant market, and that no reasonable alternate source is available").

directly. Indeed, even exclusive dealing arrangements—where a manufacturer elects to distribute product to only *one* distributor—are routinely upheld when competing *alternatives* are available—and Warner's distribution policy is far less restrictive than such an arrangement.[30] Even if Redbox had to pay more for Warner DVDs under this policy, that would not be a cognizable antitrust harm.[31] Orson, 79 F.3d at 1358.[32]

Nor is there any plausible suggestion in Redbox's complaint that output to *consumers* will be affected by Warner's distribution policy. Courts decline to find antitrust violations when there are alternative products and distribution channels available.[33] Indeed, where a product remains "just as available" in the market "as it was before" and there is no allegation "of anticompetitive purpose or effect at the interbrand level", there is no violation of Section 1 even if the intent of the restraint is to "destroy" the plaintiff's business. Cf. Crane & Shovel Sales Corp. v. Bucyrus-Erie Co., 854 F.2d 802, 806, 810 (6th Cir. 1988).

---

[30] See, e.g., Omega Envtl., Inc. v. Gilbarco, Inc., 127 F.3d 1157, 1163 (9th Cir. 1997) (existence of potential alternative sources of distribution "eliminate[s] substantially any foreclosure effect" of defendant's practice at issue); Elder-Beerman Stores Corp. v. Federated Dept. Stores, Inc., 459 F.2d 138 (6th Cir. 1972).

[31] Cf. Seagood Trading Corp., 924 F.2d at 572-73 (rejecting plaintiff's argument in refusal to deal case that, while it could obtain refused services from other companies, it would be more expensive; "plaintiffs then are asking us to equip them with [defendant's] competitive advantage. This is not a function of the antitrust laws.").

[32] See also Nat'l Auto Brokers Corp. v. Gen. Motors Corp., 572 F.2d 953, 957, 959 (2d Cir. 1978) (rejecting antitrust claim because "despite some refusals, there were many . . . dealers willing to deal with [plaintiff] and . . . [plaintiff] was able to obtain from one dealer or another almost all of the [product] it wanted"); Cascade Cabinet Co. v. W. Cabinet & Millwork Inc., 710 F.2d 1366 (9th Cir. 1983) (no adverse effect on competition where plaintiff did not allege that it was unable to lease other commercial space); Joyce Beverages of New York, Inc. v. Royal Crown Cola Co., 555 F. Supp. 271, 278-79 (S.D.N.Y. 1983).

[33] See, e.g., Habitat Ltd. v. Art of the Muse, Inc., No. 07-CV-2883, 2009 WL 803380, at *10 (E.D.N.Y. Mar. 25, 2009) (dismissing antique distributor's complaint because defendants sold goods to other distributors in the area; therefore there were alternative sources for the goods); Floors-N-More, Inc. v. Freight Liquidators, 142 F. Supp. 2d 496, 501-02 (S.D.N.Y. 2001) (no adverse effect on competition; no allegation that defendants were "now the only store in the geographic market where customers can purchase products made by the manufacturers").

      b.      <u>Redbox's Allegations of "Inflated Prices" and "Consumer Overcharge" Do Not Constitute Plausible Anticompetitive Effects.</u>

Redbox's complaint also includes several conclusory allegations of "inflated prices". To the extent Warner's distribution policy results in a higher purchase price to Redbox, that is decidedly not an antitrust violation. <u>See, e.g., Cascade Cabinet Co.</u>, 710 F.2d at 1373 ("although Cascade complains of its business losses, economic injury to a competitor does not equal injury to competition. . . . [I]t is injury to the market, not to individual firms, that is significant") (internal quotation marks and citation omitted).

Redbox also suggests that a purported "price increase" to consumers will occur under Warner's new distribution policy. (Am. Compl. ¶ 5.) But Warner's policy went into effect with the October release of "The Orphan", and Redbox has not alleged that this policy has resulted in higher prices for consumers for that movie, or for other movies released before the amended complaint was filed. Of course, even if a higher price had been alleged, if the market is defined as "new-release DVDs" or DVD genres, a higher consumer price for a *Warner* DVD could not constitute a *market-wide* anticompetitive effect.

