## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

REDBOX AUTOMATED RETAIL, LLC,                )
                                             )
                    Plaintiff,               )
                                             )        Civil Action No. 09-613-RBK-JS
            vs.                              )
                                             )        **JURY TRIAL DEMANDED**
WARNER HOME VIDEO, a division of             )
WARNER BROS. HOME                            )
ENTERTAINMENT, INC.,                         )
                                             )
                    Defendant.               )

## REDBOX'S ANSWERING BRIEF IN OPPOSITION TO WARNER HOME VIDEO, A DIVISION OF WARNER BROS. HOME ENTERTAINMENT, INC., MOTION TO DISMISS REDBOX'S AMENDED COMPLAINT

Charles S. Bergen
George R. Dougherty
Pei Y. Chung
Colleen P. Sorensen
GRIPPO & ELDEN LLC
111 South Wacker Drive
Chicago, IL 60606
Phone: (312) 704-7700
Fax:    (312) 558-1195

Frederick W. Stein
REDBOX AUTOMATED RETAIL, LLC
One Tower Lane, Suite 1200
Oakbrook Terrace, IL 60181
Phone: (630) 756-8255
Fax:    (630) 756-8885

James S. Green, Sr. (DE#0481)
SEITZ, VAN OGTROP & GREEN, P.A.
222 Delaware Avenue, Suite 1500
PO Box 68
Wilmington, DE 19899
Telephone: (302) 888-0600
Facsimile: (302) 888-0606
jgreen@svglaw.com

*Attorneys for Plaintiff*
*Redbox Automated Retail, LLC*

Dated:  January 29, 2010

Dockets.Justia.com

# TABLE OF CONTENTS

Page

NATURE AND STAGE OF PROCEEDINGS ............................................................1

SUMMARY OF THE ARGUMENT ........................................................................1

STATEMENT OF RELEVANT FACTS ...................................................................3

    A.    Relevant Entities. ...............................................................................3

    B.    Industry Practice Regarding New-Release DVDs. ..................................4

    C.    The Commercial Realities Of The New-Release DVD Markets. ...............5

    D.    Redbox's Relationship With Ingram And VPD...........................................7

    E.    Warner's Decision To Interfere With Redbox's Relationships With Ingram And VPD And To Shut Off Redbox's Supply Of Warner New-Release DVDs. ...........................................................................8

    F.    The Effects Of Warner's Activities. ....................................................10

ARGUMENT ..................................................................................................11

I.    REDBOX HAS STATED A CLAIM UNDER SECTION 1 OF THE SHERMAN ACT.............................................................................................11

    A.    This Court Has Already Determined That Facts Essentially The Same As Those Pled Here State A Section 1 Antitrust Claim.................11

    B.    Redbox Has Adequately Alleged The Requisite Agreements Involving Warner, Wholesale Distributors And The Retailers.................13

        1.    Warner's Cases Do Not Support a Dismissal. ...........................17

    C.    Redbox Has Properly Pled Anticompetitive Effects Within a Plausible Market. ...........................................................................19

        1.    Redbox Has Properly Alleged New-Release DVD Product Markets, and Warner's Market Power. .....................................20

        2.    Warner's Argument that Redbox Has Not Pled Anticompetitive Effects Ignores Redbox's Well-Pled Factual Statements and Relies on Unsupported Assertions as to What Warner Claims Discovery Will Show. ....................23

    D.    Redbox Has Properly Alleged Antitrust Standing. .................................29

i

**Page**

II.     WARNER'S MOTION TO DISMISS REDBOX'S COPYRIGHT
        MISUSE CLAIMS SHOULD BE DENIED...................................................................31

III.    WARNER'S MOTION TO DISMISS REDBOX'S TORTIOUS
        INTERFERENCE WITH CONTRACT CLAIM SHOULD BE DENIED.......................31

IV.     REDBOX HAS PROPERLY ALLEGED TORTIOUS INTERFERENCE
        WITH PROSPECTIVE BUSINESS OPPORTUNITY AND UNFAIR
        COMPETITION CLAIMS. ..........................................................................................31

CONCLUSION.......................................................................................................................35

861969

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Accenture Global Serv. GMBH v. Guidewire Software, Inc.*
631 F. Supp. 2d 504 (D. Del. 2009)........................................................................ 34

*Agilent Techs. v. Kirkland*, No. 3512-VCS
2009 WL 119865 (Del. Ch. Jan. 20, 2009)...................................................... 31, 35

*Alvord-Polk Inc. v. F. Schumacher & Co.*
37 F.3d 996 (3d Cir. 1994) ............................................................................... 17

*Angelico v. LeHigh Valley Hosp.*
184 F.3d 268 (3d. Cir. 1999) ...................................................................... 29, 30

*Aschcroft v. Iqbal*
129 S. Ct. 1937 (2009)...................................................... 11, 12, 16, 23

*Bell Atlantic Corp. v. Twombly*
550 U.S. 544 (2007).......................................................................... passim

*Boyd v. Tempay*
No. 07-377, 2008 WL 5156307 (D. Del. Dec. 4, 2008) ...................................... 18

*Brokers' Assistant, Inc. v. Williams Real Estate Co., Inc.*
646 F. Supp. 1110 (S.D.N.Y. 1986) .................................................................. 34

*Burtch v. Milberg Factors, Inc.*
No. 07-556, 2009 WL 840589 (D. Del. March 30, 2009) .................................... 18

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*
485 U.S. 717 (1988)............................................................................ 27

*Cable Holdings of Georgia, Inc. v. Home Video, Inc.*
825 F.2d 1559 (11th Cir. 1987) ....................................................................... 22

*Cernuto, Inc. v. United Cabinet Corp.*
595 F.2d 164, 166 n.11 (3d Cir. 1979) ............................................................. 28

*City of Pittsburgh v. West Penn Power Comp.*
147 F.3d 256 (3d Cir. 1998) ........................................................................ 29

*Continental T.V., Inc. v. GTE Sylvania, Inc.*
433 U.S. 36 (1977)....................................................................... 27

*Copperweld Corp. v. Indep. Tube Corp.*
467 U.S. 752 (1984)............................................................................. 13

*Corning Inc. v. SRU Biosystems, LLC*
292 F. Supp. 2d 583 (D. Del. 2003)............................................................ 31, 33

*Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.*
  854 F.2d 802 (6th Cir. 1988) .................................................................. 27

*Eastman Kodak Co. v. Image Tech. Servs.*,
  504 U.S. 451 (1992) ............................................................ 20, 23, 24, 28

*Erickson v. Pardus*
  551 U.S. 89 (2007) ............................................................................... 3

*Ethypharm S.A. France v. Abbott Labs.*
  598 F. Supp. 2d 611 (D. Del. 2009) ........................................................ 32

*Fischer v. City of Berkeley, California*
  475 U.S. 260 (1986) ............................................................................ 24

*Fishman v. Estate of Wirtz*
  807 F.2d 520 (7th Cir. 1987) ............................................................... 34

*Forseth v. Village of Sussex*
  199 F.3d 363 (7th Cir. 2000) ............................................................... 14

*Fowler v. UPMC Shadyside*
  578 F.3d 203 (3d Cir. 2009) ......................................................... passim

*Gill v. Delaware Park, LLC*
  294 F. Supp. 2d 638 (D. Del. 2003) ....................................................... 33

*Gordon v. Lewistown Hosp.*,
  423 F.3d 184 (3d Cir. 2005) ................................................................. 24

*Helicopter Support Sys. Inc. v. Hughes Helicopter, Inc.*
  818 F.2d 1530 (11th Cir. 1987) ............................................................ 15

*IDT Corp. v. Bldg. Owners and Managers Ass'n Int'l*
  No. 03-4113, 2005 WL 3447615 (D.N.J. Dec. 15, 2005) ............................. 12

*In re Elevator Antitrust Litig.*
  502 F.3d 47 (2d Cir. 2007) .................................................................. 18

*In re Flat Glass Antitrust Litigation*
  385 F.3d 350 (3d Cir. 2004) ................................................................ 19

*Int'l Logistics Group, Ltd. v. Chrysler Corp.*
  884 F.2d 904 (6th Cir. 1989) ............................................................... 17

*Isaksen v. Vt. Castings, Inc.*
  825 F.2d 1158 (7th Cir. 1987) ............................................................. 15

*John J. & Warren H. Graham v. Triangle Publ'g, Inc.*
  233 F. Supp. 825 (E.D. Pa. 1964) ......................................................... 17

*Kendall v. Visa U.S.A., Inc.*
  518 F.3d 1042 (9th Cir. 2008) ............................................................. 17

*Klein v. Am. Luggage Works, Inc.*
  323 F.2d 787 (3d Cir. 1963) ............................................................... 17

ii

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*
   551 U.S. 877 (2007).................................................................................... 27

*Lucas Indus. Inc. v. Kendiesel, Inc.,*
   No. 93-4480, 1995 WL 350050 (D.N.J. June 9, 1995)........................................ 29

*Monsanto Co. v. Spray-Rite Serv. Corp.*
   465 U.S. 752 (1984)........................................................................... 14, 15, 17

*Nat'l Collegiate Athletic Ass'n v. Board of Regents of University of Oklahoma,*
   468 U.S. 85 (1984)...................................................................................... 23

*Natural Design, Inc. v. Rouse Co.*
   302 Md. 47 (1984) ...................................................................................... 34

*Orson, Inc. v. Miramax Film Corp.*
   79 F.3d 1358 (3d Cir. 1996) ......................................................................... 13

*Phillips v. County of Allegheny*
   515 F.3d 224 (3d Cir. 2008) ........................................................................... 3

*Queen City Pizza v. Domino's Pizza, Inc.*
   124 F.3d 430 (3d Cir. 1997) ............................................................... 20, 21, 23

