IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

REDBOX AUTOMATED RETAIL, LLC,

                                    Plaintiff,

v.

WARNER HOME VIDEO, a division of
WARNER BROS. HOME ENTERTAINMENT,
INC.,

                                    Defendant.

C.A. No. 09-613 (RBK)

## DEFENDANT WARNER HOME VIDEO'S REPLY BRIEF IN FURTHER SUPPORT OF ITS MOTION TO DISMISS THE AMENDED COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)

Of Counsel:

Katherine B. Forrest
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
kforrest@cravath.com

Dated: February 12, 2010

Frederick L. Cottrell, III (#2555)
Anne Shea Gaza (#4093)
Stephen M. Ferguson (#5167)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700
cottrell@rlf.com
gaza@rlf.com
ferguson@rlf.com

*Counsel for Defendant*
*Warner Home Video*

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ................................................................................. ii

I.    REDBOX CANNOT STATE A SECTION 1 CLAIM ...................................... 5

    A.    Redbox Has Not Alleged An Agreement Between Warner and Its
       Wholesalers ........................................................................................ 5

    B.    Redbox Has Not Alleged An Agreement Between Warner and
       "Retailers" ........................................................................................ 8

II.   REDBOX HAS NOT ALLEGED PLAUSIBLE ANTICOMPETITIVE EFFECTS ........ 10

    A.    Redbox's Ever-Changing Market Definition Remains Untenable. ........................ 11

    B.    Redbox Has Not Plausibly Alleged Competitive Harm ........................................ 15

    C.    Redbox Misapplies the Law Concerning Interbrand Competition ........................ 17

III.  REDBOX CANNOT ESTABLISH STANDING ............................................ 18

IV.   REDBOX'S TORTIOUS INTERFERENCE CLAIMS FAIL ......................... 19

CONCLUSION ............................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Accenture Global Servs. GmbH v. Guidewire Software Inc.,
    631 F. Supp. 2d 504 (D. Del. 2009)........................................................................20

Agilent Tech., Inc. v. Kirkland,
    No. 3512-VCS, 2009 WL 119865 (Del. Ch. Jan. 20, 2009)........................19, 20

Angelico v. Lehigh Valley Hosp., Inc.,
    184 F.3d 268 (3d Cir. 1999)........................................................................18

Ashcroft v. Iqbal,
    129 S. Ct. 1937 (2009) ............................................................... *passim*

Bell Atlantic v. Twombly,
    550 U.S. 544 (2007)........................................................................15

Brokers' Assistant, Inc. v Williams Real Estate Co.,
    646 F. Supp. 1110 (S.D.N.Y. 1986)........................................................20

Commonwealth of Pa. ex rel. Zimmerman v. PepsiCo, Inc.,
    836 F.2d 173 (3d Cir. 1988)........................................................................10

Continental T.V., Inc. v. GTE Sylvania, Inc.,
    433 U.S. 36 (1977)........................................................................18

Corning Inc. v. SRU Biosystems, LLC,
    292 F. Supp. 2d 583 (D. Del. 2003)........................................................20

Eastman Kodak Co. v. Image Technical Servs., Inc.,
    504 U.S. 451 (1992)........................................................................13, 17

Ethypharm S.A. France v. Abbot Labs,
    598 F. Supp. 2d 611 (D. Del. 2009)........................................................20

Fisher v. City of Berkeley, California,
    475 U.S. 260 (1985)........................................................................6

Fishman v. Estate of Wirtz,
    807 F.2d 520 (7th Cir. 1987) ........................................................................20

Fowler v. UPMC Shadyside,
    578 F.3d 203 (3d Cir. 2009)........................................................................4, 5

# TABLE OF AUTHORITIES

**Page(s)**

Fray Chevrolet Sales, Inc. v. General Motors Corp.,
    536 F.2d 683 (6th Cir. 1976) ................................................................2

Gordon v. Lewistown Hosp.,
    423 F.3d 184 (3d Cir. 2005)..........................................................6, 17

Helicopter Support Sys. v. Hughes Helicopter, Inc.,
    818 F.2d 1530 (11th Cir. 1987) ...........................................................8

IDT Corp. v. Bldg. Owners & Managers Ass'n Int'l,
    No. 03-4113, 2005 WL 3447615 (D.N.J. Dec. 15, 2005).......................13

Intercontinental Parts, Inc. v. Caterpillar, Inc.,
    631 N.E.2d 1258 (Ill. App. Ct. 1994) ...................................................6

Isaksen v. Vermont Castings, Inc.,
    825 F.2d 1158 (7th Cir. 1987) .............................................................8

Monsanto Co. v. Spray-Rite Serv. Corp.,
    465 U.S. 752 (1984)........................................................................6, 7

Morse v. Lower Merion Sch. Dist.,
    132 F.3d 902 (3d Cir. 1997)...............................................................13

Nat'l Collegiate Athletic Ass'n v. Bd of Regents of Univ. of Oklahoma,
    468 U.S. 85 (1984)...........................................................................14

Natural Design, Inc. v. Rouse Co.,
    485 A.2d 663 (Md. 1984) .................................................................20

Orson, Inc. v. Miramax Film Corp.,
    79 F.3d 1358 (3d Cir. 1996)...................................................9, 17, 18

Queen City Pizza v. Domino's Pizza, Inc.,
    124 F.3d 430 (3d Cir. 1997)...................................................12, 13, 14

Suzuki of W. Mass., Inc. v. Outdoor Sports Expo, Inc.,
    126 F. Supp. 2d 40 (D. Mass. 2001) ...................................................6

United States v. Colgate & Co.,
    250 U.S. 300 (1919)...........................................................................6

World of Sleep, Inc. v. La-Z-Boy Chair Co.,
    756 F.2d 1467 (10th Cir. 1985) ...........................................................8

## TABLE OF AUTHORITIES

**Page(s)**

**Statutes & Rules**

Fed. R. Civ. P. 12(b)(6)........................................................................................................1

Fed. R. Civ. P. 8 ...............................................................................................................13