Moreover, even if the market is limited to individual DVDs, Redbox's allegations remain insufficient. <u>First</u>, given Redbox's conceded ability to procure DVDs from multiple sources and the possibility—even likelihood—that Redbox will *always* find ways to stock Warner DVDs, if Redbox chooses to offer Warner DVDs in its kiosks at a price higher than $1, that is Redbox's unilateral business choice based on the margin it desires. Again, the law is quite clear that harm to an individual competitor's profits are not cognizable anticompetitive effects. <u>See, e.g., Cascade Cabinet Co.</u>, 710 F.2d at 1373; <u>O.S.C. Corp. v. Apple Computer, Inc.</u>, 792 F.2d 1464, 1469 (9th Cir. 1986) ("injury to an antitrust plaintiff is not enough to prove injury to competition").

Second, courts have repeatedly made clear that, in the absence of monopoly power, increased prices to consumers caused by single-firm conduct or by vertical agreements are not enough to sustain an antitrust violation.[34] There are no plausible allegations of monopoly power here.   Moreover, because a seller's efforts to obtain higher prices "normally has no particular tendency to exclude rivals and thus to diminish competition", the unsupported allegations that "consumers might pay more" under Warner's announced distribution policy utterly fail to provide the anticompetitive effects necessary to support Redbox's claim.   See Rambus Inc. v. FTC, 522 F.3d 456, 464 (D.C. Cir. 2008), cert. denied, 129 S. Ct. 1318 (2009).

c.     Redbox's Allegations of "Reduced Consumer Choice" Do Not
       Support Plausible Allegations of Anticompetitive Effects.

Redbox also conclusorily alleges that, due to the "boycott" of Redbox, it will not be able to offer new-release Warner DVDs to consumers, resulting in "reduce[d] consumer choice in the marketplace".   (See Am. Compl. ¶ 62.)   The mere incantation of "reduce[d] consumer choice" does not constitute a sufficient allegation of *market-wide* anticompetitive effect.[35]   Again, Warner's policy went into effect with "The Orphan", and Redbox makes no allegations that consumer choice in the marketplace has been reduced with respect to that movie or the other movies impacted by the policy at the time the amended complaint was filed.

---

[34] Fisher v. City of Berkeley, California, 475 U.S. 260, 266 (1986) ("it [is] of considerable importance that independent activity by a single entity be distinguished from a concerted effort by more than one entity to fix prices or otherwise restrain trade.   Even where a single firm's restraints directly affect prices and have the same economic effect as concerted action might have, there can be no liability under § 1 in the absence of agreement.") (internal citations and quotes omitted); see also Williamsburg Wax Museum, Inc. v. Historic Figures, Inc., 810 F.2d 243, 252 (D.C. Cir. 1987) ("[A]n excessive price alone does not establish a violation of the antitrust laws, because imposition of a high price is not, in and of itself, an anticompetitive act.").

[35] See, e.g., Discon Inc. v. NYNEX Corp., 86 F. Supp. 2d 154, 163 (W.D.N.Y. 2000); see also Rome Ambulatory Surgical Ctr., LLC v. Rome Mem'l Hosp., Inc., 349 F. Supp. 2d 389, 413 (N.D.N.Y. 2004) ("conclusory" statements about "restraints on price, choice, and output as a result of the alleged conspiracy" fail to show anticompetitive effects).

In fact, courts have explicitly rejected the argument suggested by Redbox here: that the vertical restriction imposed by Warner injures competition or violates antitrust laws because consumers "ha[d] fewer options".[36]   Indeed, the Supreme Court has long permitted manufacturers to restrict the locations from which retailers may sell their products, even though the restrictions plainly limit consumer choice with respect to specific brands.   See Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 54-55 (1977).   And again, Redbox does not suggest that as a result of Warner's distribution policy consumers are actually precluded from obtaining Warner DVDs from *any* outlets (including Redbox's own kiosks), or that other competitors of Redbox's will not be able to provide consumers with competing products.[37]

> d.   Redbox Has Failed To Counter the Well-Settled Principle That Vertical Nonprice Restraints Generally Enhance Competition.