*Rambus v. FTC*
   522 F.3d 456 (D.C. Cir. 2008)....................................................................... 25

*Regency Oldsmobile, Inc. v. Gen. Motors Corp.*
   723 F. Supp. 250 (D.N.J. 1989) ..................................................................... 17

*RxUSA Wholesale, Inc. v. Alcon Labs, Inc.*
   F. Supp. 2d --, 2009 WL 3111728, at *9 (E.D.N.Y. 2009) ..................................... 17

*Ryko Mfg. Co. v. Eden Servs.*
   823 F.2d 1215 (8th Cir. 1987) ....................................................................... 27

*Satellite Television & Associated Res. Inc. v. Cont'l Cablevision of Virginia*
   714 F.2d 351 (4th Cir. 1983) ......................................................................... 22

*Starr v. Sony BMG Music Ent.*
   __ F.3d __, 2010 WL 99346 (2d Cir. Jan. 13, 2010).............................................. 19

*Tunis Bros. Co. v. Ford Motor Co.,*
   952 F.2d 715 (3d Cir. 1991) ......................................................................... 29

*Westman Commc'n Co. v. Hobart Int'l, Inc.*
   796 F.2d 1216 (10th Cir. 1986) ..................................................................... 27

*Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*
   810 F.2d 243 (D.C. Cir. 1987)........................................................................ 24

*World of Sleep, Inc. v. La-Z-Boy Chair Co.*
   756 F.2d 1467 (10th Cir. 1985) ..................................................................... 15

iii

**Treatises**

Sullivan, THE LAW OF ANTITRUST:  AN INTEGRATED HANDBOOK,
    Second Edition (2006) ............................................................................................ 28

## NATURE AND STAGE OF PROCEEDINGS

On August 18, 2009, plaintiff Redbox Automated Retail, LLC ("Redbox") filed its initial Complaint.  On November 30, 2009, Redbox filed an Amended Complaint.  On December 21, 2009, Warner Home Video, a division of Warner Bros. Home Entertainment, Inc. ("Warner") moved to dismiss the Amended Complaint, filing a 41-page brief ("Warner Br.").  Redbox now responds to, and opposes, Warner's new motion to dismiss.

## SUMMARY OF THE ARGUMENT

Warner's Motion to Dismiss should be denied with respect to Redbox's claims under the antitrust laws (Counts II - V), for tortious interference with prospective business opportunity (Count VII), and for unfair competition (Count VIII).  This Court held in the Universal action that factual allegations similar to those set forth in the Amended Complaint stated viable Section 1 Sherman Act claims.  *See* Opinion dated August 17, 2009 in *Redbox Automated Retail, LLC v. Universal City Studios LLP, et al.*, No. 08-766 (the "Universal Opinion").  Specifically, after extensive consideration of Redbox's factual statements, this Court held that it was "convinced" that Redbox had pled a valid claim under Section 1 of the Sherman Act, including its claim that Universal had induced or convinced others to boycott Redbox and that Universal's actions had produced anticompetitive effects.  *Id.* at 9.  Resolution of Redbox's claims, therefore, would require discovery on the "multitude of factors bearing on whether Universal's alleged acts are uncompetitive in nature."  *Id.* at 10.

Redbox's Amended Complaint against Warner contains essentially the same factual allegations found in its Universal complaint.  Like the Universal complaint, Redbox has here stated facts reflecting a concerted effort, orchestrated this time by Warner, also a distributor of DVDs, to artificially restrict supply and increase prices for the rental of new-release DVDs through facially anticompetitive behavior.  *See*, *e.g.*, Am. Compl. at ¶¶ 39, 41.  As a result,

new-release DVDs that had been renting for one dollar per night before Warner's anticompetitive restraints are now available, if at all, only at fewer outlets, at a restricted supply and at a higher price.  *Id.* at ¶¶ 39-41.  Consumers are harmed by this unlawful activity.  *Id.*

Warner is able to orchestrate this activity based upon several distinctive features of the new-release DVD market: (1) the low cross-elasticity of demand between new-release DVDs and other DVDs; (2) the structure of the market(s) for new-release DVDs, including Warner's and other major distributors' efforts to structure those markets so as to avoid direct competition between new-release DVDs of similar type or genre; (3) the short shelf life of new-release DVDs; and (4) the unique nature of copyrighted new-release DVDs, including the monopoly power that a copyright conveys to its holders.  *See*, *e.g.*, Am. Compl. at ¶¶ 19-29; 39-41.  Warner provides no compelling reason for the Court to reach conclusions here different from those it reached in the Universal action, especially given that the Amended Complaint contains virtually identical factual statements.  Indeed, Warner simply reargues points earlier raised by Universal and rejected by this Court.

Redbox's remaining claims are for copyright misuse, tortious interference with contract, tortious interference with a prospective business opportunity and unfair competition.  We acknowledge with respect to Redbox's copyright misuse and tortious interference with contract claims, that this Court's earlier Universal decision is based on similar allegations and need not be re-argued here.  Therefore, we reserve all appellate rights and restate the arguments raised in the Universal case in Exhibits A and B, incorporating them as part of this brief, but understand that under this Court's reasoning in the Universal Opinion, those claims would also be dismissed in the present action.

861969

Redbox's new claims for tortious interference with prospective business opportunity and unfair competition are claims not raised in the Universal action.  They are discussed in Section IV, *infra*.  These claims have not previously been considered by the Court.  Redbox will show that Warner's interference with Redbox's relationship with retailers constitutes tortious interference with prospective business opportunity and unfair competition.  Warner's motion to dismiss these claims should be denied.

**STATEMENT OF RELEVANT FACTS**

We set forth, consistent with *Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009), the facts upon which Redbox bases its claims.  These facts must be accepted as true, construed in the light most favorable to Redbox, and used to determine whether under "any reasonable reading of the complaint," Redbox "may be entitled to relief."  *Id.* at 210, *quoting Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotations and citations omitted).  In deciding whether Redbox's stated facts show that Redbox has asserted a "plausible claim for relief," a court must "draw on its judicial experience and common sense."  *Fowler*, 578 F.3d at 211.  A complaint need only give a defendant "fair notice" of what the claim is and the "grounds upon which it rests."  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007).

A.      **Relevant Entities.**

Redbox is the nation's leading low-cost alternative for consumers seeking to rent digital video disks ("DVDs").  Am. Compl. at ¶ 2.  Redbox serves its customers through innovative, consumer-friendly means: automated self-service kiosks located in various retail outlets.  *Id.*  Consumers can rent new-release DVDs from Redbox kiosks for $1 per night – a lower cost than traditional brick-and-mortar outlets or alternative sources for new-release DVD rental where the average cost of a DVD rental is approximately $4.00.  *Id.* at ¶ 21.

Consumer demand for Redbox's rentals and sales has grown substantially in the last five years. *Id.* at ¶ 18. Redbox began with 125 kiosks in 2004. *Id.* By the end of 2008, it had over 12,000 kiosks. *Id.* As of the time this Amended Complaint was filed, Redbox had over 20,000 kiosks. This growth has enabled Redbox to surpass Blockbuster, Inc. as the leader in terms of DVD rental locations in the United States. *Id.* Consumers have rented more than 500 million DVDs from Redbox. *Id.*

Warner is one of the world's leading distributors of copyrighted DVDs and other video entertainment in the United States and throughout the world. *Id.* at ¶¶ 8-9. Warner does not create or manufacture DVDs, but instead purchases them from others for marketing and distribution. *See id.*

Ingram and VPD are wholesale distributors of DVDs, including new-release DVDs offered by Warner. *Id.* at ¶¶ 10, 11. As wholesale distributors, Ingram and VPD maintain warehouses filled with new-release DVDs. *Id.* VPD and Ingram place orders for DVDs in bulk, they are not merely relay points through which individual customer orders are transmitted to larger distributors such as Warner. *Id.* Since the effective date of Warner's boycott, both VPD and Ingram have refused to sell any Warner DVDs to Redbox. *Id.*

Wal-Mart, Best Buy, and Target are nationwide retailers. *Id.* at ¶ 32. Redbox representatives have attempted to purchase new-release DVDs from these entities. *Id.* Contrary to past practice and normal economic self-interest, these retailers have refused to sell more than an inadequate quantity of new-release DVDs to Redbox. *Id.*

### B.      Industry Practice Regarding New-Release DVDs.

A critical aspect of Redbox's business success is its ability to provide consumers new-release DVDs on the same day they are made available for home viewing (the "street date," typically a Tuesday). *Id.* at ¶ 20. Consumer demand for a new-release DVD is at its highest

4

during the weekend immediately following its street date and declines substantially thereafter. *Id.* Over thirty percent of a new-release DVD's revenue is generated during the first two weeks after its release, and over 60% of the rental demand for a new-release DVD occurs within 45 days of its release.[1] *Id.* Thus, new-release DVDs for rental or resale are perishable goods, like milk or fruit; their value drops rapidly and materially almost from the first day they appear on the shelf. *Id.* at ¶¶ 22-23.

Because consumer demand for a particular new-release DVD is highest while the DVD is new in the market, consumer demand for a new-release DVD is different from consumer demand for a back-catalog DVD, *i.e.*, a DVD that has been on the market for longer than 30 days. *Id.* New-release DVDs constitute separate markets. *Id.* In economic terms, the elasticity of demand between new-release DVDs and back-catalog items is low. *Id.*

## C.    The Commercial Realities Of The New-Release DVD Markets.

Release dates for new-release DVDs are timed so that a particular new-release DVD title faces as little competition as possible from other new-release DVDs of the same genre when it is released. *Id.* at ¶¶ 24-25. Warner recruits new audiences for each of its theatrical films by advertising on its television and cable networks, and then attempting to ensure that the audience will not defect to another film by scheduling, or rescheduling, the release date of its film to a date when there will be no competition.[2] *Id.* at ¶ 24. For instance, Warner avoided head-to-head

---

[1]       In fact, Redbox's allegations concerning the "decay rate" for new-release DVDs appear to understate the speed with which the value of a new-release DVD drops. Recent industry publications state that between 50-70% of the sales revenue for a new-release DVD is generated within the first week following its release. Exhibits C and D.