## CITATION CONVENTIONS

| Citation Form | Source |
| --- | --- |
| "Br." | Redbox's Answering Brief in Opposition to Warner Home Video, a Division of Warner Bros. Home Entertainment, Inc., Motion [sic] to Dismiss Redbox's Amended Complaint, filed January 29, 2010, C.A. No. 09-613 (D.I. No. 27). |
| "Warner Br." | Defendant Warner Home Video's Opening Brief In Support of Its Motion to Dismiss the Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6), filed December 21, 2009, C.A. No. 09-613 (D.I. No. 23). |
| "Original Compl." | Original complaint filed by Redbox against Warner Home Video on August 18, 2009, C.A. No. 09-613 (D.I. No. 1). |
| "Compl." | Amended Complaint filed by Redbox against Warner Home Video on November 30, 2009, C.A. No. 09-613 (D.I. No. 21) |
| "Univ. Op." | Opinion dated Aug. 17, 2009, in <u>Redbox Automated Retail LLC v. Universal City Studios LLLP</u>, C.A. No. 08-766, 2009 WL 2588748 (D.N.J. Aug. 17, 2009) (D.I. No. 46) . |

Having brought this lawsuit to gain negotiating leverage in what is clearly nothing more than a business dispute, Redbox's opposition to Warner's motion to dismiss largely refuses to address uncontroverted facts making clear that its complaint, already amended once, has not asserted a plausible claim for relief. Redbox never addresses the critical fact that it has signed a number of direct deals with studios that effectively lock up over 50% of the supply of "new release" DVD titles it seeks to carry; it never addresses the statements sprinkled throughout its own public filings and pleadings attesting to the explosive growth its DVD kiosk business has experienced throughout precisely the same period of time that the Warner, Fox and Universal kiosk distribution policies have been in effect; it never asserts that a single one of its kiosk customers has actually been unable to obtain a Warner title or had to pay more for a Warner title since the implementation of Warner's policy; and finally, it ignores the numerous inconvenient public admissions made by its parent company that its DVD kiosk business competes with a wide variety of distribution channels, technology and content in the "highly competitive" home video industry. Singly and collectively, these facts are fatal to Redbox's claims.

Redbox nevertheless asks this Court to close its eyes to these uncontroverted facts—and engage with it in unsupported speculation. Redbox asserts that while its kiosk business has continued to grow and compete, this does not *necessarily* mean that "Warner's actions have not harmed consumers and competition". (Br. at 12.) Redbox's support for this assertion in its brief reduces to one conclusory statement: "it is clear that" absent Warner's policy, "more consumers would have rented" DVDs for a dollar per night. (id.; see also Compl. ¶ 41.) Redbox alleges no *facts* suggesting that this conclusion is plausible (which it is not). (See Warner Br. at 4-5, 15-17.) Moreover, even if Redbox had alleged facts showing that "more" consumers would have rented from kiosks absent Warner's unilateral decision to implement a

new distribution policy, the law is clear that Warner was free to make that decision for its products.  See Warner Br. Parts I.A, II.A.3.d-e; see also, e.g., Fray Chevrolet Sales, Inc. v. General Motors Corp., 536 F.2d 683, 686 (6th Cir. 1976) ("opinions have been unanimous . . . in holding that a manufacturer's changes in his distribution system, vertical realignments, or transfers, do not offend anti-trust laws") (internal cites and quotes omitted).  The mere allegation of a vertical nonprice distribution restriction—which are routinely employed by manufacturers and recognized by courts as *enhancing* competition (Warner Br. Part II.A.3)—does not plausibly establish that competition has been, or will be, harmed without some *fact* suggesting that this could be the case.  It was Redbox's burden to assert such facts; its failure to do so is dispositive.

Redbox also declares that its continued procurement of new release Warner DVDs from retailers does not *necessarily* mean that "consumers and competition have not been harmed".  (Br. at 26.)  Again, Redbox fails to identify a single *fact* supporting a plausible inference to that effect.  Instead, Redbox asks the Court to ponder a theoretical question: "[h]ow many consumers have been forced to pay extra for a DVD that they could have rented for a dollar from Redbox?"  (Id.)  It is *Redbox's* burden, not Warner's, to assert *facts* in its complaint that would support its claims.  (See Warner Br. at 4-5, 15-17.)  Redbox cannot fulfill this burden by asking rhetorical and hypothetical *questions* supporting speculative and self-serving conclusions.  See id.; see also Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).

Ultimately, Redbox attempts to avoid confronting the deficiencies of its complaint by arguing that its case against Warner is just like its case against Universal.  (Br. at 1-3, 11, 19-20.)  Such reliance is misplaced.  (See Warner Br. at 3-6.)  At the time the Universal case was filed, Redbox had *not* signed deals with other studios guaranteeing new release DVD content for Redbox's kiosks in the very "markets" that Redbox claims it seeks to "compete";

there was *not* uncontested evidence of continuous competition and enormous growth on Redbox's part despite the existence of Universal's kiosk windowing policy; and Redbox had *not* had the opportunity to point to actual anticompetitive effects occurring in the real-world as a result. (Id.) Circumstances have clearly changed—but Redbox's claims have not.[1]

In addition to more than a year's worth of changed circumstances, the legal arguments at issue in this case are not the same as those in the Universal matter. Here, Warner has asserted a significant legal argument in support of dismissal that was not raised there: Redbox has failed to allege plausible facts supporting any actionable agreement in restraint of trade. (Warner Br. at 20 n.19.) Arguing in its brief that it has done so is not sufficient—to survive a motion to dismiss Redbox must assert facts. This it has not done. Instead, Redbox trips over itself to use the words "agreement" and "agree" but concedes that Warner formulated its policy itself and then "demanded" that its wholesalers comply if they wished to continue to deal with Warner. These facts make it impossible that Warner's purported "plan" could be the result of an "agreement". Indeed, it is obvious from the facts alleged that Warner does not need the "acquiescence" of its wholesalers to effectuate its direct distribution policy: according to the terms of the policy, if VPD did not comply with Warner's demands, Warner would simply cut off supply to VPD and deal directly with kiosks subject to the 28-day window. That is, indisputably, a unilateral business decision protected by Colgate; the "acquiescence" of Warner's wholesalers does not transform it into an unlawful agreement or scheme. (Warner Br. Part I.)

Redbox also pretends that the analysis applicable to the ever-shifting market definition it advances in this case is no different from the market definition analysis in Universal.

---

[1] While the cases are not identical, Warner agrees with Redbox that its claims for "copyright misuse" and tortious interference with contract asserted in this case are identical to those dismissed in Universal and that Redbox may no longer pursue them as a result. (Br. at 2, 31.)