Assuming, *arguendo,* that Redbox has asserted any concerted action as between Warner and its distributors, that action would amount to a vertical nonprice restraint.[38]   The Supreme Court long ago made clear that vertical nonprice restraints are unlikely to have a "pernicious effect on competition" and, indeed, have "real potential to stimulate interbrand competition, the primary concern of antitrust law".   Bus. Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 724 (1988); GTE Sylvania, Inc., 433 U.S. at 52 n.19.

"Interbrand competition" is competition among sellers of the same product (i.e., all studios' DVDs—thus, Warner's "The Orphan" would compete with Paramount's "Imagine

---

[36] E&L Consulting, Ltd. v. Doman Indus. Ltd., 472 F.3d 23, 30 (2d Cir. 2006), cert. denied, 552 U.S. 816 (2007); see also Kestembaum v. Falstaff Brewing Corp., 575 F.2d 564, 571 (5th Cir. 1978).

[37] Cf. Anheuser-Busch, Inc. v. G.T. Britts Distrib., Inc., 44 F. Supp. 2d 172, 175 (N.D.N.Y. 1999) (rejecting "reduced market choice" argument as a result of beer manufacturer removing plaintiff as beer distributor to sell to retailers).

[38] Cf. Univ. Op. at 9 ("Plaintiff's Sherman Act claim, practically speaking, alleges a vertical nonprice restraint or vertical boycott").

That"), while intrabrand competition is competition among sellers of the same brand of a product (i.e., Warner DVDs—thus, Warner's "The Orphan" competes with Warner's "Whiteout", or, more narrowly, "The Orphan" would compete only with "The Orphan"). It is well-settled that it is competition relating to *products*, and not to single *brands*, that the antitrust laws generally seek to protect. See Orson, 79 F.3d at 1368 ("The Supreme Court has also repeatedly confirmed in vertical restraint cases that interbrand competition, as opposed to intrabrand competition, is the primary goal of the antitrust laws."). This is based on the common sense understanding that:

> The Supreme Court has recognized that manufacturers have an economic interest in maintaining as much intrabrand competition as is consistent with the efficient distribution of their products. The only real incentive a manufacturer has to restrict distribution of its product is to make its product more competitive. It gains nothing by reducing competition in the distribution of its product.

Westman Commc'n Co. v. Hobart Int'l, Inc., 796 F.2d 1216, 1226 (10th Cir. 1986) (quotations omitted). Thus, "in dealing with vertical nonprice restraints the focus of antitrust concern is the impact of a particular restraint on *inter*brand competition, rather than its impact on *intra*brand competition . . . . This is especially true in cases where substantial competition in the interbrand market provides a check on the exploitation of intrabrand market power by providing a ready supply of adequate substitutes to consumers." Ryko Mfg. Co. v. Eden Servs., 823 F.2d 1215, 1231 (8th Cir. 1987) (emphasis added). Even to the extent a vertical restraint results in a higher price to consumers, it must be remembered that:

> "[I]n general, the interests of manufacturers and consumers are aligned with respect to retailer profit margins. The difference between the price a manufacturer charges retailers and the price retailers charge consumers represents part of the manufacturer's cost of distribution, which, like any other cost, the manufacturer usually desires to minimize. . . . A manufacturer has no incentive to overcompensate retailers with unjustified margins. The retailers, not the manufacturer, gain from higher retail prices. The manufacturer often loses; interbrand competition reduces its competitiveness and market share because consumers will substitute a different brand of the same product."

Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 896 (2007) (internal quotation marks and citation omitted).