[2]       To help studios avoid such competition, the National Research Group ("NRG"), for example, supplies a "Competitive Positioning" report to major providers of DVDs. Am. Compl. at ¶ 24. The NRG polls likely moviegoers to project how well upcoming movies will do against each other in each audience quadrant (males under 25, males over 25, females under 25, females over 25) should they be released during the same time period. *Id.* A "losing" provider will reschedule the release of a film to a different time period, even if it is less advantageous (*i.e.*, not the summer and not the holidays). *Id.*

theatrical competition with Fox's "*Fantastic Four*" by releasing its "*Batman Begins*" in mid-June, a few weeks before the Fox release.  *Id.*  Similarly, Fox avoided head-to-head theatrical competition with *"War of the Worlds"* during the coveted Fourth of July Weekend by releasing its *"Fantastic Four"* a week later.  As a result, all three films won their weekend box office and could advertise themselves, as *Fantastic Four* did, as "America's No. 1 hit."  *Id.*

Major distributors of new-release DVDs, including Warner, apply a similar approach to scheduling the release dates for their new-release DVDs.  *Id.* at ¶ 25.  Because of this industry practice, a particular new-release DVD generally does not have a readily acceptable substitute.  *Id.*  The major distributors of DVDs work hard to ensure that a new-release in a particular category, or genre, does not share its street date with another release in the same category or genre.  *Id.*

Consumers seeking to rent a new-release DVD generally search by title and by category or genre, not by its distributor (*e.g.*, Fox or Warner).  *Id.* at ¶ 25.  The industry is structured in this manner, as evidenced by the way in which video rental stores and video rental websites are laid out.  *Id.*[3]  Some titles, such as the latest *Harry Potter* movie, have no reasonable substitute.  By virtue of their copyright and their position in the market, there is little, if any, cross-elasticity of demand.  Alternatively, for many new-release DVDs, each genre or category constitutes a distinct sub-market within the overall new-release DVD market.  *Id.*  The industry itself recognizes the existence of common categories or genres, including action/adventure, comedy,

---

[3]       Warner's own website allows consumers to search for DVDs by selecting what it terms as "genres."  *See* http://www.warnerbros.com/#/page=wb-library/ (last visited Jan. 28, 2010).  The genres listed on Warner's website include, among others, action/adventure, family/children, drama, horror and sci-fi/fantasy.  *Id.*  Indeed, within the "library" of movies on Warner's website, "genres" is the only way to search other than by title (alphabetical listing) or by year.  *Id.*  Likewise, Universal and Warner websites also categorize DVDs by genre.  See Universal Studios Home Entertainment, http://homevideo.universalstudios.com/index.html (last visited Jan. 28, 2010) and Fox, http://www.foxconnect.com (last visited Jan. 28, 2010).

drama, family and kids, horror, sci-fi and suspense.  *Id.*[4]  There is a low cross elasticity of demand among consumers for new-release DVDs of different genres.  *Id.*

Because of the inelastic demand for each particular new-release DVD, the way the markets are structured by their participants, and Warner's monopoly power derived from its government-granted copyrights, Warner possesses significant market power for certain of its new-release DVDs, and, in the alternative, within a specific category or genre during the period immediately following the DVD's release.  *Id.* at ¶¶ 22-29.  During this limited period, consumers have few, if any, acceptable substitutes for a particular new-release DVD in a particular category or genre, especially during the critical period following a DVD's street date. *Id.* at ¶ 28.

### D.     Redbox's Relationship With Ingram And VPD.

Redbox has historically been able to meet consumer demand for copies of new-release DVDs for rental on a title's street date because of its longstanding contractual and mutually-beneficial business relationships with wholesale distributors like VPD and Ingram. Am. Compl. at ¶ 33.  Redbox has historically purchased all, or nearly all, of its supply of new-release DVDs from these wholesale distributors.  *Id.*

Specifically, Redbox has supply contracts with Ingram and VPD.  *Id.* at ¶¶ 34-36.  These contracts give Redbox the right to purchase Warner DVDs from Ingram and VPD, and similarly obligates both of them to sell to Redbox, upon Redbox's request, Warner DVDs.  *Id.* at ¶¶ 34, 36.  The Ingram supply contract also contains a "DVD Buy Back" clause that permits Redbox to sell and obligates Ingram to "repurchase from Redbox ('Buy Back') new-release DVD product"

---

[4]      For example, the Golden Globes confer separate "Best Picture" awards to films in different genres, including Drama, Comedy or Musical, Animated Film and Foreign Language Film.  *See* Golden Globes Official Website, http://www.goldenglobes.org/nominations/  (last visited January 28, 2010).

pursuant to a timeframe tied to the title's street date. *Id.* at ¶ 35.  Under this arrangement, Ingram agreed to buy back significant quantities of previously-viewed DVDs from Redbox, and in turn would sell these to other buyers in the distribution stream. *Id.*  Redbox is also able to sell back significant amounts of previously-viewed DVDs to VPD, which in turn sells them to other buyers in the distribution stream. *Id.* at ¶ 36.  VPD and Ingram hold themselves out as having the ability to provide retailers like Redbox access to all of the titles released by the major Hollywood providers of new-release DVDs. *Id.*

Notwithstanding these contractual relationships, VPD and Ingram have stopped filling Redbox's orders for Warner DVDs with release dates beginning October 27, 2009 and have stopped buying back DVDs from Redbox. *Id.* at ¶ 37.  Absent Warner's boycott and other unlawful acts, Redbox would have continued to purchase all, or nearly all, of its supply of new-release Warner DVDs from VPD and Ingram beyond October 27, 2009 and into the foreseeable future. *Id.*  Warner's ability to coerce agreements from Ingram and VPD to stop selling to Redbox is due to Warner's dominant market position and market power with respect to unique, new-release DVDs. *Id.* at ¶ 38.  Because Warner has obtained agreement from *all* of its wholesale distributors to stop selling to Redbox and has entered into agreements with retailers to stop selling DVDs to Redbox, Redbox lacks viable channels from which to purchase new-release Warner DVDs. *Id.*

###   E.   Warner's Decision To Interfere With Redbox's Relationships With Ingram And VPD And To Shut Off Redbox's Supply Of Warner New-Release DVDs.

On August 13, 2009, Mark Horak and Mark Saksa, Warner's President and Vice President- New Release Sales, respectively, telephoned Mitch Lowe, Redbox's President and indicated that, for Warner DVDs with street dates beginning October 27, 2009, Warner would only provide product subject to a 28-day blackout period. *Id.* at ¶ 30.  Horak stated that Warner

would demand that VPD, Ingram and other traditional distributors stop distributing new-release DVDs to Redbox during the 28-day blackout period.  *Id.*  Additionally, these distributors would be asked to stop purchasing previously-viewed Warner DVDs from Redbox.  *Id.*

But Warner did not stop there.  Warner representatives contacted representatives of both VPD and Ingram, seeking confirmation that both VPD and Ingram would agree to stop selling new-release DVDs to Redbox during the 28-day blackout period.  *Id.* at ¶ 31.  Both VPD and Ingram communicated to Warner that they would agree to stop selling new release DVDs to Redbox during the 28-day blackout period.  *Id.*

Discovery will also show that Warner representatives contacted not only VPD and Ingram, but also numerous other wholesale distributors and retailers of DVDs, seeking confirmation that they would also agree not to sell new-release DVDs to Redbox during the 28-day blackout period.  *Id.* at ¶ 32.  Redbox's representatives have been informed by representatives at certain major retail stores that Redbox will not be allowed to purchase more than three copies of any new-release DVD.  *Id.*  It makes no economic sense for any individual retailer to deny sales to Redbox unless it knows that other retailers have also agreed not to sell to Redbox.  *Id.* at ¶ 32.  Warner continues to seek agreement with, and cooperation from, wholesale distributors and national retailers to prevent sales of new-release DVDs to Redbox.  *Id.* Wholesale distributors, including VPD and Ingram, have agreed to comply with Warner's demand, due to Warner's dominant market position with respect to new-release DVDs and their need for the DVDs Warner sells.[5]  *Id.* at ¶ 38.

---

[5]      Warner makes much of the fact that Redbox had stated in November 2009 that it had been able to get new-release DVDs from some alternative sources.  Warner Br. at 14-15 & n.11.  That Warner had not yet been successful in completely foreclosing all sources of supply to Redbox does not mean that its tightening restrictions on supply of new-release DVDs have not harmed competition, Redbox and consumers.