(Br. at 20.) But unlike when the Universal case was filed, Redbox now has *over half* of the new release DVD supply it seeks locked up through agreements with other studios. (Warner Br. at 10.) Thus, Redbox now focuses entirely on purported markets for "single, unique copyrighted titles on DVD" and "weekly new release DVDs with relevant submarkets by genre or category". (Br. at 20.) These definitions rest on the faulty assumption that DVDs are all released in a staggered manner that completely prevents them from competing with one another. (Br. at 5-6, 21.) If that were true, Redbox's kiosks would offer only one movie per kiosk, or one movie per kiosk per week, or one movie per genre per kiosk per week. Common sense tells us that these scenarios are absurd. Indeed, Redbox's contention that studios stagger the release of their DVDs to reduce head-to-head competition with other DVDs amounts to a recognition that, indeed, DVDs are understood and expected to compete with other DVDs (and as admitted by Redbox, other forms and means of delivering home entertainment.).

Redbox's opposition also confirms that it cannot state a tortious interference claim: it has not adequately asserted any damage. Redbox confesses that it is in fact able to purchase product from retailers. (Br. at 32.) Moreover, Redbox's amended complaint is devoid of factual allegations that retailers have not sold or will not sell to Redbox—generic emails improperly attached to its brief in opposition to this motion are not enough. (Br at 33-34.)

Finally, Redbox argues that Iqbal and Fowler change nothing about the pleading standards it has to satisfy to state any of its claims. (See Br. at 12-13.) Redbox is wrong. The Fowler case itself stated that pleading standards had tightened significantly as a result of Twombly and Iqbal. Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009). Iqbal built upon and added definitional breadth to Twombly's plausibility mandate, but was not cited or applied in the Court's Universal opinion. (See Univ. Op. at 5-6, 9-10.) The day after the Court's

opinion issued, the Third Circuit made clear in <u>Fowler</u> that the complaint analyses dictated in <u>Twombly</u> <i>and</i> <u>Iqbal</u> must now be applied.    <u>Fowler</u>, 578 F.3d 203.    Against these standards, Redbox's claims clearly cannot survive.

I.    REDBOX CANNOT STATE A SECTION 1 CLAIM

Aware that its antitrust claims depend completely on the existence of an unlawful <i>agreement</i> between Warner and some other entity (<u>see</u> Warner Br. Part I.A), Redbox labors to conform the facts alleged in its amended complaint to the technical language of the governing law.    But Redbox cannot create what does not exist; inactionable conduct does not become actionable through the mere addition of verbiage without substance.    Thus, Redbox's arguments do not defeat Warner's motion to dismiss for failure to assert agreement under the Sherman Act.

A.    <u>Redbox Has Not Alleged An Agreement Between Warner and Its Wholesalers</u>

Redbox's opposition brief repeats its allegations that Warner informed Redbox of its new direct dealing and 28-day window policy and stated that Warner "would demand that VPD, Ingram and other traditional distributors stop distributing" DVDs to Redbox in a manner inconsistent with the policy.    (Br. at 13.)    Redbox alleges that Warner "did not stop there", contacting VPD and Ingram, informing them of the policy, "seeking confirmation" that they would "agree" to follow it, and telling them that "absent agreement, <i>it would eliminate all supply to them</i>".    (Compl. ¶ 31; <u>see also</u> Br. at 9.)    The insertion of the words "absent agreement" does not change the <i>substance</i> of this claim:    Warner informed its distributors of its new policy and informed them that if they failed to comply, it would not continue to deal with them.    That is <i>unilateral action</i> under <u>Colgate</u> and <u>Monsanto</u>.[2]

---

[2] As set forth in Warner's opening brief (Warner Br. Part I), in a line of cases spanning almost 100 years, the Supreme Court has emphasized the "long recognized right of trader or manufacturer . . . to exercise his own independent discretion as to parties with whom he will

Redbox's allegation that "absent assurance that all distributors would not sell to Redbox, Warner's plan would fail" provides further insight into the substance of its claim. (Compl. ¶ 4)  This allegation does not state—because it could not—that "Warner's plan" was formulated *in tandem with* its wholesalers' assurances that they would acquiesce.  (Id.)  Indeed, "Warner's plan" to deal directly with kiosks subject to a 28-day window would take effect *regardless* of whether VPD or Ingram acquiesced to its terms of dealing:  if either entity refused to acquiesce in Warner's "plan", Warner would stop selling to them.  The "plan" to deal directly with kiosks subject to a 28-day window would be entirely unaffected.  Thus, Redbox's assertions contradict one another; a common sense reading of the complaint's allegations makes obvious that the acquiescence of Warner's wholesalers was never a part of formulating or effectuating "Warner's plan".  The fact that Warner and its wholesalers communicated about the policy Warner had determined "does not change the unilateral terms into the product of a conspiracy".[3]

Aware of these factual deficiencies in its amended complaint, Redbox attempts to reinterpret Monsanto, arguing that  "an agreement exists whenever a manufacturer seeks

---

deal" and to "announce in advance the circumstances under which he will refuse to sell".  United States v. Colgate & Co., 250 U.S. 300, 307 (1919).  Thus, "a distributor is free to acquiesce in the manufacturer's demand in order to avoid termination" without creating an agreement for purposes of Section 1.  Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 761 (1984).

[3]  See Suzuki of W. Mass., Inc. v. Outdoor Sports Expo, Inc., 126 F. Supp. 2d 40, 46 n.5 (D. Mass. 2001) (where defendant unilaterally formulated policy, fact that defendant discussed terms of policy with distributors did not establish Section 1 agreement; allegations amount to "discuss[ion of] the terms unilaterally adopted by [the defendant producer]"); Gordon v. Lewistown Hosp., 423 F.3d 184, 207 (3d Cir. 2005) ("Concerted action is established where two or more distinct entities have agreed to take action against the plaintiff."); cf. Fisher v. City of Berkeley, California, 475 U.S. 260, 267 (1985) (where plaintiff claimed unlawful conspiracy due to city's enactment of ordinance and landlords' compliance with ordinance, "a restraint imposed unilaterally by the government does not become concerted action within the meaning of the statute simply because it has a coercive effect upon parties who must obey the law"; there is no "meeting of the minds") (citing Monsanto, 465 U.S. at 764); see also Intercontinental Parts, Inc. v. Caterpillar, Inc., 631 N.E.2d 1258, 1267 (Ill. App. Ct. 1994).