Interbrand competition in the DVD business is thriving, and Warner has made a calculated choice to impose specific vertical nonprice restraints with respect to distribution of its own brand, thereby restricting only intrabrand competition for Warner DVDs.[39]  Warner's only economically rational incentive in imposing that restraint can be to make its product more competitive.  Warner might be wrong in pursuing this strategy; its products may become less competitive when they are up against other studios' movies offered at other prices in other distribution channels.  See id.  If so, the market will correct that, and interbrand competition will require Warner to change its business practices.  See id.  It is not, however, the place of the antitrust laws to interfere with lawful market dynamics, and courts must guard against formulaic application of rules "prohibiting procompetitive conduct the antitrust laws should encourage".  Id. at 895.[40]

The Third Circuit case of Orson v. Miramax, 79 F.3d 1358 (3d Cir. 1996), is instructive.  In Orson, the Third Circuit examined an agreement between a movie distributor and an art-house movie theater limiting the sale of the distributor's first-run movies to the theater.  Plaintiff, who owned a competing art-house movie theater in the area, asserted that it was

---

[39] See Crane, 854 F.2d at 810 ("Every distribution choice by a manufacturer could be either a good or bad decision from a business standpoint, but the antitrust laws have never been intended to police such a choice, absent any allegation that such choice is part of a [monopoly power scheme] or which is based on, or causes, anticompetitive effect at the interbrand level.").

[40] Cf. Westman Commc'n Co., 796 F.2d at 1227 ("The prospect of limited intrabrand competition that results from restricted distribution may encourage distributors to make the investment necessary to carry a new manufacturer's product . . . .  If the antitrust laws are applied so as to interfere with a manufacturer's ability to deal freely with its distributors, procompetitive vertical restraints may be deterred.  In the end, we are convinced that, when a manufacturer is left free to determine the profile of its distributorships, procompetitive incentives will lead it to make distribution decisions that ultimately benefit consumers.").

unlawfully prevented from competing because it was unable to exhibit the distributor's films immediately upon release.   The Court held that the reasonableness of the exclusive dealing agreement depended on the "competitive stance of the theaters involved and the . . . effect on competition, especially the *interbrand competition* which, as the Supreme Court has instructed, is our primary concern".   Id. at 1372 (emphasis added).   The Court found that "competition thrived at both the distributor and exhibitor level", and that, although the agreements "most certainly reduced intrabrand competition to some degree by disallowing the [plaintiff] from showing on a first-run basis any Miramax film that the [other theater] had selected, they undeniably promoted *interbrand* competition by requiring the [plaintiff theater] to seek out and exhibit the films of other distributors, which it consistently accomplished. Thus, . . . competition in the relevant market was enhanced; art film consumers in [Philadelphia] had more movies from which to choose." Id. (emphasis added).   To the extent that Redbox has alleged an intrabrand restraint (e.g., Warner DVDs) and since it has not even attempted to allege how an *intrabrand* restraint would impact *interbrand* competition, the complaint must be dismissed.[41]

        e.      <u>Redbox Has Not Alleged Facts That Plausibly Suggest Harm to Interbrand Competition Sufficient To Satisfy *Twombly* and *Iqbal*.</u>

To meet the <u>Twombly</u> and <u>Iqbal</u> standard, Redbox must allege facts plausibly suggesting that the purported nonprice vertical restraint Redbox claims is at issue here will be *more* likely than not to harm *overall competition* in a cognizable market.   <u>See</u> <u>Twombly</u>, 550 U.S. at 565-67.   Redbox must, then, find a way around the case law—from the Supreme Court down—that vertical nonprice restraints generally *enhance* interbrand competition.   <u>See, e.g.,</u> <u>Orson</u>, 79 F.3d at 1368.   Thus, applying <u>Twombly</u>, Warner's vertical wholesale announcement is

---

[41] <u>See</u> <u>Crane</u>, 854 F.2d at 810 ( "'[E]ven though refusals to deal limit intrabrand competition, they are likely to benefit consumers by increasing interbrand rivalry.'") (quoting <u>Westman Commc'n Co.</u>, 796 F.2d at 1227)).

more or equally consistent with "lawful, unchoreographed free-market behavior" and cannot support an antitrust claim.  Iqbal, 129 S. Ct. at 1950.  Moreover, Redbox's speculations are implausible and are in direct tension with the facts asserted and with Redbox's own claims of ongoing growth and clearly thriving competition in the DVD market during the same time period when Universal's allegedly similar wholesale policies were in effect.  (See Am. Compl. ¶ 18.) Thus, Redbox's speculation about its own future, let alone the future of competition generally, is conclusory at best.  Twombly and Iqbal require more.  See Iqbal, 129 S. Ct. at 1950.