9

F.      **The Effects Of Warner's Activities.**

Warner's actions, if not remedied by this Court, have and will restrict output, eliminate competition in the rental and sales markets and artificially raise prices to consumers.  *Id.* at ¶ 39. Warner's goal in entering into agreements with distributors and retailers is to restrict output, increase prices and artificially control the market for new-release DVD rentals and re-sales.  *Id.* at ¶ 41.  Warner has no valid legal right to restrict or govern how or to whom VPD, Ingram and other wholesale distributors and retailers may resell DVDs that they have purchased.  *Id.* at ¶ 40. However, as a result of Warner's unlawful acts, Redbox no longer has access through its regular channels to new-release DVDs distributed by Warner  *Id.*

Warner's actions, if allowed to stand unchecked, artificially constrain output and prevent consumers from renting new-release DVDs from Redbox and other kiosk rental outlets.  *Id.* at ¶ 41.  Warner's true purpose in demanding that VPD and Ingram stop selling to Redbox is to eliminate the independent kiosk as a low-cost consumer choice and thereby create an artificial shortage of product with a correspondingly high artificial price for rental or re-sale of new-release DVDs.  *Id.* at ¶ 41.  Warner seeks to eliminate the low-cost, highly-convenient and fast-growing automated kiosk channel, because (1) Redbox (and other independent kiosk vendors) threaten to undercut the artificial pricing of the distribution structure that Warner seeks to establish; and (2) by virtue of its monopoly power, Warner seeks to capture excess revenue from artificially high prices for new-release DVD rentals and re-sales.  *Id.*

## ARGUMENT

**I.    REDBOX HAS STATED A CLAIM UNDER SECTION 1 OF THE SHERMAN ACT.**

    **A.    This Court Has Already Determined That Facts Essentially The Same As Those Pled Here State A Section 1 Antitrust Claim.**

This Court held in its Universal Opinion that Redbox had "properly pleaded a claim for a violation of Section 1 of the Sherman Act." Universal Op. at 9. Redbox's factual allegations here are virtually identical to those that the Court found "convinc[ing]" in the Universal action. *Id.* Specifically, as was true in the Universal action, Redbox alleges (1) a boycott of Redbox involving distributors and retailers, Am. Compl. at ¶¶ 4, 31, 32; (2) a new-release DVD market structured to avoid competition, especially during the critical period right after the street date when demand for a new-release DVD is at its highest and when most rental revenues are generated, *id.* at ¶¶ 20, 22-29; (3) higher rental prices in alternative venues for new-release DVD rentals, *id.* at ¶ 21; and (4) a distributor of new-release DVDs (Warner) that is not seeking to promote interbrand competition by imposing the challenged restraints, but rather is seeking to create and sustain an artificially high price for new-release DVDs for the limited (but critical) period immediately after release when there are few, if any, viable substitutes available to consumers, *id.* at ¶ 41. These actions harm consumers and have no offsetting procompetitive effects. *Id.*

Warner provides the Court with no compelling reason to deviate from the conclusions reached in the Universal Opinion. Warner identifies three issues that it claims distinguishes Redbox's claims here from those in the Universal action: that (1) Redbox continues to "compete vigorously" and has had "continued growth" despite the boycott by Universal imposed over a year ago (Warner Br. at 3-4); (2) *Iqbal* and *Fowler* had not yet been decided (*id.* at 4-5); and (3)

the antitrust allegations against Warner are different from the allegations against Universal (*id.* at 5-6).

These arguments are meritless and should be rejected.  With respect to Warner's first assertion, that Redbox continues to "compete vigorously" and has had "continued growth," that assertion does not lead to the conclusion that Warner's actions have not harmed consumers and competition, as well as diminishing Redbox's growth.  Moreover, Warner did not begin to implement its scheme until October 27, 2009, less than one month before the Amended Complaint was filed.  The full impact of the Warner boycott on Redbox, competition and consumers remains to be seen.  But it is clear that absent Warner's illegal behavior, more consumers would have rented or purchased new-release DVDs for $1 per night from Redbox, as opposed to being forced to pay an artificially high price for the same item through some other channel of distribution.  This issue is a matter of proof that Redbox will establish through evidence; it is not a valid basis for dismissal at the pleading stage.  *Cf. IDT Corp. v. Bldg. Owners and Managers Ass'n Int'l*, No. 03-4113, 2005 WL 3447615, at *7 (D.N.J. Dec. 15, 2005) (an antitrust plaintiff "need not prove an actual lessening of competition in order to recover.  [C]ompetitors may be able to prove antitrust injury before they are actually driven from the market and competition is thereby lessened") (internal citation and quotation marks omitted).

As to the second issue, *Iqbal* (*Aschcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)), was decided more than three months before the Court issued the Universal Opinion, and *Fowler* does nothing more than apply the relevant standards set forth in *Twombly* (*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) and *Iqbal*, something that this Court also did when it issued the Universal Opinion.  Under *Fowler*, the issue is whether the well-pled facts set forth a "plausible claim for relief," *Fowler*, 578 F.3d at 211, exactly the determination this Court made

when it held that Redbox had adequately pled each required element of a Section 1 claim,
including the requisite agreement.  Universal Opinion at 9; *see also id.* at 5-6 (*citing Twombly*
and stating that the complaint must contain enough facts to raise a right to relief above a
"speculative level").

As to the final issue, the antitrust allegations against Warner are not substantially
different from those against Universal.  (*See* Warner Br. at 5-6.)  In fact, they are virtually
identical.  Just as in the Universal case, Redbox has validly alleged all the elements to establish a
Section 1 claim, as will be further explained below.  Warner's remaining antitrust arguments
were all raised by Universal and rejected by this Court.

**B.**  **Redbox Has Adequately Alleged The Requisite Agreements Involving Warner, Wholesale Distributors And The Retailers.**

A Section 1 plaintiff must show "concerted action," a "collective reference to the
'contract . . . combination or conspiracy'" requirement of Section 1.  *Orson, Inc. v. Miramax
Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996).  Liability is triggered by a "'unity of purpose or a
common design and understanding or a meeting of minds in an unlawful arrangement.'"  *Id.*,
*quoting Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984).

Redbox's Amended Complaint clearly contains enough factual material to allege an
agreement among Warner, wholesale distributors and retailers.  Redbox has alleged that
Warner's President and Vice President of New Release Sales stated to Redbox that Warner
would demand that VPD, Ingram and other traditional wholesale distributors stop distributing
new-release DVDs to Redbox.  Am. Compl. ¶ 30.  Redbox's two largest wholesale suppliers,
contrary to past practice, stopped selling Warner DVDs to it.  *Id.* ¶ 31, 37.  Well-known and
powerful retailers also restricted selling to Redbox shortly after Warner implemented its boycott.

861969

*Id.* ¶ 32.[6]  It defies "common sense" that a diverse group of entities, each with competing and

conflicting economic self-interest, would all simultaneously agree to forego the economic benefit

of millions of dollars of sales to Redbox.  *Orson*, 79 F.3d at 1369-70 (stating that an entity acting

contrary to its economic self-interest is evidence that suggests an agreement).  Such facts

certainly render Redbox's claims of agreement plausible.  *Twombly*, 550 U.S. at 570.[7]  *Bell*

*Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Warner seeks to avoid the effect of these well-pled facts by claiming that (1) there are

"no plausible allegations" that Warner and its wholesale distributors made a "conscious

commitment to a common scheme" to achieve an anticompetitive effect, *citing Monsanto*,

Warner Br. at 18, and that each wholesale distributor was simply following Warner's announced

"unilateral" policy, *id.* at 17-19; and (2) with respect to the retailers, Warner posits that there are

"obvious reasons" why retailers might not sell to a kiosk company which purportedly competes

with it.  *Id.* at 19.

Warner's first argument seeks the benefit of inferences to which it is not entitled.

*Twombly* (and *Fowler*) specifically hold that well-pled facts must be accepted as true.  In

asserting there was no "agreement" to "produce an anticompetitive effect," Warner simply

ignores Redbox's allegations of an agreement resulting in harm to the relevant markets.  Warner

also ignores Redbox's allegations that Warner's actions are not motivated by a desire to promote

---

[6]      Attached as Exhibit E is a copy of an internal Best Buy memorandum received by a Redbox
representative from a Best Buy store manager in December 2009, after Redbox had filed its Amended
Complaint.  It provides in the very first sentence that Best Buy's agreements with the "major studios"
provide that Best Buy "can't sell to Redbox or any other . . . rental business."  *Id.*  Thus, there is no
question that an agreement not to sell to Redbox exists.  *Forseth v. Village of Sussex*, 199 F.3d 363, 368
(7th Cir. 2000).

[7]      Recent events provide additional factual support for Redbox's contentions.  Earlier this week,
news sources reported that Target and Wal-Mart will limit purchases of new-release DVD purchases to
five copies per title for the first few weeks after street date. (*See* Exhibit F.)

its "brand," but rather an effort to eliminate the automated kiosk channel because of the downward pressure that it puts on Warner's pricing. Warner argues that its conduct is "unilateral" and therefore "wholly permissible" under the law (i.e. the "manufacturer's privilege"), Warner Br. at 17-18. However, Warner's argument ignores the facts plainly set forth in Redbox's Amended Complaint. These facts allege and establish *concerted* action, not unilateral conduct, and remove Warner's alleged policy from the "manufacturer's privilege" on which it relies. Specifically, Redbox states that Warner representatives "contacted" representatives of VPD and Ingram "seeking confirmation" that the entities would agree to stop selling new-release DVDs to Redbox during the 28-day blackout period, both of which gave assurances that they would do so. Am. Compl. ¶ 31. Warner is alleged to have engaged in similar behavior with respect to other wholesalers and the retailers. *Id.* at ¶ 32. (Subsequent factual development demonstrates that this is true, even before formal discovery has begun; *see* fns. 6 and 7.) There is no valid basis for Warner to ignore these well-pled facts which, under established law, refute Warner's assertion of unilateral action and establish the requisite agreement. *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 763-64 n.9 (1984) (an agreement exists whenever a manufacturer seeks acquiescence or agreement to one of its policies from a distributor and the distributor then communicates its acquiescence or agreement to the manufacturer); *Helicopter Support Sys. Inc. v. Hughes Helicopter, Inc.*, 818 F.2d 1530, 1533 (11th Cir. 1987) (same); *Isaksen v. Vt. Castings, Inc.*, 825 F.2d 1158, 1164 (7th Cir. 1987) (Posner, J.) (same); *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1475 (10th Cir. 1985) (same).