acquiescence or agreement to one of its policies from a distributor and the distributor then communicates its acquiescence to the manufacturer". (Br. at 15.) Monsanto never makes such a pronouncement. Monsanto's concerted action analysis arose in the context of a terminated distributor claiming that the defendant and other nonterminated distributors had conspired to fix resale prices of defendant's product. Monsanto, 465 U.S. at 763. The Court held that evidence that the nonterminated distributors complained about plaintiff's price-cutting, or that plaintiff's termination occurred after the manufacturer had received such complaints, was not sufficient to establish a price fixing agreement between the manufacturer and nonterminated distributors; rather, evidence must be "presented both that the distributor communicated its acquiescence or agreement, and that this was sought by the manufacturer". Id. at 764 n.9. Moreover, in Monsanto, the manufacturer announced a "suggested" price and sought distributors' *agreement to sell* products at that "suggested" price; in *that* context, the Court noted that a plaintiff must have proof that *agreement* to sell at the "suggested" price was sought and received. Id.

In other words, Monsanto did *not* address the unilateral announcement of a *mandatory* policy, followed by an indication that a distributor would comply to continue dealing with the manufacturer (other than to affirm that, where a distributor acquiesces with a manufacturer's announced pricing policy to avoid termination of supply, neither party has violated Section 1).[4] The other cases cited by Redbox are distinguishable for precisely the same

---

[4] Redbox argues that Monsanto and Colgate are not "motion to dismiss cases" (Br. at 17), but that is a red herring and misses the point. These cases establish the well-settled law that must be applied to the facts alleged to *determine* whether Redbox has stated a plausible claim. See Iqbal, 129 S. Ct. at 1947 (in analyzing sufficiency of complaint, Twombly court took note of "antitrust principles implicated by the complaint"). The same is true for the cases cited by Warner establishing that a manufacturer may unilaterally announce terms of dealing and a dealer may comply without creating an agreement, all of which Redbox refuses to address because they were decided at "the summary judgment or post-trial stage." (Br. at 17; Warner Br. at 17-18.)

reasons,[5] and Redbox cites no Third Circuit or Supreme Court case holding that a conspiracy existed under facts like those alleged in the amended complaint.

B.      Redbox Has Not Alleged An Agreement Between Warner and "Retailers"

Redbox argues that a number of the cases cited in Warner's opening brief were decided "in the context of an agreement based on allegations of only parallel conduct and pure legal conclusions". (Br. at 17.) Redbox fails to acknowledge that these cases were cited in response to the vague allegations added to Redbox's amended complaint that Warner sought agreement from various "retailers" to participate in its "plan". (See Warner Br. at 18-19.) With respect to these allegations, "parallel conduct and pure legal conclusions" *are* the only allegations Redbox makes. Redbox alleges that Warner "contacted numerous other distributors and retailers of DVDs" asking them to comply with Warner's policy, and then alleges parallel conduct in retailers refusing to sell in bulk to Redbox. A complaint must allege an agreement's "who", "what", "when" and "where" to defeat a motion to dismiss. (Warner Br. at 16.)

---

[5] In Isaksen v. Vermont Castings, Inc., defendant published a list of "suggested prices" with "assurances that the prices were only suggested and that the dealers could sell at any price". 825 F.2d 1158, 1162 (7th Cir. 1987). Plaintiff sold for less than the "suggested" price, defendant's other dealers complained, and defendant harassed the plaintiff to agree to raise its prices, threatening to mix up his orders if he did not; plaintiff unwillingly agreed. Id. at 1162-63. Under those circumstances—which are unlike the mandatory distribution policy alleged here— an agreement to fix the dealer's resale price was created. Id. at 1164. In Helicopter Support Sys. v. Hughes Helicopter, Inc., a distributor of the defendant's products claimed that it was terminated because it failed to adhere to an illegal resale price agreement between the defendant and its other distributors; there, like Monsanto, the existence of a conspiracy turned on whether an agreement existed between the defendant and the *nonterminated* distributors to fix prices; the court was not assessing the existence of a Section 1 agreement due to an unwilling distributor's adherence to the defendant's mandatory policy. 818 F.2d 1530 (11th Cir. 1987). Likewise, World of Sleep, Inc. v. La-Z Boy Chair Co., brought by a price-cutting dealer who was terminated by a manufacturer, turned on the existence of a conspiracy between the manufacturer and its non-terminated dealers to fix prices. 756 F.2d 1467 (10th Cir. 1985).

Instead of pointing to facts plausibly suggesting that bulk sales of DVDs by "retailers" to Redbox were limited due to illicit agreements with Warner, Redbox argues that Warner is "not entitled to dismissal" based on "unsupported speculations" about reasons why retailers may see fit to limit bulk sales to Redbox. (Br. at 16.)   Redbox has it backwards.   It is *Redbox* who is required to assert *facts*, and not speculation, sufficient to support a plausible claim. Redbox simply argues that it "defies common sense that a diverse group of entities, each with competing and conflicting economic self-interest, would all simultaneously agree to forego the economic benefit of millions of dollars of sales to Redbox". (Br. at 14.)  This plays with the actual allegations in the amended complaint, which never actually states that it is sales of *Warner* DVDs that these retailers purportedly decided to "forego".[6]  At any rate, Redbox acknowledges that many retailers *have* agreed to continue to sell DVDs to Redbox. (Br. at 25.)[7]

The only "fact" asserted by Redbox to support its claim of agreement is that, before Warner's policy was announced, "both wholesale distributors and retailers alike were selling to Redbox". (Br. at 18.)  Critically, Redbox does not allege that prior to implementation of the new policy Redbox had been buying product in *bulk* from retailers. (Id.)  Redbox's own complaint alleges that *after* it could no longer buy Warner DVDs from wholesalers, it *then* tried

---

[6] Redbox is careful in its amended complaint and brief not to specify that retailers have limited sales of *Warner* DVDs to Redbox, just "DVDs" generally.  (See, e.g., Br. at 13 (VPD and Ingram stopped selling "Warner DVDs" and retailers "restricted selling to Redbox".)  To the extent this is meant to suggest that Warner's policy caused retailers to limit bulk sales of DVDs distributed by *all* studios to Redbox, that contention defies common sense and the complaint is bereft of any factual allegation that could possibly, much less plausibly, establish that.