III.   REDBOX LACKS STANDING BECAUSE IT HAS FAILED TO ALLEGE ANTITRUST INJURY

In light of Redbox's failure to assert an unlawful agreement, a plausible market or plausible anticompetitive effects, it comes as no surprise that Redbox has not pleaded sufficient allegations that it has—or will ever suffer—the type of antitrust injury necessary for standing. Simply put, any injury Redbox may suffer is not the type of injury to competition the antitrust laws seek to prevent.

As the Third Circuit has observed, standing takes on particular significance in the context of antitrust laws, "where a balance must be struck between encouraging private actions and deterring legitimate competitive activity through overly vigorous enforcement".  City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 264 (3d Cir. 1998).  "To establish antitrust standing a plaintiff must show both:  (1) harm *of the type* the antitrust laws were intended to prevent; and (2) an injury to the plaintiff which flows from that which makes defendant's acts unlawful."[42]  The most relevant factor in this analysis is "whether the plaintiff's alleged injury is

---

[42] Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912, 924 n.6 (3d Cir. 1999); Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters, 459 U.S. 519, 535 n.31 (1983).

of the type for which the antitrust laws were intended to provide redress". Angelico v. Lehigh Valley Hosp., Inc., 184 F.3d 268, 274 (3d Cir. 1999).

"The antitrust injury requirement obligates [a plaintiff] to demonstrate . . . that the challenged action has had an actual adverse effect *on competition as a whole in the relevant market*; to prove it has been harmed as an individual competitor will not suffice." Anheuser-Busch, Inc., 44 F. Supp. 2d at 174 (emphasis added).[43] Thus, to survive this motion to dismiss, Redbox must allege sufficient facts to support an allegation of an adverse effect on market-wide competition *and* a connection between that injury to competition and the injury that it has suffered. Id. at 174-75 ("[D]efendants merely allege injury to themselves, which is insufficient to confer standing to assert antitrust violations."). In fact, Redbox's claim is a classic claim by a single competitor; precisely what Pueblo Bowl-O-Mat says the antitrust laws do not protect. Brunswick Corp., 429 U.S. at 488-89.

As set forth in Part II.A.3, Redbox has not asserted plausible allegations of antitrust injury. In order to allege injury to the *competitive process* for purposes of antitrust standing, Redbox must reach outside of its own situation and plausibly allege that Warner's distribution policy has prevented *other* competitors (e.g., companies engaged in the sale or rental of films) from competing as well. Redbox has not alleged that any competitors—let alone Redbox—have actually been foreclosed from competing—be it for individual Warner DVDs, new-release DVDs, or "genres" of new-release DVDs. (See supra, Part II.A.3.) It is, of course, insufficient for Redbox to establish standing on a concern that it, Redbox, may pay more for Warner DVDs. Tennessean Truckstop, Inc. v. NTS, Inc., 875 F.2d 86, 88 (6th Cir. 1989) ("[T]he

---

[43] Because a plaintiff is required to demonstrate anticompetitive effects in a *relevant market* to establish antitrust standing, Redbox's failure to allege a cognizable market is equally as problematic as its failure to allege plausible anticompetitive effects. (See infra, Part II.A.1-2.)

fact that a particular competitor in a particular market has lost profits does not inevitably mean that competition as a whole is lessened."). Moreover, Redbox's failure to allege an actionable conspiracy under Colgate indicates that its injury cannot flow from conduct that the antitrust laws were meant to prevent. See Steamfitters Local Union No. 420, 171 F.3d at 924 n.6.

Thus, Redbox has failed to assert facts that could plausibly establish antitrust standing, requiring dismissal of its Sherman Act claim. Iqbal, 129 S. Ct. at 1950.