With respect to Warner's second argument as to the purported "obvious reasons" for retailers' refusal to sell to Redbox, no standard for deciding a motion to dismiss states that

Warner, as the moving party, is entitled to rely on such unadorned, unsupported and self-serving speculation as a basis for dismissal. *Compare Aschcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (stating that civil complaints must make more than unadorned accusations). There is no evidence before the Court to support Warner's speculation that all of the retailers identified in Redbox's Amended Complaint are independently refusing to sell new-release DVDs to Redbox because Redbox is purportedly "cannibalizing" their sales.[8] Warner is simply not entitled to dismissal based upon unsupported speculation.

Redbox's current allegations are entirely consistent with those found in the initial Complaint, and both allege facts sufficient to establish a Section 1 agreement. *Fowler* requires a court to accept all factual allegations in a complaint as true, to construe them in a manner "most favorable" to the plaintiff and to use the court's "judicial experience and common sense" in deciding whether a party has stated a plausible claim for relief. *Fowler*, 578 F.3d at 210-11. Each wholesale distributor is alleged to have warehouses of new-release DVDs available for sale. Am. Compl. at ¶¶ 10-11. Economic theory teaches that each would have an incentive to sell these items to Redbox. The same is true for the retailers. Warner's alleged "unilateral policy" seeking to eliminate sales to Redbox could only be successful if each party was assured that some other retailer or wholesale distributor would not replace the units that any particular wholesale distributor had previously sold to Redbox.

Warner's argument is replete with references to *Twombly* and what it purportedly requires to state an antitrust claim. But *Twombly* arises in the context of alleged agreements that are based entirely on parallel conduct and that purportedly occurred over a seven-year period. Redbox's claims, by contrast, are based on agreements that occurred in a sharply defined period

---

[8]      In fact, early evidence gathered by Redbox supports Redbox's allegations that the actions of the major studios have caused retailers to refuse to sell to Redbox.  (*See* Exhibit E.)

of a few weeks, and for which there is clear evidence, both documentary and otherwise of

unlawful agreement.  Despite these facts, Warner claims that the Court should ignore Redbox's

well-pled allegations and dismiss based on *Monsanto* and *Colgate*, neither of which are motion

to dismiss cases.  Neither *Twombly* nor *Fowler* allow for such a result, and Warner's motion to

dismiss must be denied.

### 1.    Warner's Cases Do Not Support a Dismissal.

Warner's cited authorities fail to support its argument that the factual statements are

insufficient at the pleading stage to establish an agreement.  Most of these cases were decided at

the summary judgment or post-trial stage.  *See* Warner Br. at 17-20, citing *Monsanto Co. v.

Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984) (post-trial judgment); *Alvord-Polk Inc. v. F.

Schumacher & Co.*, 37 F.3d 996, 999 (3d Cir. 1994) (summary judgment); *Int'l Logistics Group,

Ltd.  v. Chrysler Corp.*, 884 F.2d 904, 906 (6th Cir. 1989) (directed verdict); *Klein v. Am.

Luggage Works, Inc.*, 323 F.2d 787, 788 (3d Cir. 1963) (post-trial judgment); *Regency

Oldsmobile, Inc. v. Gen. Motors Corp.*, 723 F. Supp. 250, 252 (D.N.J. 1989) (summary

judgment); *John J. & Warren H. Graham v. Triangle Publ'g, Inc.*, 233 F. Supp. 825, 826 (E.D.

Pa. 1964) (preliminary injunction).

Of the few that actually decided any issues at the pleading stage, virtually all did so in the

context of an agreement based on allegations of only parallel conduct and pure legal conclusions.

For example, in *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008), the court

dismissed the pled claims because the plaintiffs had pled only legal conclusions and had "failed

to plead the necessary evidentiary facts to support those conclusions."  Likewise, in *RxUSA

Wholesale, Inc. v. Alcon Labs, Inc.*, F. Supp. 2d --, 2009 WL 3111728, at *9 (E.D.N.Y. 2009)

(Warner Br. at 19, n.17), the court dismissed the Section 1 claims because the plaintiff had

alleged conduct which was only questionably parallel and a single conclusory paragraph that

17

defendants had agreed with each other.  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50-51

(2d Cir. 2007) involved a class action complaint that asserted antitrust claims against elevator

sales and repair companies who had allegedly participated in a worldwide conspiracy to fix

prices and monopolize a global market for sale and maintenance of elevators beginning in 2000.

The court found that plaintiffs had alleged an insufficient factual basis for the assertions, where it

alleged a list of "entirely general terms" which was "nothing more than a list of theoretical

possibilities."  *See also Burtch v. Milberg Factors, Inc.*, No. 07-556, 2009 WL 840589, at *9-13

(D. Del. March 30, 2009) (complaint contained only allegations of conscious parallelism

combined with conclusory allegations of agreement); *Boyd v. Tempay*, No. 07-377,

2008 WL 5156307, at *4 (D. Del. Dec. 4, 2008) (complaint contained "rote language" of

conspiracy without alleging actual agreement).

      Unlike Warner's cases, Redbox does not rely on parallelism to support its claims.  There

is no concern – as in cases premised entirely on parallel behavior – that the actions of Warner,

the wholesale distributors, and the retailers are somehow part of a "rational and competitive

business strategy" prompted by "common perceptions of the market."  *Twombly*, 550 U.S. at

554.  Before the announcement by Warner's President that Warner planned to enter into

agreements to restrict Redbox's ability to obtain new-release DVDs, both wholesale distributors

and retailers alike were selling to Redbox.  *Compare to Twombly*, 550 U.S. at 557 n.4 (complex

and historically unprecedented changes in pricing structure made at the same time by multiple

competitors and made for no other discernible reason would support plausible inference of

conspiracy).

      Redbox has adequately pled an agreement based on first-hand communications with

(former) business partners and the resulting acts in which those partners have engaged, all of

861969

which are contrary to their respective economic self-interest and past practices. *See In re Flat Glass Antitrust Litigation*, 385 F.3d 350, 360-1 (3d Cir. 2004) (evidence that a defendant acted contrary to its interests supports a claim for antitrust conspiracy); *Starr v. Sony BMG Music Ent.,* __ F.3d __, 2010 WL 99346, at *9 (2d Cir. Jan. 13, 2010) (holding that plaintiffs had not merely pled parallel conduct, but rather had properly pled a conspiracy by alleging behavior that would plausibly contravene each defendant's self-interest in the absence of similar behavior by rivals). Redbox has provided extensive factual development that is more than sufficient to render the identified agreement "plausible."  Also unlike the cases cited by Warner, Redbox is not relying on mere allegations of conscious parallelism.  It has clearly presented facts of which it is aware that are sufficient to show agreement.  These allegations must be accepted as true and, under established law, are sufficient to establish an agreement. *Twombly*, 550 U.S. at 556 (plausibility requirement "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement").

> **C.      Redbox Has Properly Pled Anticompetitive Effects Within a Plausible Market.**

In this part of its brief, *see* Warner Br. at 20–35, Warner essentially repeats arguments that Universal previously asserted and that this Court rejected in the Universal Opinion: that (1) Redbox has not defined a plausible market or plausibly alleged market power; (2) Redbox has not pled harm to competition or anticompetitive effect; and (3) harm to "mere" intrabrand competition is not sufficient to state a Section 1 claim.  Warner's arguments should fare no better than they did when previously asserted by Universal, and Warner's efforts to have Redbox's claims dismissed on these bases should be rejected.

19

1.  **Redbox Has Properly Alleged New-Release DVD Product Markets, and Warner's Market Power.**

This Court has already found that, to the extent a relevant product market must be pled, Redbox adequately pled a relevant product market in Universal matter.  (Universal Op. at 9-10.) Redbox's market allegations against Warner are identical to those set forth in the Universal complaint and should be sustained for the same reasons.

"[R]easonable interchangeability" is the "touchstone" of a plausible market.  *Eastman Kodak Co. v. Image Tech Servs. Inc.*, 504 U.S. 451, 482 (1992) at 482 (upholding a market of Kodak parts); *Queen City Pizza v. Domino's Pizza, Inc.*, 124 F.3d 430, 437 (3d Cir. 1997) ("As we have noted, the outer boundaries of a relevant market are determined by reasonable interchangeability of use.").  A product market is defined by those "commodities reasonably interchangeable by consumers for the same purpose."  *Id.* at 438.  Products in the relevant market should be characterized by a cross-elasticity of demand.  *Id.* at 437-38.  A rise in the price of one good should tend to create a greater demand for other like goods in the market.  *Id.*

Warner's arguments that Redbox's market definitions are "untenable;" *see* Warner Br. at 21-22, ignore or misconstrue Redbox's well-pled product market allegations.  Redbox has pled product markets comprised of either (1) a market for single, unique copyrighted titles on DVD (such as the latest "*Harry Potter*" release); or (2) alternatively, a weekly market for new-release DVDs with relevant submarkets by genre or category.  Redbox has supported these markets with facts describing the commercial realities that characterize those markets (*e.g.*, peak demand for a limited period that deteriorates rapidly, releases coordinated to avoid direct competition), all of which are true, and must be accepted as such.  *Twombly*, 550 U.S. at 570 (requiring "only enough facts to state a claim to relief that is plausible on its face"); *Fowler*, 578 F.3d at 212 (complaint "need only set forth sufficient facts to support plausible claims").