[7] Redbox cites Orson, Inc. v. Miramax Film Corp. for the unremarkable point that an entity acting "contrary to economic self interest" can suggest an agreement (Br. at 14)—but the cited portion of the case actually discusses the fact that a *film distributor*'s decision to license exclusively to one theater was *not* contrary to economic self interest because it was based on an array of strategic factors; "motion picture distributors have broad discretion to make licensing decisions based on their own independent judgments". 79 F.3d 1358, 1369 (3d Cir. 1996).

to buy them from retailers.[8]  No facts are alleged indicating that any retailer's purported refusal to sell in bulk to Redbox was due to Warner communications rather than preexisting limits on bulk sales, newly-established retailer policies occasioned by Redbox's efforts to "buy out the store", or even due to reticence induced by the distribution policies of *other* studios.  Indeed, the new evidence improperly cited by Redbox and attached to its opposition papers as Exhibit E only proves this point.  Although *none* of the documents attached to Redbox's brief should be considered in deciding this motion,[9] it is notable that Exhibit E, which purports to be an email from Best Buy indicating that it will not sell in bulk to Redbox, includes no reference to Warner, but does make reference to a "5 max per customer policy" and the need to "leave[] enough product for our Tuesday NR [new release] customers".

## II.    REDBOX HAS NOT ALLEGED PLAUSIBLE ANTICOMPETITIVE EFFECTS

Redbox attempts to avoid analysis of its market definition and competitive harm allegations by arguing that Warner simply "repeats arguments" that "this Court rejected in the Universal Opinion".  (Br. at 19.)  In fact, this Court's opinion did *not* analyze the multiple purported markets asserted by Redbox in this case in its <u>Universal</u> decision; not only has Redbox altered its "market" definitions every time it files a pleading, this Court did *not* consider Redbox's allegations under the circumstances of this case, where Redbox has locked up 50% of new release DVD supply by contracts and has continued to grow and compete vigorously.  Thus,

---

[8] Compl. ¶ 78 ("After implementation of the Warner boycott by VPD and Ingram, Redbox was forced to turn to other channels from which to purchase DVDs" and "commenced business relationships with other wholesalers and retailers, such as Best Buy, Target and Wal-Mart, to continue its supply of DVDs.").

[9] See <u>Commonwealth of Pa. ex rel. Zimmerman v. PepsiCo, Inc.</u>, 836 F.2d 173, 181 (3d Cir. 1988) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.") (internal citation and quotation omitted).

regardless of the <u>Universal</u> case, application of the law governing Redbox's allegations in *this* case make clear that Redbox cannot define a plausible market or anticompetitive effects.

A.   <u>Redbox's Ever-Changing Market Definition Remains Untenable.</u>

Redbox, which has the burden of defining a plausible relevant market, has asserted a variety of "market" definitions that shift with every filing it makes in this case:[10]

- Redbox's original complaint described markets for (i) "new release Warner DVDs" (<u>see</u> Original Compl. ¶¶ 48, 49), (ii) "new release Warner DVDs" by "genre" (<u>id.</u> ¶ 48), (iii) individual new-release DVD titles (<u>id.</u> ¶ 59), and (iv) new release DVD categories by "genre" (<u>id.</u> ¶¶ 58, 59).

- Redbox's amended complaint dropped the Warner-specific market definitions and asserted purported markets for (i) "new release DVDs" (Compl. ¶¶ 50, 51), (ii) individual new-release DVDs (<u>id.</u> ¶¶ 60, 61), and (iii) new release DVD categories by genre (<u>id.</u> ¶ 61).

- Redbox's opposition brief now claims that Redbox has asserted markets for (i) individual new-release DVDs, and (ii) a "*weekly* market for new release DVDs with relevant submarkets by category, and the individual new-releases by title market." (Br. at 20.)

Redbox argues that its markets are plausible because it has asserted "facts describing the commercial realities that characterize those markets (<u>e.g.</u>, peak demand for a limited period that deteriorates rapidly, releases coordinated to avoid direct competition)". (Br. at 20.)

<u>First</u>, Redbox's argument that studios coordinate staggered releases to avoid competition (which is itself an inappropriate and baseless insinuation) recognizes that DVDs, in fact, compete with one another, which nullifies its claim that individual DVDs, or DVDs within genres, are "markets unto themselves". <u>Second</u>, Redbox does itself no favors by pointing to

---

[10] The reason for this constant tailoring is obvious: Redbox needs to assert boundaries that, while inconsistent with reality, enable it to inflate Warner's market presence and influence for purposes of this litigation. The fact that Redbox's definition has repeatedly changed makes its argument that the Court already accepted its proffered market definitions when it determined that Redbox adequately pled a market for "Universal DVDs" all the more fallacious.

"commercial realities":   a test of whether these "markets" are reflected in any actual "commercial realities" makes abundantly clear that Redbox's theories are unsupportable.  For example, if, per Redbox's claims, (i) single titles constitute a market unto themselves, (ii) because they are released only at times that they face no competition from other movies, and (iii) no individual new release title could possibly substitute for another, then Redbox's kiosks would only be filled with one movie at a given point in time.   There would be no incentive to offer consumers choices between one new release and another.   That is neither a "commercial reality" nor a fact alleged.   As Redbox knows, consumers are given choices among many different movies, in Redbox's kiosks and in the myriad other channels through which movie content is offered to consumers (e.g., pay-per-view television, digital rental and purchase services, etc.) The same principle is true within genres, whether defined by "week", by title, or otherwise.