## IV.    "COPYRIGHT MISUSE" IS NOT AN AFFIRMATIVE CLAIM

Redbox's claim of "copyright misuse" is "unavailable to Plaintiff in this action as well as impertinent to the current dispute". (See Univ. Op. at 6.) Copyright misuse is an equitable defense, not a cause of action, and prior efforts by plaintiffs to wield it as an affirmative claim have been rejected by this Court and in this Circuit. Id.; see also Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc., 342 F.3d 191, 203-04 (3d Cir. 2003).

## V.    REDBOX HAS FAILED TO STATE A CLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACT

In the Universal case, this Court dismissed Redbox's claim for tortious interference with contract and business relations. (Univ. Op. at 13.) The identical claims for tortious interference with contract and business relations asserted by Redbox in this case warrant dismissal based on the same rationale. Redbox contends that Warner's policy of refusing to deal with Ingram and VPD if they continue to supply DVDs to Redbox constitutes an intentional inducement for Ingram and VPD to breach their agreements with Redbox. According to Redbox's complaint, VPD and Ingram have "bow[ed] to Warner's direct demands", and "stopped filling Redbox's orders for Warner DVDs with release dates beginning in October 2009"—with the first affected title being "The Orphan". (Am. Compl. ¶¶ 37, 74.) Redbox's claim suffers from the fundamental defect that "Ingram's contractual obligations to Redbox do

not include the guaranteed provision of [Warner] DVDs upon Redbox's demand". (See Am. Compl. Ex. A; Univ. Op. at 11.) The contract does not obligate Ingram to deliver Warner DVDs to Redbox unconditionally; thus, even if Ingram complies with Warner's policy, that would not be a breach of the agreement. (Id. at 12.) Redbox asserts that its relationship with VPD is substantially the same as that with Ingram; thus, the same conclusion applies to that agreement. (Id. at 12 n.2.)

## VI.   REDBOX HAS FAILED TO STATE A CLAIM FOR TORTIOUS INTERFERENCE WITH BUSINESS OPPORTUNITY OR FOR UNFAIR COMPETITION

Redbox's amended complaint added claims for tortious interference with prospective business opportunity and for unfair competition. These claims are based on intentionally vague new assertions relating to purported instructions to "other wholesalers and retailers, such as Best Buy, Target and Wal-Mart" not to sell "new-release DVDs" to Redbox. (Am. Compl. ¶¶ 78-82.) Like the rest of Redbox's claims, the new claims are legally and factually deficient and should be dismissed.

To state a claim for unfair competition, Redbox must have alleged "a reasonable expectancy of entering a valid business relationship, with which [Warner] wrongfully interfere[d]", thereby defeating Redbox's "legitimate expectancy" and causing Redbox harm.[44] Similarly, to state a claim for tortious interference with a prospective business opportunity, Redbox must have alleged: "1) the reasonable probability of a business opportunity; 2) the intentional interference by [Warner] with that opportunity; 3) proximate causation; and 4) damages." Agilent Tech., 2009 WL 119865, at *5 (citing DeBonaventura v. Nationwide Mut. Ins. Co., 419 A.2d 942, 947 (Del. Ch. 1980). "All of these factors must be considered in light of

---

[44] Agilent Tech., Inc. v. Kirkland, No. 3512-VCS, 2009 WL 119865, at *5 (Del. Ch. Jan. 20, 2009) (citing Rypac Packaging Mach. Inc. v. Poges, 2000 WL 567895, at *8 (Del. Ch. May 1, 2000)).

a defendant's privilege to compete or protect his business interests in a fair and lawful manner." Agilent Tech, 2009 WL 119865, at *5 (quotation marks omitted).