861969

Despite these well-pled facts, Warner argues that Redbox has not adequately alleged reasonable interchangeability because it has not shown how new release films are put to a different "use" from non-new release films, or how films in different genres are put to different "uses."  Warner Br. at 23-24, *citing Queen City Pizza*.  This argument misinterprets the standard for defining a relevant product market, which is not whether products have the same "use" in the extremely general sense that Warner posits, but whether they are considered "reasonably interchangeable by consumers for the same purpose."  *Queen City Pizza*, 124 F.3d at 438.  The key to the standard is whether the *consumer* considers the products interchangeable.  *Id.*

Here, Redbox has explained in great factual detail why a given week's new-release DVD can comprise its own market, based upon factors including limited availability, market structure and because consumers do not consider other older or new-release DVDs from different genres to be "interchangeable" for the purpose for which the consumer is seeking the current new release.  Indeed, this result is consistent with the major distributors' efforts to recruit audiences for new-release DVDs and then take steps to ensure that those audiences will not defect to other titles, including by rescheduling the release date of a DVD to avoid direct competition.  Am. Compl. at ¶ 24.[9]  Moreover, based upon the manner in which the major distributors time their releases, Redbox has also factually pled that a suitable alternative new-release DVD is unlikely to be found on the particular Friday evening a consumer is looking for a DVD, and therefore "in the market."

---

[9]    Although not required to prove its market allegations at this point, Redbox notes that early evidence supports its allegations.  In a recent study, the Los Angeles Economic Development Corporation, which is funded in part by DVD suppliers that are defendants before this Court, noted, "The industry model is built upon timed, sequential release into differentiated market segments through a variety of channels to permit revenue-maximization."  (*See* Ex. G at 1.)

For these same reasons, Warner's argument that the relevant market should be "at least the entire home entertainment market" (Warner Br. at 22 n.22) should be rejected.  Redbox has effectively alleged a market for single, unique copyrighted titles on DVD or alternatively, a weekly market for new-release DVDs in each genre or category, and the factual bases for these market allegations.  Redbox is not required to prove these markets at this early stage.  Warner's cited authorities do not suggest otherwise, as both were decided after full discovery and trial. *Cable Holdings of Georgia, Inc. v. Home Video, Inc.*, 825 F.2d 1559, 1561 (11th Cir. 1987) (post-jury verdict appeal); *Satellite Television & Associated Res. Inc. v. Cont'l Cablevision of Virginia*, 714 F.2d 351, 353 (4th Cir. 1983) (reviewing case as post-bench trial appeal).

Warner's second argument – that Redbox has not alleged facts to show Warner has market power within the relevant product markets – also fails.  Because of the calculated manner in which distributors release DVDs, as Redbox has alleged, consumers have few, if any, acceptable substitutes for a particular new-release DVD in a given category or genre.  Am. Compl. at ¶¶ 24-25.  As such, as Redbox will show, distributors therefore have significant market power to increase the rental price of new-release DVDs without sufficient reduction in demand to render the price increase unprofitable.  *Id.* at ¶ 28.  Indeed, although Warner is not willing to say it directly, that is exactly the point of the challenged restraints, to raise rental prices of new-release DVDs from the current competitive $1.00 per night offered to consumers by Redbox to the $3.41 charged in alternative venues (*e.g.*, brick and mortar stores).  *Id.* at ¶ 21. Warner will bear the burden of showing that such an anti-consumer result is pro-competitive, an issue that should not be resolved on a motion to dismiss.  *Orson*, 79 F.3d at 1367-68 (burden of showing pro-competitive effect on defendant).  Resolution of this issue requires the evaluation of evidence, not unsupported assertions that, according to Warner, should be accepted as true.

22

These same facts doom Warner's assertion that Redbox's product market should fail as a matter of "common sense." Warner Br. at 25, *citing Iqbal*, 129 S.Ct. at 1950. As described above, Redbox has factually stated that the distributors, including Warner, take steps, including the careful timing of release dates, to effectively create and maintain single-brand product markets. As both the Supreme Court and the Third Circuit have recognized, a single product can readily be its own market if it is defined in terms of reasonable interchangeability and cross-elasticity of demand. *Eastman Kodak Co.*, 504 U.S. at 482 (upholding a market of Kodak parts); *Nat'l Collegiate Athletic Ass'n v. Bd of Regents of Univ. of Oklahoma ("NCAA")*, 468 U.S. 85, 111 (1984) (collegiate sporting events are unique and constitute a separate market); *Queen City Pizza*, 124 F.3d at 439 (a single product can be its own market where it is "unique and therefore not interchangeable with other products").

Finally, contrary to Warner's assertion (Warner Br. at 24 n.25), Redbox does not base its claim of a market of unique copyrighted works on DVD solely on the fact that a DVD has a copyright. The test is reasonable interchangeability at the consumer level, and a proper market definition can only be determined after a "factual inquiry into the 'commercial realities' faced by consumers." *Kodak*, 504 U.S. at 481-82. Redbox has plausibly alleged that there are at least some individual unique copyrighted works on DVD (*Harry Potter*, *Batman, Star Wars*) that are so uniquely differentiated as to constitute their own unique market. *See NCAA*, 468 U.S. 85, 111 (1984) (stating that collegiate sporting events are unique and constitute a separate market). For other titles on DVD, Redbox's complaint alleges that the copyright may be an aspect of the overall power the distributor possesses, given the stated market structure and other commercial realities. In sum, Warner's arguments should be rejected and its motion to dismiss denied.

**2.     Warner's Argument that Redbox Has Not Pled Anticompetitive Effects Ignores Redbox's Well-Pled Factual Statements and Relies on**

23

**Unsupported Assertions as to What Warner Claims Discovery Will Show.**

    a)        **Redbox's Allegations of Lower Output, Higher Prices and Boycott Are Sufficient to Show Anticompetitive Effects and Harm to Competition.**

In the Third Circuit, factual allegations of restricted output, increased prices and reduced quality are sufficient to demonstrate anticompetitive effects or "harm to competition." *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 210 (3d Cir. 2005) (to establish anticompetitive effects, the plaintiff must show that the restraint is "facially anticompetitive" or that "enforcement reduced output, raised prices, or reduced quality"); *Orson*, 79 F.3d at 1367 (same); *see also Eastman Kodak Co.*, 504 U.S. at 478 ("[t]he alleged conduct – higher service prices and market foreclosure – is facially anticompetitive and exactly the harm that antitrust laws aim to prevent").[10]  Here, Redbox has alleged that: (1) "Warner's actions . . . will restrict output, eliminate competition in the rental sales markets and artificially raise prices to consumers," Am. Compl. at ¶ 39; (2) "Warner's actions . . . will artificially constrain output by preventing consumers from renting new-release Warner DVDs from Redbox and other kiosk rental outlets," *id.* at ¶ 41; and (3) Warner's true purpose in demanding that VPD and Ingram stop selling to Redbox is to eliminate the independent kiosk as a low-cost consumer choice and thereby create an artificial shortage of product with a corresponding higher artificial price for rental or resale of

---

[10]      Warner's claim that "courts have repeatedly made clear that, in the absence of monopoly power, increased prices to consumers caused by a single-firm conduct or by vertical agreements are not enough to sustain antitrust violations," Warner Br. at 30, is simply false.  Neither case cited by Warner supports this proposition. *Fischer v. City of Berkeley, California*, 475 U.S. 260 (1986) merely states that single-firm conduct, *i.e.*, conduct that does not amount to a conspiracy, is not actionable under Section 1 of the Sherman Act, whereas *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 810 F.2d 243 (D.C. Cir. 1987) merely holds – in the context of a Section 2 monopolization claim – that a defendant's act of raising its prices in and of itself is not an anti-competitive act sufficient to demonstrate a willful attempt to create or maintain a monopoly.

new-release Warner DVDs, contrary to the interests of consumers, *id*.  Redbox has further

alleged that Warner's actions and the resulting restraints have no pro-competitive effects.  *Id*.

Warner argues that Redbox's "unsupported allegations that 'consumers might pay more'"

are insufficient to allege anticompetitive effects (Warner Br. at 30).  Warner's conclusory

argument is wrong for at least two reasons.  First, Redbox has specifically stated factually that it

is the lowest cost rental vehicle for consumers, Am. Compl. at ¶ 21 (alleging that Redbox rents

new-release DVDs for $1 per night, in contrast to others that rent for $4.00), and that other

outlets, favored by Warner, charge more.  Thus, it is reasonable to infer that if Redbox and other

low-cost kiosks are forced from the market, consumers will be forced to pay higher prices.

Second, the case on which Warner relies for the proposition that "unsupported" allegations of a

price increase are insufficient to *allege* anticompetitive effects, holds instead that unsupported

allegations are insufficient to *prove* anticompetitive effects.  *Rambus v. FTC*, 522 F.3d 456 (D.C.

Cir. 2008) was decided on a fully developed administrative record—not a motion to dismiss.

Warner's citation to *Rambus* is consistent with its effort to obtain the benefit of unsupported

assertions not found in Redbox's pleading, an advantage to which it knows it is not entitled.

For example, Warner speculates that if its boycott truly was reducing output and

increasing prices, Redbox should have specifically referenced reduced quantities and increased

prices for four particular Warner DVDs released shortly before Redbox filed its Amended

Complaint.  But Warner's boycott started on October 27, 2009, and Redbox filed its Amended

Complaint on November 30, 2009; hardly enough time for Redbox to collect detailed data.

Indeed, two of the four films referenced in Warner's brief, "Four Christmases" and "Shorts,"

were released less than a week before Redbox filed its Amended Complaint (both on

November 24, 2009), while two others, "My Sister's Keeper" and "Orphan" were released,

respectively, two weeks (November 17, 2009) and one month (October 27, 2009) before the

filing.  "Orphan" was released on October 27, 2009; "My Sister's Keeper" was released on

November 17, 2009; "Four Christmases" was released on November 24, 2009; and "Shorts" was

released on November 24, 2009.  *See* www.moviecube.com (last visited Jan. 18, 2010).

Nor does the fact that Redbox continues to obtain some quantity of Warner DVDs,

Warner Br. at 27-28, mean that Redbox, consumers and competition have not been harmed.