Even accepting Redbox's arguments that releases are timed to "avoid direct competition" and that "peak demand" occurs immediately after release, those facts have no bearing on "the outer boundaries of a relevant market", which are determined by "reasonable interchangeability of use" for the product.  Queen City Pizza v. Domino's Pizza, Inc., 124 F.3d 430, 437 (3d Cir. 1997).  According to the Third Circuit, "the test for a relevant market is not commodities reasonably interchangeable by a particular plaintiff, but commodities reasonably interchangeable by consumers for the same purposes," looking to "the uses to which the product is put by consumers in general".  Id. at 438.  Although Redbox acknowledges this, it argues that the purpose or use posited by Warner for DVDs (home entertainment) is "extremely general". (Br. at 20-21.)  But Redbox, who has the *burden* of pleading a plausible relevant market at this stage, offers no description of what it believes appropriate "purpose"-based distinctions should

be, much less allegations establishing why one DVD is not interchangeable with another.[11]
Redbox's brief simply argues that Warner has "misinterpreted the standard" because the question
is "whether the *consumer* considers the products interchangeable". (Br. at 21.) Again, the
missing link in this argument is that consumers must consider the products to be interchangeable
in *use*, regardless of preference for one over another. (See Br. at 24 and n.25.)[12]

The cases Redbox cites in support of its "single product market" theories only
underscore the absurdity of its position. Its keynote citation, Eastman Kodak Co. v. Image
Technical Servs., Inc., noted that "[b]ecause service and parts for Kodak equipment are not
interchangeable with other manufacturers' service and parts, the relevant market from the Kodak
equipment owner's perspective is composed of only those companies that service Kodak
machines". 504 U.S. 451, 482 (1992). Under those circumstances, a single product market
makes sense; and thus, assuming the filmed entertainment market were limited to films offered

---

[11] The only allegation remotely related to this point in Redbox's complaint is the allegation
that "consumers who want to see a movie in the Harry Potter series would not be likely to accept
'17 Again' as a substitute for that film". (Compl ¶ 25). Redbox asserts no facts in support of
this bare assertion, which consequently amounts to mere speculation and does not suffice to
defeat a motion to dismiss (and, as discussed above, runs contrary to "commercial realities" of
choices offered to consumers). IDT Corp. v. Bldg. Owners & Managers Ass'n Int'l, No. 03-
4113, 2005 WL 3447615, at *3 (D.N.J. Dec. 15, 2005) (court will not accept "bald assertions,
unsupported conclusions, unwarranted inferences") (citing Morse v. Lower Merion Sch. Dist.,
132 F.3d 902, 906 (3d Cir. 1997)); Iqbal; 129 S. Ct. at 1950 (Rule 8 "does not unlock the doors
of discovery for a plaintiff armed with nothing more than conclusions").

[12] Although Redbox argues that its complaint "explains in great factual detail why a given
week's new-release DVD can comprise its own market", it cites only to conclusory assertions
(i.e., "consumers do not consider other older or new-release DVDs from different genres to be
interchangeable for the purpose for which the consumer is seeking the current new release (Br. at
21) and never identifies the "purpose" of a new release DVD compared to the "purpose" of
another new release DVD, or a less-new DVD (id.). Redbox's opposition identifies no fact
explaining how "the use to which" one new release DVD "is put" is different from "the use to
which" another is put, regardless of consumer preference for one over another. Queen City Pizza,
124 F.3d at 437 ("[a] person needing transportation to work could . . . buy a Ford or a Chevrolet
automobile, or could elect to ride a horse or bicycle, assuming those options were feasible").

on DVDs as Redbox advocates (which it should not), if certain consumers' DVD players were only capable of playing certain new release DVDs, or certain genres of new release DVDs, then it would make sense to define the market based on those characteristics of non-interchangeability in this case. Of course, that is not reality and Redbox does not pretend that it is.[13]

Finally, Redbox argues that it has "effectively alleged a market for" DVDs as opposed to an entire home entertainment market and that Warner's cited authorities "were decided after" discovery and trial. (Br. at 22.) While Redbox does not have to "prove" its markets at this stage (as it claims Warner advocates), it *does* need to allege a relevant market that is *plausible* in order to defeat a motion to dismiss.[14] Given its undisputed public statements that Redbox believes its DVD rentals compete with multiple different forms of home entertainment, that Redbox fails to cite a single case where its proffered market definition or an analogous definition was accepted by a court, and that other courts have rejected efforts to limit

---

[13] Redbox also cites Nat'l Collegiate Athletic Ass'n v. Bd of Regents of Univ. of Oklahoma, in which a market was determined to exist for "televised college football games" because they attracted an audience "uniquely attractive to advertisers" and no substitute programming could "attract a similar audience". 468 U.S. 85, 129-32 (1984). The Court did *not* determine separate markets to exist for individual basketball games between specific teams (like Redbox's purported market for individual new release movie titles), or within certain periods of time (like Redbox's "weekly" releases), or for categories of games within conferences (like Redbox's purported "genres" of new release DVDs). Similarly, Redbox argues with citation to NCAA that it has "plausibly alleged that there are at least some unique copyrighted works on DVD (Harry Potter, Batman, Star Wars) that are so uniquely differentiated as to constitute their own market". (Br. at 23.) Redbox overstates its complaint, which does not seek to limit the purported market to three specific, identified, movies. Moreover, the NCAA case did *not* determine that separate markets existed for individual basketball games and therefore provides no support for this assertion.

[14] Redbox suggests that a motion to dismiss can never be granted for failure to plead a plausible market because "a proper market definition can only be determined after a 'factual inquiry into the commercial realities faced by consumers". (Br. at 23.) That argument has been rejected by the Third Circuit, who held years ago that a 12(b)(6) motion is properly granted against a plaintiff's failure to plead a relevant market, see Queen City, 124 F.3d at 436-37 (citing multiple cases dismissing on same basis); this standard must also now be informed by Twombly and Iqbal's requirement that plaintiff allege facts sufficient to state a claim that is plausible.

entertainment-related markets in the manner Redbox now suggests (see Warner Br. at 22 n.22), Redbox's defined market is clearly not plausible.

B.     Redbox Has Not Plausibly Alleged Competitive Harm

Redbox does not dispute that it has experienced explosive growth in what it has described as the "highly competitive home video industry" despite the separate Warner, Fox and Universal kiosk distribution policies.   Redbox's counter to this fact is that this does not *necessarily* mean that "Warner's actions have not harmed consumers and competition, as well as diminishing Redbox's growth".  (Br. at 12.)  This argument amounts to academic debate.  It is Redbox's burden to assert facts plausibly supporting a conclusion that harm to competition results from Warner's policy.  It asserts none.  Instead, Redbox argues, "it is clear that" absent Warner's policy, "more consumers would have rented" DVDs for a dollar per night.  (Br. at 12)  Even if that were true, it would not matter.  Warner is free to impose vertical restrictions on distribution without running afoul of the antitrust laws; indeed, such restrictions usually tend to *enhance* the competition that the antitrust laws seek to protect.  (See Part II.C, infra.)