Even when Redbox's speculative assertions that Warner instructed distributors other than VPD and Ingram not to sell new-release DVDs to Redbox are taken as true, Redbox's allegations do not plausibly support these claims. Redbox does not allege that it is *unable* to procure products from *any* retailers; if, for example, Redbox attempted to purchase products in bulk from a Wal-Mart in California, and it was instead required to purchase the products in bulk from a Wal-Mart in Nevada, or from a Target in California, that would not be interference with a prospective business opportunity.[45] Redbox also does not explain how simply being a customer at a cash register can constitute a "business arrangement" or why a purchase method that it described as "costly and inconvenient" in the Universal case constituted a "prospective business opportunity" for Redbox in this case.   (Univ. Am. Compl. ¶ 49; Am. Compl. ¶ 78.)   And Redbox's suggestion that its expectation of a business opportunity was reasonable because "ordinarily, each retailer has an incentive to sell as many DVDs as possible to any purchaser who walked into a store" defies Iqbal's "common sense" test: retailers frequently place limitations on the amount of product one consumer is allowed to purchase (e.g., "limit three per customer"), and at any rate, Redbox is not just "any other purchaser"—it operates a massive DVD rental and sale business that competes directly with these entities at a lower price point.  In other words, there are numerous reasons why retailers may choose not to sell products to Redbox in bulk; Redbox has failed to assert any facts plausibly suggesting that an expectation to the contrary was reasonable, or that any decision by a retailer to limit bulk sales was due to actions taken by

---

[45] Again, Redbox recently noted that while "certain" Wal-Mart, Best Buy and Target stores had limited new-release DVDs sales to three copies, "many third-party retailer locations, including Walmart, Best Buy and Target locations, have continued to sell new-release DVDs to Redbox without those limitations." (Coinstar 8-K dated Nov. 30, 2009 (Ex. G).)

Warner as opposed to independent motivations held by each retailer (or individual stores within a chain).

Moreover, Redbox has not asserted facts plausibly suggesting that any of the communications it claims Warner made to retailers and other distributors were "wrongful". "Only wrongful interferences will satisfy the tort of [unfair competition], as some interferences are seen as justified or privileged under the aegis of competition. . . . Unfair competition, which is not privileged, includes fraud, intimidation, or disparagement."[46]   Redbox asserts no facts suggesting that Warner's conduct was "wrongful", "malicious" or involved "misrepresentations of fact".  Delaware Solid Waste, 2002 WL 537691, at *6; Agilent Tech., 2009 WL 119865, at *8.   And as with Redbox's antitrust claims, to the extent Redbox attempts to insinuate that *Warner* could instruct retailers not to sell *any* new-release DVDs to Redbox (not just Warner new-release DVDs), that argument defies "common sense" and necessarily fails.  Iqbal, 129 S. Ct. at 2951.

## CONCLUSION

For the foregoing reasons, Redbox's amended complaint fails to state a claim against Warner and should be dismissed.   Redbox has already amended its complaint once; further amendment would be futile and Redbox's amended complaint should be dismissed with prejudice.

---

[46] Delaware Solid Waste Auth. v. E. Shore Envtl., Inc., No. Civ. A 1472-K, 2002 WL 537691, at *6 (Del. Ch. Mar. 28, 2002) (internal quotes and cite omitted); see also Agilent Tech., 2009 WL 119865, at *8 ("An alleged interference in a prospective business relationship is only actionable if it is wrongful.").

Of Counsel:

Katherine B. Forrest
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
kforrest@cravath.com

Dated: December 21, 2009

_/s/ Stephen M. Ferguson_

Frederick L. Cottrell, III (#2555)
Anne Shea Gaza (#4093)
Stephen M. Ferguson (#5167)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700
cottrell@rlf.com
gaza@rlf.com
ferguson@rlf.com

*Attorneys for Defendant*
*Warner Home Video*

## CERTIFICATE OF SERVICE

I hereby certify that on December 21, 2009, I caused to be served by **hand delivery and**

**e-mail** the foregoing document and electronically filed the same with the Clerk of Court using

CM/ECF which will send notification of such filing(s) to the following:

James S. Green
Seitz, Van Ogtrop & Green, P.A.
222 Delaware Avenue, Suite 1500
P. O. Box 68
Wilmington, DE  19899
jgreen@svglaw.com

I hereby certify that on December 21, 2009, I caused the foregoing document to be sent

via **e-mail** to the following non-registered participants:

Charles S. Bergen
George R. Dougherty
Michael S. Gulland
Grippo & Elden LLC
111 South Wacker Drive
Chicago, IL  60606
cbergen@grippoelden.com
gdougherty@grippoelden.com
mgulland@grippelden.com

Stephen M. Ferguson (#5167)
ferguson@rlf.com