How many consumers have been forced to pay extra for a DVD that they could have rented for a

dollar from Redbox?  How many have been foreclosed from renting at all because of higher

prices?  These are matters of proof, not a basis for dismissal.[11]  Warner claims that because

consumers may be able to obtain the product (at a higher price) elsewhere, there is no alleged

harm.  Warner Br. at 30.  But a rule that allows a defendant to avoid liability on the basis that a

truly desperate consumer could always elect to pay monopoly prices is completely antithetical

antitrust law.

>     **b)**     **No Rule Of Law Holds That Non-Vertical Price Restraints Always And Invariably Enhance Competition.  Instead, Courts Require Defendants To Submit Proof That A Particular Vertical Restraint Enhances Competition.**

Contrary to Warner's assertions (Warner Br. at 31-34), courts in this Circuit do not

presume that vertical non-price restraints enhance – as opposed to harm – competition, *Orson*,

79 F.3d at 1367-68 (setting forth a burden-shifting test for determining whether restraints harm

competition on summary judgment).  As this Court's Universal Opinion held, and as the cases

---

[11]     In fact, a recent economic study funded, at least in part, by major DVD distributors, supports Redbox's allegation, in that it finds that the Redbox business model has resulted in lower rental prices and has attracted new consumers to make DVD rentals, both of which are positive effects for competition and consumers.  (*See* Ex. G, November 30, 2009 Study by the Los Angeles County Economic Development Corporation.)  Warner's boycott and its attempts to drive Redbox out of the DVD business seek to negate these pro-competitive effects.

Warner cites recognize,[12] whether a restraint harms or helps competition should generally be evaluated on a full factual record, with the defendant bearing the burden of establishing a challenged restraint's purported pro-competitive effect.  *See, e.g., Orson*, 79 F.3d at 1368 ("If a plaintiff meets his initial burden of adducing adequate evidence of market power or actual anticompetitive effects, the burden shifts to the defendant to show that the challenged conduct promotes a sufficiently pro-competitive objective").  Whether the benefits of such pro-competitive effects outweighs their detriments is an ***evidentiary*** question to be resolved at summary judgment or trial.  *Id.*

Warner's boycott against Redbox does not enhance interbrand competition, as Redbox will demonstrate.  Indeed, "Warner" is not a brand that is meaningful to consumers.  Warner acknowledges that it is merely a "distributor," Warner Br. at 1; it distributes titles produced by others.  No consumer purchases or rents a DVD because Warner, as opposed to Universal or Fox, is the distributor.  *See* Am. Compl. at ¶ 8.  Given this fact, what "interbrand" competition is Warner talking about?  Consumers care about titles and categories, not whether Universal or Warner distributes the title.  Redbox has alleged markets comprised of unique titles, released in DVD format, or in the alternative, a market comprised of new-release DVDs in particular genres,

---

[12]     Warner relies almost exclusively on cases decided on full records, *i.e.*, after summary judgment or trial.  Warner Br. at 31-34 (citing the following cases decided on summary judgment or after a jury verdict, *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007); *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717 (1988); *Continental T.V., Inc., v. GTE Sylvania, Inc.*, 433 U.S. 36 (1977); *Orson Inc. v. Miramax Film Corp.*, 79 F.3d 1358 (3d Cir. 1996); *Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215 (8th Cir. 1987); *Westman Commc'n Co. v. Hobart Int'l, Inc.*, 796 F.2d 1216 (10th Cir. 1986).  The only motion to dismiss case Warner cites in this entire section is *Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.*, 854 F.2d 802 (6th Cir. 1988), which is merely a typical "jilted distributor case" in which a terminated distributor challenges a manufacturer's decision to grant an exclusive distributorship to another.  There were no allegations in Crane that the manufacturer was attempting to limit its distributor's or, any other party's right, to sell to the plaintiff.  Moreover, even *Crane* recognized that in market devoid of interbrand competition – like the market alleged by Redbox – vertical non-price restraints may be invalid.  *Crane*, 854 F.2d at 807-09 (noting "The Fifth Circuit has stated that 'a supplier's termination of a distributor or dealer is not a violation of the antitrust laws as long as interbrand competition acts as a 'significant check on the exploitation of intrabrand market power.'").

27

characterized by inelastic demand.  Am. Compl. at ¶¶ 22-29.  These factors demonstrate that

retail competition (intrabrand competition) is critical to protecting consumers from paying

artificially high prices for new-release DVDs.  *See*, *e.g.*, *Kodak*, 504 U.S. at 481-82 (explaining

that in addition to acknowledging the contextual importance of intrabrand competition,

"commercial realities" should be considered in evaluating a restraint.)

Warner's assertion that a plaintiff must allege interbrand harm to sustain a Section 1

claim is equally false.  Warner cites no case, and we are not aware of any, holding that harm to

intrabrand competition is insufficient as a matter of law to sustain a Section 1 claim.  *Compare*

*Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164, 166 n.11 (3d Cir. 1979) (although

interbrand competition is the "primary" concern of antitrust law, it is not the only concern).

In fact, both commentators and the Third Circuit have expressly recognized that in

markets largely devoid of interbrand competition (exactly what is alleged here), harm to

intrabrand competition is more than adequate to establish anticompetitive effects:

> . . . a key issue that courts often overlook is the relative importance of
> intrabrand competition.  Even an amateur student of marketing can perceive
> distinctions that suggest when intrabrand competition would be more or less
> important.  For example, if brands are relatively undifferentiated and consumers
> do not demonstrate strong brand preferences, intrabrand competition may be less
> important.  On the other hand, strong brands or highly differentiated products will
> create potential seller power over price.  Under these circumstances, intrabrand
> competition arises naturally and is a healthy and needed response to maintain
> retail competition that allows consumers to shop for price and amenities.  *If
> particular products enjoy a monopoly, as would be the case with copyrighted
> books or recordings, competition among retailers is particularly important in
> giving consumers price alternatives and pressuring the producer to keep prices
> low.*

Sullivan, THE LAW OF ANTITRUST: AN INTEGRATED HANDBOOK, Second Edition (2006), at

p. 327 (emphasis added); *see also Orson*, 79 F.3d at 1372 n.13 ("'[I]t is also true that a well-

defined submarket may constitute a relevant product market and so under certain circumstances a

relevant product market could consist of one brand of a product, placing intrabrand competition

28

at issue.'"), *quoting Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 723 (3d Cir. 1991)); *see*

*also Lucas Indus. Inc. v. Kendiesel, Inc.*, No. 93-4480, 1995 WL 350050, at *7 (D.N.J. June 9,

1995) (holding that allegations of exclusion from an intrabrand market constituted a sufficient

anti-competitive effect to survive a 12(b)(6) motion).  Thus, allegations of harm to intrabrand

competition are sufficient to support Redbox's Amended Complaint.  *See, e.g., Orson* , 79 F.3d

at 1372 n.13.

In sum, Warner provides no valid basis for the Court to conclude that its agreements with

VPD, Ingram, other wholesalers and retailers to cut off supply to Redbox and other independent

kiosks will have a pro-competitive effect on new-release DVD markets.  As a result of the

market structure in which DVDs have short shelf lives and are released at staged intervals to

avoid direct competition, Warner (and other major distributors) have the ability to raise prices

above the competitive level, resulting in price increases with no offsetting pro-competitive

benefits.

**D.**     **Redbox Has Properly Alleged Antitrust Standing.**

The Third Circuit has instructed district courts to consider the following five factors to

determine if a plaintiff has antitrust standing:

> (1) the causal connection between the antitrust violation and the harm to the
> plaintiff and the intent by the defendant to cause that harm, with neither factor
> alone conferring standing; (2) whether the plaintiff's alleged injury is of the type
> for which the antitrust laws were intended to provide redress; (3) the directness of
> the injury, which addresses the concerns that liberal application of standing
> principles might produce speculative claims; (4) the existence of more direct
> victims of the alleged antitrust violations; and (5) potential for duplicative
> recovery or complex apportionment of damages.

*See, e.g. Angelico v. LeHigh Valley Hosp.*, 184 F.3d 268, 274 (3d. Cir. 1999); *City of Pittsburgh*

*v. West Penn Power Comp.*, 147 F.3d 256, 264 (3d Cir. 1998).  Warner does not even attempt to

apply this test in its brief.  Instead, Warner simply repeats its arguments regarding anti-

competitive effects (which are meritless for the reasons set forth *supra* in Section I.C.2.).

Warner Br. at 36.  Warner's standing argument should be rejected for this reason alone.

Under the Third Circuit's test, Redbox plainly has established antitrust standing.  The

Third Circuit has held that when the purpose of an antitrust conspiracy is to drive the plaintiff

from the relevant market, antitrust standing exists.  *Angelico*, 184 F.3d at 274-76.   Here

Redbox's Amended Complaint alleges that defendant's purpose is to eliminate Redbox from the

market through a boycott and thereby decrease competition and increase prices.  Am. Compl. at ¶

41.

Warner's argument that Redbox must allege, not only that it is excluded from the market,

but that other competitors are excluded as well, is incorrect.  Not only has Warner failed to cite

any authority for this proposition (see Warner Br. at 36, stating without citation that "Redbox

must reach outside of is own situation and plausibly allege that Warner's distribution policy has

prevented other competitors (e.g., companies engaged in the sale or rental of films) from

competing as well"), it has been rejected by the Third Circuit.  *See Angelico*, 184 F.3d at 273,

275 n.1. (reversing a district court's dismissal on standing grounds even though the plaintiff had

not alleged or argued that others were excluded from the market, explaining "[T]he fact that the

antitrust laws are intended to protect competition rather than competitors does not mean that a

competitor is never a proper antitrust plaintiff.  Indeed, protecting a competitor's ability to

compete from a conspiracy, the sole purpose of which is to decrease competition by eliminating

that competitor, is clearly in the interest of competition.")

In sum, Warner's arguments ignore the relevant standing test and binding Third Circuit

authority that reject their arguments.  Redbox has standing, and this Court should not dismiss its

claims for lack thereof.