Similarly, neither Redbox's amended complaint nor its opposition brief alleges facts suggesting that consumers have ever been unable to rent DVDs at any particular price point, much less Warner DVDs.  Instead, while admitting that it continues to obtain Warner DVDs despite the purported boycott, Redbox asks, "How many consumers have been forced to pay extra for a DVD that they could have rented from Redbox?"  (Br. at 26.)  Unfortunately for Redbox, facts must be alleged, not rhetorical questions raised, to force this Court and Warner to undertake the "inevitably costly and protracted discovery phase" of an antitrust lawsuit.[15]

---

[15] Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 557-58 (2007) ("something beyond the mere possibility of loss causation must be alleged, lest a plaintiff with a largely groundless claim

Similarly, to support its conclusory allegation of "raised prices", Redbox argues that as the supposed "lowest cost rental vehicle for consumers", "it is reasonable to infer that if Redbox and other low-cost kiosks are forced from the market, consumers will be forced to pay higher prices". (Br. at 25.)  Even if those inferences were "reasonable" (which they are not), Redbox fails to explain how, given its admissions that it has locked down supply of new release DVDs from multiple studios other than Warner, it could plausibly be established that Redbox is in any way being "forced from the market".  These inconsistencies demonstrate that its claims are hollow.

In response to the point that it does not assert actual reduced output or increased price in its amended complaint, Redbox scolds that there was "hardly enough time for Redbox to collect detailed data" in the month before its amended complaint was filed.  (Br. at 25.)  Even if that were true, why would Redbox not assert decreased supply of *Universal* DVDs under Universal's policy as a fact supporting its conclusory assertions, particularly given its view that the allegations in this case are "essentially the same"?   (Br. at 1.)  The answer is because, as Redbox has repeatedly admitted in public filings, it has *continued* to procure and compete with Universal DVDs despite the alleged Universal boycott.[16]  Redbox also repeats its mantra that it has generally alleged "lower output" and "higher prices".  (Br. at 24.)  The cases Redbox cites do

---

be allowed to take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value") (internal cite and quote omitted).

[16] Redbox's predictions that consumers will be harmed by Warner's purported efforts "to drive Redbox out of the DVD business" (Br. at 26 n.11) are belied by the multiple deals it has signed guaranteeing product supply from other studios (Warner Br. at 10) and are unsupported by its complaint's allegations, which reduce to assertions that Warner attempted to institute a direct-dealing sales policy with Redbox subject to a 28-day window.  Redbox is not entitled to the benefit of inferences unsupported by its allegations. Iqbal, 129 S. Ct. at 1949, 1950-51.

not support its characterizations and provide examples of courts rejecting allegations of "boycott", "reduced output" and "raised prices" as insufficient to support antitrust claims.[17]

C.     Redbox Misapplies the Law Concerning Interbrand Competition

Redbox argues that Warner "assert[s]" that courts "presume that vertical non-price restraints enhance—as opposed to harm—competition". (Br. at 26.)   Warner's brief decidedly does *not* say that; rather, it states the well-settled law that it is competition relating to *products*, and not to single *brands*, that the antitrust laws generally seek to protect.[18]   Redbox also attempts to obfuscate the concepts of "intra" and "inter" brand by arguing that "Warner is not a brand that is meaningful to consumers" because it merely "distributes titles produced by others". (Br. at 27.)   This is a red herring.   In Orson, the Third Circuit found that a movie distributor's decision not to license its movies to plaintiff enhanced interbrand competition by forcing the plaintiff to "seek out and exhibit the films of other *distributors*". 79 F.3d at 1372 (emphasis added).   Redbox identifies no facts differentiating this case from that case.

Redbox also asserts that the markets it has alleged are "largely devoid of interbrand competition". (Br. at 27 n.12; 28.)   But interbrand competition is "among the

---

[17] In Gordon v. Lewistown Hosp., the Third Circuit noted that a plaintiff bears the "initial burden" of showing that an agreement "produced an adverse, anticompetitive effect", and held that the plaintiff's allegations of purported reduced output were insufficient. 423 F.3d at 209-11. In Orson v. Miramax Film Corp., the Third Circuit rejected plaintiff's claims that defendant's "boycott" led to "decreasing output and increasing prices", because competition "thrived at both the distributor and exhibitor levels", there were "alternative sources of supply", and plaintiff's inability to procure defendant's films required it to offer *other* distributors' films, providing *greater* choice for consumers. 79 F.3d at 1367, 1372. Eastman Kodak involved efforts to actually raise prices in markets where consumers were captive to defendant's product because their cameras were not compatible with other companies' technologies; as established in Part II.A, supra, that is unlike any of the allegations asserted here. 504 U.S. 451 at 481-82.

[18] Orson, 79 F.3d at 1368; Warner Br. Part II.A.3.d. Redbox also mischaracterizes Warner's brief when it argues that Warner "assert[s] that a plaintiff must allege interbrand harm to sustain a Section 1 claim". (Br. at 28; compare Warner Br. Part II.A.3.d.)

manufacturers of the same *generic product*".[19] For example, in Continental T.V. , the Court considered the "generic product" at issue to be television sets. Continental T.V., 433 U.S. at 52 n.19. Although different consumers may prefer different types of television sets, and therefore different television manufacturers offer different brands of televisions from which consumers can choose (interbrand competition), consumers wishing to purchase a particular type and brand of television can generally choose to purchase it from various TV retailers (intrabrand competition). Likewise, in this case, interbrand competition for generic "products" is among different studio distributors of filmed home entertainment (or more narrowly, DVDs) and intrabrand competition is among distribution channels for particular distributor studios' filmed home entertainment (or more narrowly, particular studios' DVDs).[20]

## III. REDBOX CANNOT ESTABLISH STANDING

Redbox argues that it has "plainly established antitrust standing" based on Angelico v. Lehigh Valley Hosp., Inc., 184 F.3d 268 (3d Cir. 1999). Redbox is wrong. First, Redbox argues that the court held in Angelico that "when the purpose of an antitrust conspiracy is to drive the plaintiff from the relevant market, antitrust standing exists". (Br. at 30.) That is not accurate. Angelico held that being "shut out of competition for anticompetitive reasons" is

---

[19] "Interbrand competition is the competition among the manufactures of the same generic product—television sets in this case—and is the primary concern of antitrust law. The extreme example of a deficiency of interbrand competition is monopoly, where there is only one manufacturer. In contrast, intrabrand competition is the competition between the distributors—wholesale or retail—of the product of a particular manufacturer". Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 52 n.19 (1977).