II.   **WARNER'S MOTION TO DISMISS REDBOX'S COPYRIGHT MISUSE CLAIMS SHOULD BE DENIED.**

Redbox incorporates its positions from the Universal action with respect to this claim (Exhibit A), accepting – for purposes of proceedings before this Court only and without waiver of any appeal right – that the Universal Opinion should control resolution of this claim based on the similarity of the well-pled allegations.

III.   **WARNER'S MOTION TO DISMISS REDBOX'S TORTIOUS INTERFERENCE WITH CONTRACT CLAIM SHOULD BE DENIED.**

Redbox incorporates its positions from the Universal action with respect to this claim (Exhibit B), accepting –  for purposes of proceedings before this Court only and without waiver of any appeal right – that the Universal Opinion should control resolution of this claim based on the similarity of the well-pled allegations.

IV.   **REDBOX HAS PROPERLY ALLEGED TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS OPPORTUNITY AND UNFAIR COMPETITION CLAIMS.**

To state a claim for tortious interference with business opportunity, a complaint must state: (1) the existence of a valid business relation or expectancy; (2) the interferer's knowledge of the relationship or expectancy; (3) intentional interference that (4) induces or causes a breach or termination of the relationship, and that (5) causes resulting damages to the party whose relationship or expectancy is disrupted.  *Corning Inc. v. SRU Biosystems, LLC*, 292 F. Supp. 2d 583, 585 (D. Del. 2003).  The tort of unfair competition has similar elements.  *See Agilent Techs. v. Kirkland*, No. 3512-VCS, 2009 WL 119865, at *5 (Del. Ch. Jan. 20, 2009).  Contrary to Warner's assertions that Redbox has failed to allege interference with a business relation or conduct that is wrongful, Redbox's amended complaint satisfies all essential elements and

properly states claims for tortious interference with prospective business opportunity and unfair competition.[13]

Redbox has effectively pled interference with a business opportunity with wholesalers and retailers by Warner.  While Warner asserts that if Redbox is able to purchase some product from some retailers, that would not be interference with a business opportunity (Warner Br. at 39), it cites no legal support for this proposition.  Although Redbox has been able to obtain some limited amount of product from some retailers in the face of Warner's actions, this does not relieve Warner of liability for its tortious interference.  As Redbox has alleged, Warner has sought confirmation from distributors and retailers that they would not sell DVDs to Redbox during a 28-day blackout period, and retailers have since refused to sell Redbox DVDs or limited the number of DVDs they would sell to Redbox.  Am. Compl. ¶¶ 32, 81-82.  Discovery will establish that Warner demanded that retailers prohibit or limit sales to Redbox; that the retailers agreed to Warner's demands not to sell to Redbox; and that Redbox has been damaged as a result.  Am. Compl. ¶¶ 32, 81-82, 84.  These allegations are sufficient for intentional interference, and the law does not require more at this early stage.[14]  *See Ethypharm S.A. France v. Abbott Labs.*, 598 F. Supp. 2d 611, 619 (D. Del. 2009) (where essential elements of tortious interference and unfair competition claims have been articulated, "the court declines to require more absent the benefit of discovery").

---

[13]     Redbox has not yet raised claims for tortious interference with prospective business opportunity and unfair competition in the *Universal* matter, and this Court's prior opinion in the *Universal* matter did not address these claims.  In addition, these claims rely on different factual allegations and are based upon different legal elements than Redbox's tortious interference with contract claim.

[14]     Likewise, the Coinstar 8-K statement to which Warner refers has no bearing on the elements of these claims or on the adequacy of these claims in general.  Although Redbox has been able to procure some DVDs from retail stores in some instances, as Redbox alleged, retailers have restricted the number DVDs that they will sell to Redbox as a result of Warner's actions.  Am. Compl. at ¶¶ 32, 81.  Warner's interference is intentional, wrongful, and has caused damage to Redbox.  These allegations support Redbox's tortious interference with prospective business opportunity and unfair competition claims.

Warner also argues that Redbox has not explained how being a customer for DVDs is a "business arrangement" or how purchases from retailers are a "prospective business opportunity." Again, Warner provides no legal authority for the proposition that Redbox's allegations are insufficient to allege a valid business opportunity. As Redbox has alleged, retailers have an incentive to sell as many DVDs as possible to any purchaser who walks in the door and wants to buy DVDs. Am. Compl. at ¶ 32. As Redbox also indicated, it makes no economic sense for a retailer to deny sales to Redbox unless it knows that other retailers have also agreed not to meet Redbox's demands. *Id.* In addition, Redbox's Amended Complaint includes allegations that its reasonable expectation of a business relationship with retailers is based upon the logical expectation that it would be able to buy DVDs from these retailers just as any purchaser who walked into Best Buy, Target, or other major retail stores would be able to buy DVDs. Am. Compl. at ¶ 79. New-release DVDs are a necessary resource for Redbox's business, which it has sought to obtain from these retailers. Allegations regarding the supply of a necessary resource for one's business sufficiently establish the business expectancy element. *See, e.g., Corning Inc.*, 292 F. Supp. 2d at 585-86 (allegations that party's actions interfered in negotiations with companies and disrupted receipt of financing from potential investors sufficiently alleged tortious interference claim); *Gill v. Delaware Park, LLC*, 294 F. Supp. 2d 638, 645-46 (D. Del. 2003) (plaintiff racehorse owner stated a tortious interference claim where plaintiff alleged that defendants had improperly influenced race track's decision not to permit plaintiff to rent stalls or race horses at the track).

As to Warner's suggestion that there are "numerous reasons" why retailers may choose not to sell to Redbox in bulk and Warner's belief that retailers' limitations are due to "independent motivations," these speculative theories are not a basis to dismiss these claims

33

prior to discovery.  Discovery will show that these retailers and wholesalers had in the past and still would, absent agreement with Warner, be willing to engage in a business relationship to supply Redbox with Warner DVDs, a necessary resource for Redbox's business, if it were not for Warner's interference.

Finally, Warner argues that Redbox has not asserted facts to suggest Warner's conduct was "wrongful."  However, as Redbox has alleged, Warner's interference in Redbox's dealings with wholesalers and distributors is part of its illegal boycott against Redbox, in violation of the antitrust laws.  *See* Am. Compl. at ¶ 81.  As described above, Redbox has sufficiently pled a antitrust claim against Warner, and, as this Court has already held, Redbox properly alleged a similar antitrust claim against Universal.  *See* Universal Op. at 9.  Because Warner's intentional interference in Redbox's dealings with wholesalers and retailers violates the antitrust laws, its actions also constitute wrongful conduct, which is not justified or protected under the competitor's privilege, for tortious interference and unfair competition.  *See Fishman v. Estate of Wirtz*, 807 F.2d 520, 546-47 (7th Cir. 1987) (defendants intentionally interfered with plaintiffs' business expectancy through unfair and anticompetitive acts); *Brokers' Assistant, Inc. v. Williams Real Estate Co., Inc.*, 646 F. Supp. 1110, 1126 (S.D.N.Y. 1986) (plaintiff's antitrust claim satisfied the "improper means" requirement of tortious interference claim); *Natural Design, Inc. v. Rouse Co.*, 302 Md. 47, 73-74 (1984) (defendant's acts, if proven to be part of scheme in violation of antitrust law, would also constitute unlawful and improper acts for tortious interference).

Warner's motion to dismiss Redbox's tortious interference with prospective business opportunity and unfair competition claims must be denied.  *Compare, e.g., Accenture Global Serv. GMBH v. Guidewire Software, Inc.*, 631 F. Supp. 2d 504, 508-09 (D. Del. 2009) (denying

34

motion to dismiss tortious interference claim where each element has been alleged); *Agilent*

*Techs., Inc.*, 2009 WL 119865, at *10 (denying motion to dismiss tortious interference and unfair

competition claims where each element has been alleged).

## CONCLUSION

For all the foregoing reasons, Warner's motion should be denied.

        /s/ James S. Green

| | |
|---|---|
| Charles S. Bergen | James S. Green, Sr. (DE0481) |
| George R. Dougherty | SEITZ, VAN OGTROP & GREEN, P.A. |
| Pei Y. Chung | 222 Delaware Avenue, Suite 1500 |
| Colleen P. Sorensen | PO Box 68 |
| GRIPPO & ELDEN LLC | Wilmington, DE 19899 |
| 111 South Wacker Drive | Telephone: (302) 888-0600 |
| Chicago, IL 60606 | Facsimile: (302) 888-0606 |
| Phone: (312) 704-7700 | jgreen@svglaw.com |
| Fax: (312) 558-1195 | |

Frederick W. Stein
REDBOX AUTOMATED RETAIL, LLC
One Tower Lane, Suite 1200
Oakbrook Terrace, IL 60181
Phone: (630) 756-8255
Fax: (630) 756-8885

        *Attorneys for Plaintiff*

Dated: January 29, 2010        *Redbox Automated Retail, LLC*

35

861969

## CERTIFICATE OF SERVICE

I, James S. Green, Sr., hereby certify that on January 29, 2010 I electronically filed REDBOX'S ANSWERING BRIEF IN OPPOSITION TO WARNER HOME VIDEO, A division of WARNER BROS. HOME ENTERTAINMENT, INC., MOTION TO DISMISS REDBOX'S AMENDED COMPLAINT with the Clerk of the Court using CM/ECF, which will send notification of such filing to the following:

Katherine b. Forrest
CRAVATH, SWAINE, & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
kforrest@cravath.com

Anne Shea Gaza (#4093)
Stephen M. Ferguson (#5167)
RICHARDS, LAYTON, & FINGER P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
gaza@rlf.com
ferguson@rlf.com

/s/ James S. Green, Sr.
James S. Green, Sr. (DE0481)