[20] Contrary to Redbox's suggestion, the cases Warner cites do *not* state that a restraint's effect on competition must be resolved "at summary judgment or trial". (Br. at 27.) Orson simply arose in the context of assessing plaintiff's theory, allegations and evidence at the summary judgment stage, and determined that the plaintiff could not maintain a claim—based on many of the *same facts* asserted here. 79 F.3d at 1368. That clearly speaks to the plausibility of Redbox's complaint. Iqbal, 129 S. Ct. at 1949-52.

the type of injury that the "antitrust laws were designed to prevent", which partially satisfied *one element* in the standing test. Angelico, 184 F.3d at 274 (describing first element of antitrust standing analysis as "the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing"). Second, the Angelico court further found that, if these assumptions were taken as true, "Angelico's harm clearly resulted from the conspiracy that prevented him from competing in the market and thereby earning a living". Id. Redbox's repeated admissions that it has *continued* to compete in the very markets in which it claims to have been foreclosed from competing takes it beyond the purview of the Angelico case by rendering implausible any claim of harm to Redbox caused by Warner's purportedly unlawful actions. Id.

## IV.    REDBOX'S TORTIOUS INTERFERENCE CLAIMS FAIL

As established in Warner's opening brief, Redbox's vague allegations that various "distributors and retailers" have refused to sell or limited the number of DVDs they would sell to Redbox" suffer from a number of factual pleading deficiencies. (Warner Br. Part VI.)  Indeed, based on Redbox's allegations, every time a retailer places a limit on the number of goods or titles that a consumer can purchase (e.g., "limit five per customer"), the consumer will have a tortious interference claim. Commercial realities and common sense dictate otherwise.

Redbox recognizes that it continues to procure DVDs from retail stores; thus, even if its vague allegations of retailer interference were true, it does not allege facts supporting a plausible "inference of commercial harm". Agilent Tech., Inc. v. Kirkland, No. 3512-VCS, 2009 WL 119865, at *9 (Del. Ch. Jan. 20, 2009). Redbox still fails to identify facts supporting its allegations that it ever had a reasonable expectation of a "business opportunity" with retailers, whose sales of new releases compete with Redbox's rental business. (Br. at 33-34.)   Redbox falls back on the theory that "it would be able to buy DVDs"—in bulk—"from these retailers just

as any purchaser who walked into Best Buy". (Br. at 33.) This speculation runs contrary to the same documents that Redbox improperly attaches to its brief. (See Part II.B, infra.) The cases Redbox cites rest on factual allegations very different from the conclusory assertions made in this case and do not support its claims.[21] Finally, Redbox argues that because it was determined to have sufficiently pled an antitrust claim against *Universal*, Warner's purported actions described in this case also violate the antitrust laws, *ergo*, Warner has engaged in wrongful conduct for purposes of its tort claims. (Br. at 34.) This case is *not* the *Universal* case and Redbox has *not* asserted a plausible antitrust claim. The cases cited by Redbox—all of which were decided outside of this Circuit—also do not support Redbox's position.[22]

## CONCLUSION

For the foregoing reasons, and as stated in Warner's opening brief, Redbox's amended complaint fails to state a claim against Warner and should be dismissed with prejudice.

---

[21] For example, in Corning Inc. v. SRU Biosystems, LLC, a defendant asserted a counterclaim that the plaintiff had filed the lawsuit in bad faith to interfere with defendant's negotiations with certain parties and disrupt financing from investors. 292 F. Supp. 2d 583 (D. Del. 2003). Ethypharm S.A. France v. Abbot Labs. also involved allegations that a lawsuit was filed in bad faith to intentionally interfere with a contract (not a business opportunity). 598 F. Supp. 2d 611 (D. Del. 2009). In Accenture Global Servs. GmbH v. Guidewire Software Inc., plaintiff pled facts demonstrating interference with a specific third party, including alleging a theft of trade secrets. 631 F. Supp. 2d 504, 506 (D. Del. 2009). In Agilent, a defendant counterclaimed that the plaintiff made misrepresentations to several of defendant's prospective customers suggesting that an injunction had issued against the sale of defendant's product to deter them from buying defendant's products. 2009 WL 119865, at *6-8.

[22] Fishman v. Estate of Wirtz, 807 F.2d 520 (7th Cir. 1987), held that acts found to constitute unfair competition in that case sufficiently established the intentional interference necessary to support a tortious interference claim. Brokers' Assistant, Inc. v. Williams Real Estate Co., 646 F. Supp. 1110 (S.D.N.Y. 1986), found that the plaintiff had demonstrated facts in dispute on its antitrust claim, which assisted in supporting the elements of its tortious interference claim. Natural Design, Inc. v. Rouse Co., held that the defendant's acts, "if proven to be part of a price-fixing combination in violation of the Maryland Antitrust Act, would also constitute" malicious interference with the plaintiff's business. 485 A.2d 663, 676 (Md. 1984).

Of Counsel:

Katherine B. Forrest
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
kforrest@cravath.com


Dated: February 12, 2010

*/s/ Frederick L. Cottrell, III*
Frederick L. Cottrell, III (#2555)
Anne Shea Gaza (#4093)
Stephen M. Ferguson (#5167)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700
cottrell@rlf.com
gaza@rlf.com
ferguson@rlf.com


*Counsel for Defendant*
*Warner Home Video*

## CERTIFICATE OF SERVICE

I hereby certify that on February 12, 2010, I caused to be served by **hand delivery and e-mail** the foregoing document and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

James S. Green
Seitz, Van Ogtrop &  Green, P.A.
222 Delaware Avenue, Suite 1500
P. O. Box 68
Wilmington, DE   19899
jgreen@svglaw.com

I hereby certify that on February 12, 2010, I caused the foregoing document to be sent via **e-mail** to the following non-registered participants:

Charles S. Bergen
George R. Dougherty
Michael S. Gulland
Grippo & Elden LLC
111 South Wacker Drive
Chicago, IL   60606
cbergen@grippoelden.com
gdougherty@grippoelden.com
mgulland@grippelden.com

*/s/ Frederick L. Cottrell, III*
Frederick L. Cottrell, III (#2555)
cottrell@rlf.com